Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 1 of 106   Page ID
#:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 1 of 106   Page ID

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5    SPIGEN KOREA CO. LTD., a          )
     Republic of Korea Corporation,    )
6                                      )        <u>**CERTIFIED**</u>
              Plaintiff,               )
7                                      )
         vs.                           ) No. 8:15-CV-1050-DOC
8                                      )     Day 1
     ISPEAK CO. LTD., a Republic of    )
9    Korea Corporation; VERUS USA LLC, )
     a California Limited Liability    )
10   Company,                          )
                                       )
11            Defendant.               )
     _____)
12                                     )
     ISPEAKER CO., LTD.,               )
13                                     )
              Counter Claimant.        )
14    _____)

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  Jury Trial

18              Santa Ana, California

19           Tuesday, November 8, 2016

20

21

22   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-8141

25

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 79 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 2 of 106   Page ID
#:8080
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 2 of 106   Page ID
2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF SPIGEN KOREA CO. LTD., A REPUBLIC OF KOREA
3    CORPORATION:

4

         Michael C. Hewitt
5        LAW OFFICES OF MICHAEL C. HEWITT
         2082 Michelson Drive
6        Suite 200
         Irvine, California 92612
7        949-825-5260
         mhewitt@lawverdict.com
8
         Heedong Chae
9        EAST WEST LAW GROUP PC
         3600 Wilshire Boulevard
10       Suite 702
         Los Angeles, California 90010
11       213-387-3630
         hdchae@ewpat.com
12
         Karen Y. Kim
13       EAST WEST LAW GROUP
         3600 Wilshire Boulevard
14       Suite 702
         Los Angeles, California 90010
15       213-387-3630
         kkim@ewpat.com
16
         Richard Kim
17       EAST WEST LAW GROUP PC
         3600 Wilshire Blvd
18       Suite 702
         Los Angeles, California 90010
19       213-387-3630
         litigation@ewpat.com
20

21

22

23

24

25

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 80 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 3 of 106   Page ID
#:8097
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 3 of 106   Page ID
#:2

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR DEFENDANT ISPEAK CO. LTD, a Republic of Korea
     Corporation:

4
         David S. Poole
5        POOLE AND SHAFFERY LLP
         400 South Hope Street
6        Suite 1100
         Los Angeles, California 90071
7        213-439-5390
         dpoole@pooleshaffery.com
8

9
     FOR DEFENDANT VERUS USA LLC, A California Limited Liability
10   Company:

11       David S. Poole
         POOLE AND SHAFFERY LLP
12       400 South Hope Street
         Suite 1100
13       Los Angeles, California 90071
         213-439-5390
14       dpoole@pooleshaffery.com

15       John K. Park
         PARK LAW FIRM
16       3255 Wilshire Boulevard
         Suite 1110
17       Los Angeles, California 90010
         213-389-3777
18       park@parklaw.com

19       Mark L. Sutton
         PARK LAW FIRM
20       3255 Wilshire Blvd
         Suite 1110
21       Los Angeles, California 90010
         213-389-3777
22       mlsutton@parklaw.com

23

24

25

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 81 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 4 of 106   Page ID
#:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 4 of 106   Page ID
#:4

1                          **I N D E X**

2                      (Jury Trial - Day 1)

3    **PROCEEDINGS**                                **PAGE**

4    Appearances                                      5

5    Jury Selection (recorded with CourtSmart system)  10

6    Plaintiff's opening statement                    11

7    Defense opening statement                        39

8    Court's discussion with counsel                  93

9    Mistrial Declared                               104

10   Jury excused                                    105

11

12                          **WITNESSES**

13   **WITNESSES              DIRECT  CROSS  REDIRECT  RECROSS**

14   KIM, Dae Young

15   By Mr. Hewitt              58              91

16   By Mr. Poole                      74

17

18                          **EXHIBITS**

19                          (None)

20

21

22

23

24

25

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 82 -

|      |    |                                                                      |
|------|----|----------------------------------------------------------------------|
|      | 1  | SANTA ANA, CALIFORNIA, TUESDAY, NOVEMBER 8, 2016                      |
|      | 2  | Day 1                                                                 |
|      | 3  | (8:57 a.m.)                                                           |
| 08:57| 4  | THE COURT:  Counsel on Spigen, why don't you make                    |
|      | 5  | your appearances.                                                     |
| 08:57| 6  | APPEARANCES                                                           |
| 08:57| 7  | MR. POOLE:  Good morning, Your Honor.  David                          |
|      | 8  | Poole, Mark Sutton and John Park for Defendant ISpeaker and          |
|      | 9  | Verus.                                                                |
| 08:57| 10 | THE COURT:  All right.  Thank you very much.  Why                     |
|      | 11 | don't you have a seat.  Welcome, gentlemen.                           |
| 08:57| 12 | MR. HEWITT:  Good morning, Your Honor.  Mike                          |
|      | 13 | Hewitt, Heedong Chae, Karen Kim and Richard Kim, appearing           |
|      | 14 | on behalf of Spigen Korea Company Limited.                            |
| 08:57| 15 | THE COURT:  Why don't you have a seat.  And we'll                     |
|      | 16 | get the jury up here in just a moment.                                |
| 08:57| 17 | Now, listen, I've been wrestling with this time                      |
|      | 18 | limit.  You wanted 14 hours -- or both of you did, which is           |
|      | 19 | ludicrous.  I'm not going to do that.  And then I reduced it          |
|      | 20 | to 10, which is my standard because I can't get a jury past           |
|      | 21 | that period of time usually because it's past five days, and         |
|      | 22 | folks just don't get paid by their employers and they can't          |
|      | 23 | sit, so it reduces my jury pool.  In other words, it becomes          |
|      | 24 | non-democratic.  It's those people who can serve.  And                |
|      | 25 | everybody should serve.                                               |

DEBBIE GALE, U.S. COURT REPORTER

EXHIBIT C
- 83 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 6 of 106   Page ID
#:8080
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 6 of 106   Page ID
6

08:58    1                But you've come back, then, with a suggestion of

         2    12 hours.  Chafing at 12 hours.  Can you really put on this

         3    case in 12 hours?

08:58    4                MR. HEWITT:  I'm going to do everything within --

08:58    5                THE COURT:  Oh, nonsense.

08:58    6                Now, can you put on this case in 12 hours?  And

         7    are you calling a bunch of adverse witnesses?  And here's

         8    why:  If you're calling a bunch of adverse witnesses, I'm

         9    not inclined to give you any additional time.  In other

        10    words, you can shape your case.  But adverse witnesses from

        11    the other side and, uh -- they're gonna have to call the

        12    same people, so...

08:58   13                MR. HEWITT:  I will not call -- I will not be

        14    calling any adverse witnesses, Your Honor.

08:58   15                THE COURT:  Okay.  These are all people in your

        16    case in chief?

08:58   17                MR. HEWITT:  You're correct, Your Honor.

08:58   18                THE COURT:  You know, I'm gonna accept your

        19    representation.  I'm gonna give you 12 hours per side, which

        20    is extraordinary -- yeah, normally 10 -- but on the

        21    condition you don't tell any other counsel I've done this.

        22    Okay?  It'll destroy my reputation.

08:59   23                So 12 hours per side.  There'll be a running

        24    clock.  That includes direct, cross-examination.  But I

        25    don't count your opening statements nor your closing

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 84 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 7 of 106   Page ID
#:9085
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 7 of 106   Page ID
#:7

           1    arguments.  It's gonna be plenty of time for the back of an

           2    iPhone device.

08:59      3            MR. HEWITT:  I apologize, Your Honor.  I thought

           4    that it was initially 10 hours for opening and closing.  We

           5    can finish this case in 10 hours on -- excluding opening and

           6    closing.

08:59      7            THE COURT:  Oh, no, no.  I never use the opening

           8    and closing, nor the jury selection.  So's 10 and 10.  Okay.

           9    That helps with the jury 'cause then we can get a jury.

          10    Okay?  So here's what's gonna happen:

08:59     11            You'll be in session today.  We're gonna get the

          12    jury today, make your opening statements today, start

          13    presenting witnesses today.  And you should have a pretty

          14    good and full complete day.  At the end of the day, I want

          15    to let the jury go so that they can vote.  Okay?  And get

          16    'em out of here about 4:00, 4:30 so that they can beat the

          17    traffic.  It's a great day in America.  We get to vote.

09:00     18            Tomorrow, if I can con the jury into starting at

          19    7:30, I'll do that.  Most of the time I can't.  They've got

          20    child problems, transportation problems, so it'll probably

          21    be 8:00 o'clock.

09:00     22            Tomorrow, though, I have a huge party going on out

          23    in the hallway.  It's the Marine Corps birthday, or one day

          24    before, and there's about a couple hundred folks coming up

          25    there.  We do that every year.  You're invited to have cake,

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 8 of 106  Page ID #:8088
8:15-CV-1050-DOC — 11/8/2016 — Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 8 of 106  Page ID #8

| | |
|---|---|
| 1 | et cetera, as long as both sides have the cake; otherwise, |
| 2 | disappear for about an hour and a half 'cause I'm fitting |
| 3 | you in.  This is something that we do every year.  But |
| 4 | you'll have a full day.  You'll get in another six hours |
| 5 | minimally tomorrow. |
| 09:00  6 | You'll get in a full day Thursday.  I've got a |
| 7 | speech in Superior Court that I've gotta run across the |
| 8 | street and give, but it's probably an hour and a half, so |
| 9 | you'll get in a full day.  Then we'll take a recess for |
| 10 | Friday 'cause we're -- national holiday.  Saturday, Sunday, |
| 11 | and then you're back Monday.  Because we cleared our |
| 12 | calendar for most of the day.  And Debbie and I will |
| 13 | continue to work.  We're shifting cases, so we can try to |
| 14 | give you a continuous trial.  I'm a little worried about any |
| 15 | split on the plaintiff's side because your case gets old. |
| 09:01  16 | I don't want your case being old, so that |
| 17 | three-day holiday in there kind of set you back a day, so |
| 18 | I'd like to get a continuous day, instead of resuming on |
| 19 | Monday -- or Tuesday, we'll resume on Monday, and get some |
| 20 | amount of work done.  And the case'll probably go to the |
| 21 | jury sometime on Thursday.  Now, couple things -- I'm sorry. |
| 22 | Tuesday. |
| 09:01  23 | Now, this videotape.  Who's objecting to the |
| 24 | video? |
| 09:01  25 | MR. HEWITT:  That would be plaintiff, Your Honor. |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 86 -

09:01    1              THE COURT:  You know, I sat on the Federal

         2     Judicial Board.  Did you know that?  Barbara Rothstein was

         3     the Director, and we thought that that was just an excellent

         4     videotape, nonprejudicial.  And we're gonna show it.  Simple

         5     as that.  It's not prejudicial.  I'm absolutely convinced of

         6     that.  And it helps explain the process.  So that's one

         7     issue resolved.

09:01    8              The second issue involved is an issue concerning

         9     the efforts by the Korean court to determine the validity of

        10     this device.  Tentatively there's not to be any mention of

        11     that during your opening statement.  We'll take that up at a

        12     later time.  I want to have a more full and complete

        13     argument.  I want to hear more about the standards.  And I'm

        14     not inclined to let that in at the present time.  But I'm

        15     gonna give you another opportunity to talk to me about that.

09:02   16              The third issue we had on the table, the prior

        17     art.  I'm inclined to allow that in; although I'm a little

        18     concerned that this was discovered at the last moment by the

        19     defense, and the efforts to do so.  But I also indicated to

        20     you to get that over to the plaintiff's expert immediately.

09:02   21              Has that been done?

09:02   22              MR. HEWITT:  Yes, Your Honor.

09:02   23              THE COURT:  Have plaintiff's experts looked at it?

09:02   24              MR. HEWITT:  Yes.  It was the limited amount of

        25     evidence or -- or prior art.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 87 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 10 of 106   Page ID #:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 10 of 106   Page ID #:10

| | | |
|---|---|---|
| 09:02 | 1 | THE COURT:  Okay.  Then that's gonna be allowed, |
| | 2 | Counsel. |
| 09:02 | 3 | Now, that should resolve the three remaining |
| | 4 | issues. |
| 09:03 | 5 | *(To the clerk:)* Debbie, bring up the jury in just |
| | 6 | a moment. |
| 09:03 | 7 | *(To counsel:)* Do I have something I'm gonna read |
| | 8 | the jury, or am I gonna tell them this is an antitrust case? |
| 09:03 | 9 | MR. HEWITT:  Your Honor, we submitted a |
| | 10 | preliminary jury instruction, a joint, I believe.  And |
| | 11 | Mr. Sutton can -- |
| 09:03 | 12 | THE COURT:  Okay.  Thanks.  I'll be right with |
| | 13 | you. |
| 09:03 | 14 | *(Pause in the proceedings.)* |
| 09:03 | 15 | *(Jury selection proceedings recorded using* |
| | 16 | *CourtSmart system; not transcribed herein.)* |
| 10:59 | 17 | *(In the presence of the jury.)* |
| 10:59 | 18 | THE COURT:  All right.  Thank you, Counsel.  Now, |
| | 19 | this will be the -- or these will be the opening statements |
| | 20 | by counsel.  They're about to give you a summary of what |
| | 21 | they believe the evidence will be in their respective cases. |
| 10:59 | 22 | But this is not evidence.  It's a summary of what |
| | 23 | they believe the evidence we'll hear -- the evidence we will |
| | 24 | hear will come from the witness stand, from people under |
| | 25 | oath.  So the opening statement's simply an overview. |

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 11 of 106  Page ID
#:8089
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 11 of 106  Page ID
#:11

| | | |
|---|---|---|
| 10:59 | 1 | Counsel on behalf of the plaintiff. |
| 10:59 | 2 | MR. HEWITT:  Thank you, Your Honor. |
| 10:59 | 3 | **PLAINTIFF'S OPENING STATEMENT** |
| 10:59 | 4 | MR. HEWITT:  Good morning again, ladies and |
| | 5 | gentlemen.  My name is Mike Hewitt, and as I told -- and |
| | 6 | this is my co-counsel, Karen Kim, Heedong Chae, Richard Kim, |
| | 7 | and the CEO and founder of Spigen Korea Company, Limited, |
| | 8 | Mr. Dae Young Kim. |
| 11:00 | 9 | And, by the way, there's -- Kim is a very common |
| | 10 | last name, Korean last name, so there's no relationship |
| | 11 | between any of them. |
| 11:00 | 12 | This case that you're about to hear is about cell |
| | 13 | phone cases.  Cell phone cases that have a compartment -- |
| | 14 | and I set mine down over here. |
| 11:00 | 15 | *(Item displayed.)* |
| 11:00 | 16 | MR. HEWITT:  Give me one moment, please. |
| 11:01 | 17 | Cell phone cases that have a place to put the cell |
| | 18 | phone and a credit card compartment in which to store credit |
| | 19 | cards in the back. |
| 11:01 | 20 | If for any reason you can't hear me, raise your |
| | 21 | hand and I'll try and speak louder. |
| 11:01 | 22 | THE COURT:  It's Debbie who also needs to record |
| | 23 | what you're saying, so you'll need to keep that microphone |
| | 24 | pretty close. |
| 11:01 | 25 | MR. HEWITT:  I will do so, Your Honor. |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 89 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 12 of 106   Page ID
#:8070
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 12 of 106   Page ID
#:1272

11:01    1              THE COURT:  Okay.  Thank you.

11:01    2              MR. HEWITT:  These -- this that I'm holding in my

3     hand -- and you will have an opportunity to do so at the

4     close of the case -- is called the Slim Armor CS.  The Slim

5     Armor CS was designed by Mr. Kim and is manufactured and

6     sold by Spigen Korea Company, Limited.

11:02    7              The CS Slim Armor is what we call a "practicing"

8     product.  It's manufactured pursuant to specifications in

9     the United States patent issued to Mr. Kim and then assigned

10    to Spigen.  That patent number is 9049283.

11:02   11              And I'm going to show you some of the major

12    components of the '283 patent.

11:02   13              One major component is the soft protective case

14    made out of thermal plastic polyurethane.  We're going to

15    use a lot of acronyms in this trial.  We call it TPU.  On

16    the back of the TPU is a raised wall to form the credit card

17    storage compartment.  That is one of the claims that the

18    '283 patent spells out.

11:03   19              The '283 patent also claims a sliding cover to

20    slide forward and backward on a hard protective frame.  Both

21    the sliding cover and the hard protective frame are made of

22    polycarbonate.

11:03   23              The '283 patent further calls out an aperture to

24    form the credit card storage compartment, surround the

25    soft-raised wall.  The '283 patent importantly also calls

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 90 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 13 of 106   Page ID
#:8077
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 13 of 106   Page ID
13

| | | |
|---|---|---|
| | 1 | out that the hard protective frame is removable from the |
| | 2 | TPU.  The '283 patent last spells out that there are grooves |
| | 3 | that mate with rails in the cover so that the cover may be |
| | 4 | slide-ably mounted on to the hard protective frame. |
| 11:04 | 5 | Now, Spigen alleges that the defendants, Verus and |
| | 6 | ISpeaker, produced, sold in the -- produced and sold, |
| | 7 | eventually sold in the United States products that infringe |
| | 8 | on the '283 patent.  And there are seven Verus Damda Slide |
| | 9 | products, each one for a different phone. |
| 11:05 | 10 | For instance, iPhone 6, an iPhone 6 Plus. |
| 11:05 | 11 | But you'll find that each of the defendants' |
| | 12 | products that are alleged -- they would call them "accused |
| | 13 | products" that infringe on the '283 patent -- are -- all |
| | 14 | operate in pretty much the same manner, the same function. |
| 11:05 | 15 | And what the evidence is going to show is that |
| | 16 | each of the accused products -- now, before I go on -- to |
| | 17 | infringe on the patent -- I'm going to go through Claim 1 |
| | 18 | with you, one of the 18 claims that are being asserted a |
| | 19 | little bit later.  It doesn't have to be an exact copy or be |
| | 20 | the same color or anything else.  It just has to meet the |
| | 21 | claims of the patent.  And I'm going to go in through detail |
| | 22 | one of the claims with you.  Our technical expert, |
| | 23 | Mr. Stein, will go through 18 claims with you that we assert |
| | 24 | infringe. |
| 11:06 | 25 | The accused products only have to infringe on any |

EXHIBIT C
- 91 -

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | one of the claims to infringe on the '283 patent.            |
| 11:06 | 2  | And what I'd like to do, if I could, is give some            |
|       | 3  | cell phone cases to the clerk to give to the jurors.         |
| 11:06 | 4  | THE COURT:  That will be fine.                               |
| 11:06 | 5  | Deb, would you be kind enough to distribute these.           |
| 11:06 | 6  | Well, Counsel, is there any objection?  I want to            |
|       | 7  | make sure.                                                   |
| 11:06 | 8  | MR. POOLE:  No objection, Your Honor.                        |
| 11:07 | 9  | *(Cell phone cases provided to the jury.)*                   |
| 11:07 | 10 | MR. HEWITT:  Your Honor, I also brought one for              |
|       | 11 | the Court.                                                   |
| 11:07 | 12 | THE COURT:  All right.  Thank you.                           |
| 11:07 | 13 | *(Cell phone case provided to the Court.)*                   |
| 11:07 | 14 | MR. HEWITT:  Now, I hope that we've opened those             |
|       | 15 | cases; otherwise, they're real hard to open, and so I think  |
|       | 16 | we did.  And I'm going to ask you not to disassemble the     |
|       | 17 | case at this time.  I'll show you how to reassemble 'em.     |
| 11:07 | 18 | But if you slide open -- well, first off, you'll             |
|       | 19 | look and you'll see that the cell phone case, the cell phone |
|       | 20 | fits right in the front there.  There's not much to that.    |
|       | 21 | If you turn it over, you'll note that the compartment can be |
|       | 22 | opened and closed with a sliding cover.  You'll also note -- |
|       | 23 | and when you take it apart, it will be much more clear, but  |
|       | 24 | there is a raised -- soft-raised wall forming the credit     |
|       | 25 | card compartment on the backside.  And you can't see it, but |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 92 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 15 of 106  Page ID
#:8079
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 15 of 106  Page ID
#:15

|       | 1  | there is also an aperture that is another major component of |
|       | 2  | the '283 claim that the evidence will show was infringed |
|       | 3  | upon. |
| 11:08 | 4  | Now, on reassembling these, when you do get down |
|       | 5  | to -- oh, also, I should note, and I'm going to try and put |
|       | 6  | it underneath the ELMO here. |
| 11:09 | 7  | I'm going to ask for assistance from Ms. Kim so I |
|       | 8  | can stand in front of the microphone.  On the sliding cover, |
|       | 9  | you can see that the Damda slide products have rails and |
|       | 10 | those rails fit into grooves on the hard protective frame |
|       | 11 | and allows the cover to slide backward and forward.  That is |
|       | 12 | another major claim that we will be discussing on the |
|       | 13 | '283 patent. |
| 11:09 | 14 | So I'll go over reassembly several times on these |
|       | 15 | cell phone covers because it took me awhile to learn how to |
|       | 16 | do it.  And one of the methods by which I do it, I take the |
|       | 17 | rail on the sliding cover, insert it into the groove -- oh, |
|       | 18 | that -- I should show you this.  The hard protective frame |
|       | 19 | has protrusions which mate into the soft protective case. |
|       | 20 | So the cover, the hard protective frame goes first on the |
|       | 21 | soft protective case. |
| 11:10 | 22 | Take the sliding cover with the slope to the |
|       | 23 | outside, insert the rail in the groove, bend the cover, and |
|       | 24 | it goes back.  Otherwise, you might be struggling with that |
|       | 25 | for awhile.  It's almost like one of those puzzles when you |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 93 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 16 of 106   Page ID
#:8070
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 16 of 106   Page ID
#:16

| | | |
|---|---|---|
| | 1 | were a kid that didn't quite work together. |
| 11:11 | 2 | So Mr. Kim, the designer of the '283, the |
| | 3 | practicing product, which I -- you'll get to see -- this is |
| | 4 | Spigen's product.  It's made pursuant to the '283 patent. |
| | 5 | Mr. Kim is going to testify that what his design objectives |
| | 6 | were a slim, elegant, compact design that held two credit |
| | 7 | cards and held the credit cards so that they were private. |
| 11:12 | 8 | Now, what I would like to do is take you and walk |
| | 9 | you through the '283 patent similar to what they did on the |
| | 10 | video.  And the first page of the '283 patent, you can see |
| | 11 | it has a United States patent number on the top right, the |
| | 12 | date of issuance.  The patent was -- Mr. Kim from Spigen is |
| | 13 | the inventor.  And I apologize for the quality of the |
| | 14 | monitor.  It -- again, couldn't seem to get it to come |
| | 15 | through too well, but that -- you'll have the actual |
| | 16 | '283 patent with you at the end of the case to review. |
| 11:12 | 17 | On the right-hand side of the front page of the |
| | 18 | '283 patent are cited references.  That's prior art that the |
| | 19 | patent examiner looked at when deciding whether to issue the |
| | 20 | '283 patent to Mr. Kim.  And another part of the patent is |
| | 21 | composed of the illustrations.  And these are compressed. |
| | 22 | They're multiple pages of illustrations in the '283 patent |
| | 23 | and shows what the claims mean in the patent to work |
| | 24 | together. |
| 11:13 | 25 | And you'll note I told you that it doesn't have |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 94 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 17 of 106  Page ID
#:8075
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 17 of 106  Page ID
#:1717

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | the -- the infringing product doesn't have to be an exact          |
|       | 2  | copy.  And you'll note on the bottom right corner that the          |
|       | 3  | sliding cover operates in this orientation (indicating).            |
|       | 4  | And the patent, the '283 patent, says it can move forward or        |
|       | 5  | backward, and the drawing shows it moving in both this              |
|       | 6  | orientation.  And in the practicing product made by Spigen,         |
|       | 7  | you'll see illustrations in this orientation.                       |
| 11:14 | 8  | So the door -- the evidence is gonna show the                       |
|       | 9  | orientation of the door does not play into whether or not           |
|       | 10 | the Verus Damda Slide products infringe on the '283 patent.         |
| 11:14 | 11 | The next part of the patent is an abstract which                    |
|       | 12 | describes what the patent is about, and the body of the             |
|       | 13 | patent, which details why the invention is new and useful.          |
| 11:14 | 14 | And I see you're having some difficulty                             |
|       | 15 | reassembling, so I'm gonna walk through that again.                 |
| 11:14 | 16 | THE COURT:  Well, we can do that later, Counsel.                    |
| 11:14 | 17 | MR. HEWITT:  Very good, Your Honor.                                 |
| 11:14 | 18 | THE COURT:  All right.                                              |
| 11:15 | 19 | MR. HEWITT:  So we have the body of the                            |
|       | 20 | '283 patent.  And the body of the '283 patent explains why         |
|       | 21 | the invention, the practicing product is new and useful.           |
|       | 22 | Then we go to the heart of the patent.  And to show               |
|       | 23 | infringement, we compare the accused products, the Verus            |
|       | 24 | Damda Slide against the claims of the patents.  We make a          |
|       | 25 | literal comparison.  We literally compared the language of          |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 95 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 18 of 106   Page ID
#:8078
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 18 of 106   Page ID
#:18

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | the claims, and the claims only, against the accused            |
|       | 2  | products.                                                       |
| 11:15 | 3  | And what I'd like to do is go -- we're going to                 |
|       | 4  | take Claim 1, and take a look at that, and I'd like to walk     |
|       | 5  | you through how the Verus Damda slide infringes on Claim 1      |
|       | 6  | of the patent.  And the patent begins "what is claimed."        |
|       | 7  | And the preamble states, "a case having a storage               |
|       | 8  | compartment for an electronic device."                          |
| 11:16 | 9  | So I have a case for an electronic device.                      |
|       | 10 | Electronic device fits here, and we have a picture up there     |
|       | 11 | from one of Verus -- I believe it's one of Verus'               |
|       | 12 | advertisements.  Fits a cell phone in there.  And the second    |
|       | 13 | part of the preamble is having a storage compartment.  And      |
|       | 14 | there is the storage compartment.                               |
| 11:16 | 15 | So the Verus Damda slide products have satisfied                |
|       | 16 | all the elements of that preamble.                              |
| 11:16 | 17 | The next step is the first clause of Claim 1.  "A               |
|       | 18 | soft protective case which comprises a back panel to cover a    |
|       | 19 | back portion of the electronic device."  Okay.  So I've got     |
|       | 20 | a back panel to cover the back portion.  When I put my          |
|       | 21 | electronic device in here, it covers a back portion of the      |
|       | 22 | electronic device.                                              |
| 11:17 | 23 | The next part is "a raised wall formed on a bottom              |
|       | 24 | surface of a back panel to form the storage compartment."       |
|       | 25 | So I go to the back panel of the accused products.              |

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 19 of 106   Page ID
#:8077
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 19 of 106   Page ID
#:19

11:17    1         And could we view a photograph of a raised wall,

2  Mr. Chae.

11:17    3      *(Document displayed.)*

11:17    4      MR. HEWITT:  So probably have difficulty seeing

5  this, but there's a raised wall that you'll see forming the

6  storage compartment on the back panel.

11:17    7      And then the next part of Clause 1 is "a side wall

8  extending from a top surface of the back panel."

11:17    9      So again, here's my top surface of the back page.

10  Here is a side wall.  And that side wall extends along the

11  edges of the back panel for significantly covering a side

12  portion of the electronic device.

11:18   13      I don't have an electronic device here, but you

14  can imagine that when you insert a cell phone in there, the

15  side wall significantly covers the side wall.  And, in fact,

16  Mr. Stein will show you later that it more than -- on the

17  Verus Damda products, it's designed so that you can set it

18  down so the entire side wall is covered on the -- on these.

11:18   19      So that's -- the evidence is going to show that

20  the accused products, all seven Verus Damda slide models

21  infringe on the -- or meet all the elements of the first

22  clause of Claim 1.

11:18   23      This is very tedious.  Now we have to go to the

24  next step.  We have to look at the second and the third

25  clauses of Claim 1.  And I'm gonna handle them together.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 97 -

8:15-CV-1050-DOC - 11/8/2016 - Day 1

11:19   1          The second clause of Claim 1 reads, "a hard

2    protective frame, configured to removably mount over the

3    soft protective case wherein the hard protective frame

4    comprises grooves.  Well, we can certainly know that we have

5    the hard protective frame and the soft protective case.

6    Mounts over the soft protective case.

11:19   7          And now we have to integrate the second -- the

8    third clause.  And I'll get to grooves in a moment.

11:19   9          (As read:) "A cover which includes rails adapted

10   to mate with and to be slide-ably mounted on the grooves to

11   open and close the storage compartment."

11:19   12         So Ms. Kim's going to put up a cover, which

13   includes rails, adapted to mate with and to be slide-ably

14   mounted on the grooves to open and close the storage

15   compartment.

11:20   16         *(Document displayed.)*

11:20   17         MR. HEWITT:  Thank you.

11:20   18         So the rails fit into the grooves.  Make sure I

19   have this correctly *(indicating)*.  I need my glasses on.  I

20   apologize here.  I have it backward.

11:20   21         So the rails on the cover mate with the grooves

22   and slide-ably mount it *(indicating)*.

11:20   23         Now, the Court has construed the term "grooves."

24   And that is going to be your definition for grooves.  It's a

25   very broad definition.  States, "any long and narrow

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 98 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 21 of 106   Page ID
#:8079
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 21 of 106   Page ID
21

```
 1    channel, hollow, cut, or indentation in a surface."  And

 2    Mr. Stein, our technical expert, is going to testify that on

 3    the Damda slide hard protective frames, there are grooves

 4    that meet the Court's definition.

 5         Now, the Court also construed another term that

 6    we'll see later in the claims:  "Sliding means."  And

 7    "sliding means" the Court defined as rails in a cover --

 8    rails in a cover we talked about -- that slide along grooves

 9    formed in the hard protective frame of a case.  And when we

10    reassemble, we see that we have (indicating) -- we have

11    rails in a cover that slide along grooves formed in the hard

12    protective frame of the case.

13         The defendants are going to present evidence

14    through their technical expert, Mr. Seil, that those are not

15    grooves.  That will ultimately be for you to decide.

16         So by going through their 22 claims in the

17    '283 patent, Spigen is asserting that 18 of them are

18    infringed, and the evidence will show that 18 of them are

19    infringed.  Again, not all of the claims have to be

20    infringed; only one.

21         Now, the evidence is also going to show that if

22    you take out either component, take the rails off the cover,

23    the cover won't mount, won't stay.  Take the grooves out of

24    the frame and leave the rails on, cover will not stay.

25    It'll simply fall out.
```

11:21  (line 5)
11:22  (line 13)
11:23  (line 16)
11:23  (line 21)

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 99 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 22 of 106   Page ID
#:8080
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 22 of 106   Page ID
22

11:24     1            Now, the next clauses -- two clauses of Claim 1 --

      2    and I'll go through these rather briefly, because they're

      3    fairly straightforward.  *(As read:)*

11:24     4            "Wherein the soft protective case

      5            significantly covers a back portion of

      6            the electronic device with the top

      7            surface of the back panel and a side

      8            portion of the electronic device with a

      9            side wall of the soft protective case."

11:24    10            So you can imagine -- and we have some photographs

     11    up there of, uh -- the soft protective case significantly

     12    covers the back.  You know, there's a camera opening, so

     13    it's not going to cover that portion -- significantly covers

     14    the back of the case -- of the electronic device and the

     15    side portion.  So there -- there's not going to be much

     16    issue there.

11:24    17            The next is the fifth clause of Claim 1.

11:24    18            And, by the way, I should mention that we're going

     19    to prove that the Damda Slide products satisfy all the

     20    elements of every single clause in here.  So I'll go to

     21    five.

11:25    22            (As read:) "Wherein the soft protective case is

     23    sufficiently flexible to accept insertion of the electronic

     24    device and sufficiently rigid to securely retain the

     25    inserted device."

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 100 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 23 of 106   Page ID
#:8087
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 23 of 106   Page ID
#:23

11:25    1              Again, I don't have an iPhone, but I don't think

2        there's any dispute -- or whatever phone this might be

3        for -- you insert the phone in here, and it is sufficiently

4        flexible to accept the phone and sufficiently rigid to

5        retain the phone.  So that's Clause 5 of Claim 1.

11:25    6              So the evidence is going to show that the Damda

7        Slide products infringe on each -- on Claim 1.  It's going

8        to be tedious.  That's how the analysis goes through all 18

9        claims.

11:26   10              Some of the claims are much shorter -- many of

11       them, actually, and so we hope to move through those as

12       quickly as we can.

11:26   13              Now, the defendants have alleged that Mr. Kim and

14       Spigen engaged in inequitable conduct in obtaining the

15       '283 patent.  And they're going -- we're going -- the

16       inequitable conduct, they're going to try and show that

17       Mr. Kim intentionally withheld prior art to deceive the PTO

18       and obtain the '283 patent.  So I'm going to go through that

19       now.

11:27   20              There is a -- Mr. Kim received the

21       '435 patent -- well, there's a Korean utility model.  It's

22       called -- we call it KUM 435 or '435, and it's a Korean

23       patent.  And the Korean patent has a practicing product --

24       that is this.  This is the Korean -- Mr. Kim did not have

25       this.  He had the patent.  And the Korean utility model, the

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 101 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 24 of 106  Page ID #:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 24 of 106  Page ID 24

           1    '435, this is a design skin slider, which you'll also have.

           2    Accepts a credit card from the bottom and closes as such.

           3    But the differences between the design skin slider and the

           4    '283 patent -- I'd like to show you some of 'em.

11:28      5             One, on the design skin slider, it has a hard

           6    plate.  It's an entirely different manufacturing process.

           7    The plate is not removable from the TPU.  The '435 patent

           8    doesn't call this a soft compartment.  It calls it a

           9    recessed groove, and you'll see that in the patent itself in

          10    the claim.  And additionally, the '435 product only allows

          11    for one credit card.  One of Mr. Kim's design objectives was

          12    for two credit cards.

11:29     13             So Mr. Kim had the '435 patent during the pendency

          14    of the '283 patent.  And in the '435 patent, Mr. Kim

          15    reviewed the claims and the -- one of which we just went

          16    through, which would describe the limitations and

          17    boundaries -- and, additionally, reviewed the illustrations.

11:29     18             Mr. Kim came to an immediate conclusion that the

          19    '435 patent was nothing like the '283 patent at all.

          20    Mr. Kim thought nothing of it.

11:29     21             Second, Mr. Kim wasn't aware of -- he had -- at

          22    that time, Mr. Kim had approximately ten U.S. patents that

          23    had been issued to him.  And he wasn't aware of any

          24    obligation to send the PTO any prior art.

11:30     25             Additionally, when we look -- if we could go to

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 102 -

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | the face page of the '283 patent, please.                     |
| 11:30 | 2  | *(Document displayed.)*                                        |
| 11:30 | 3  | MR. HEWITT:  On the face page -- yes, right there.             |
|       | 4  | I can't see it from here, but on that face page, under Cited   |
|       | 5  | Reference, you're going to receive a reference to a Hall       |
|       | 6  | patent application.  And if we go to Hall and we take a        |
|       | 7  | diagram from Hall, you'll see that Hall has a sliding cover    |
|       | 8  | that moves up and down and a credit card that slides up from   |
|       | 9  | the bottom, and it closes.  That's a -- that's an              |
|       | 10 | illustration directly from Hall, what Hall was trying to do.   |
|       | 11 | The evidence is going to show that the patent examiner         |
|       | 12 | already had something so similar to the '435 patent that it    |
|       | 13 | wouldn't have made any difference in the patent examiner's     |
|       | 14 | decision whether or not to issue the '283 patent.             |
| 11:31 | 15 | And the real -- on Hall you'll also note that                 |
|       | 16 | there is a -- they put on a mirror either on the outside of    |
|       | 17 | the cover or the inside of the cover.  I don't know which      |
|       | 18 | one it is.  A minor difference, but functioning in the same    |
|       | 19 | manner.                                                        |
| 11:31 | 20 | Now, the '435 patent, in the body, and just one               |
|       | 21 | word states that the recessed groove on the '435 may be       |
|       | 22 | pierced.  Mr. Kim never even looked at the body of the         |
|       | 23 | '435 patent.  He was only interested in the claims to         |
|       | 24 | determine whether there was any crossover between the '283     |
|       | 25 | and the '435.  It's one vague, ambiguous reference.  And in    |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 103 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 26 of 106   Page ID
#:8080
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 26 of 106   Page ID
26

1    the '435 patent, what you are going to see is there's not a

2    single illustration showing a piercing.  It simply could be,

3    one, a embodiment of the '435 patent.

11:32  4         So the evidence is going to show that, one,

5    Mr. Kim had no intent to deceive the PTO, and, two, that the

6    PTO had a patent application very similar to the '435 patent

7    right in front of 'em to examine and look at.  And what

8    you're going to find and the evidence'll show is that the

9    '435 patent is cumulative of the Hall patent application

10   that we looked at.

11:33  11        The defendants also contend that Mr. Kim failed to

12   provide the patent trade -- uh, trademark office with

13   Mr. Kim's own prior invention.  And the prior invention the

14   defendants are alleging Mr. Kim failed to give the

15   United States PTO is what's called the Spigen-1.  And the

16   evidence is going to show that the Spigen-1 has a hard clam

17   shell, no grooves, no sliding cover, no storage compartment

18   formed by a raised wall.

11:34  19        The evidence is gonna show that Mr. Kim saw --

20   that Mr. Kim -- this was a clean slate pioneering design.

21   The evidence'll show there's nothing else like it on the

22   market.  Mr. Kim's going to testify that it took him two

23   months to design a Slim Armor CS.  This takes approximately

24   a month.

11:34  25        And Mr. Kim had -- of course, Mr. Kim had the

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 104 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 27 of 106   Page ID
#:8085
8:15-CV-1050-DOC - 11/8/2016 - Day 1

Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 27 of 106   Page ID
27

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | Spigen-1 because he designed it.  Spigen manufactured and          |
|        | 2  | sold it.                                                           |
| 11:34  | 3  | But there's more.  The Spigen-1, the evidence is                   |
|        | 4  | gonna show that Spigen-1 wouldn't have made a bit of               |
|        | 5  | different to the patent examiner.                                  |
| 11:35  | 6  | If we can go back to the first page of the                         |
|        | 7  | '283 patent, please.                                               |
| 11:35  | 8  | *(Document displayed.)*                                            |
| 11:35  | 9  | MR. HEWITT:  At the top right, again, you'll see a                 |
|        | 10 | patent that the patent examiner analyzed.  It's called the         |
|        | 11 | Lu patent.  L-U.                                                   |
| 11:35  | 12 | If we could go to the Lu patent.                                   |
| 11:35  | 13 | *(Document displayed.)*                                            |
| 11:35  | 14 | MR. HEWITT:  So here is a drawing from the Lu                      |
|        | 15 | patent.  And you can see on the left-hand side a hard              |
|        | 16 | protective shell that the patent examiner was looking at, a       |
|        | 17 | soft protective case that the patent examiner was looking         |
|        | 18 | at, everything that the Spigen-1 had.  Additionally, there's      |
|        | 19 | an additional element in Lu that the patent examiner looked       |
|        | 20 | at, and that is one of the claims -- contained in one of the      |
|        | 21 | claims of the '283 patent, you can see a hard protective          |
|        | 22 | frame that snaps on the top.  That hard protective frame has      |
|        | 23 | an aperture that is claimed in the '283 patent.  So not --        |
|        | 24 | when the patent examiner looked at Lu, not only did he or         |
|        | 25 | she have Spigen-1 to analyze, the patent examiner also had        |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 105 -

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | the hard protective frame to look at.                        |
| 11:36 | 2  | And that's going to be important.  We're going to            |
|       | 3  | talk about obviousness.  And I'm going to talk about         |
|       | 4  | obviousness in a second.                                     |
| 11:36 | 5  | The evidence is going to show that Mr. Kim had no            |
|       | 6  | intent to deceive the PTO.  He's gonna testify that if       |
|       | 7  | his -- he protects his intellectual property.  It's very     |
|       | 8  | important to Spigen, and if it's found to be invalid, what   |
|       | 9  | good is it?  He can't prevent competing products from        |
|       | 10 | selling.  So he is careful.  He just was not aware of any    |
|       | 11 | obligation to disclose to the PTO.  And second, the evidence |
|       | 12 | shows that the Spigen-1 and the KUM '435 were cumulative to  |
|       | 13 | the Hall and Lu patents.                                     |
| 11:37 | 14 | Now, the defendants contend -- pardon me -- that            |
|       | 15 | this would've been obvious at the time it was invented.      |
|       | 16 | Okay.  But the evidence is going to show that on the market  |
|       | 17 | at the time was what's called an OtterBox.  Okay?  And the   |
|       | 18 | OtterBox does have a soft TPU.  Comes out.  It's got a hard  |
|       | 19 | plate here and an entire frame.  No aperture.  No            |
|       | 20 | soft-raised wall.                                            |
| 11:38 | 21 | On the OtterBox -- and, by the way, the evidence           |
|       | 22 | is also going to show Mr. Kim never even saw an OtterBox     |
|       | 23 | when he was designing the '283.  He was going clean slate on |
|       | 24 | the '283.  On the OtterBox, the credit card inserts into the |
|       | 25 | cover of the OtterBox.                                       |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 106 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 29 of 106   Page ID
#:8083
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 29 of 106   Page ID
#:2637

11:39   1                You'll also note Mr. Kim's design objectives --

        2      and this is for an iPhone 4.  It might be a little bit

        3      thicker than the phone for this.  But still, Mr. Kim's

        4      design objectives were slim, elegant, compact.  Okay?

11:39   5                And the defendant's take various combinations of

        6      the phones that I'm going to show you, and claim that the

        7      '283 patent was obvious.

11:39   8                Another phone is what's called the Incipio

        9      Stowaway.  And the Incipio Stowaway has a soft TPU.  You can

       10      take it out.  Okay?  A hard shell frame.  And the Incipio

       11      Stowaway has a hinged cover.  Okay?

11:39  12                The credit card -- no grooves, no rails.  The

       13      Incipio part of the cover forms the credit card compartment.

       14      You'll have a chance to see this, and I apologize that it's

       15      so far away.

11:40  16                Additionally, on the Incipio, there's no raised

       17      wall.  The credit card simply slides in on a flat surface.

       18      I'm not gonna close it all the way because -- hard to open.

       19      Credit card comes out.

11:40  20                Now, on the Incipio Stowaway, again, Mr. Kim had

       21      not seen it.  Or he may have seen it on the Internet.  I

       22      don't know.  I'll have to double-check on that, so I'll

       23      leave that open.  But again, for -- for an iPhone 4 or some

       24      earlier phone and for a later-model phone, which will be

       25      thinner; but even when you take into consideration the

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 107 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 30 of 106   Page ID
#:8058
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 30 of 106   Page ID 30

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | design of the product, this product, even with a modern      |
|       |  2 | phone, is still going to be much thicker than the Slim Armor  |
|       |  3 | CS for an equivalent.  And again, the Slim Armor CS is a      |
|       |  4 | product made pursuant to the '283 patent by Spigen.          |
| 11:41 |  5 | Another phone that the defendants say taken in               |
|       |  6 | various combinations should make the '283 patent obvious is  |
|       |  7 | the one that we've already looked at:  The design skin       |
|       |  8 | slider.  The hard plate.  The no raised wall.  Permanently   |
|       |  9 | bonded.  In fact, Mr. Seil, the defendant's expert, you'll   |
|       | 10 | hear he said that taking this alone would lead to this       |
|       | 11 | *(indicating)*.  And again, when you compare them, when you  |
|       | 12 | see the raised wall and no raised one on that one, soft TPU, |
|       | 13 | removable, sliding cover utilizing grooves and rails, an     |
|       | 14 | aperture to form the raised wall -- Mr. Stein, our technical |
|       | 15 | expert's gonna testify that that's a leap, that you just     |
|       | 16 | can't make that jump from here to here *(indicating)*.       |
| 11:42 | 17 | Or that, in obviousness, anyone can look back.               |
|       | 18 | You can look back and say, gee, why didn't I think of that.  |
|       | 19 | That's a great idea.  But what the evidence is gonna show is |
|       | 20 | that at that time of the '283 product, you would be          |
|       | 21 | utilizing impermissible hindsight to look back and say that  |
|       | 22 | makes sense.  Can't do that.  And Mr. Stein is gonna testify |
|       | 23 | that the -- Mr. Stein is our technical expert -- is gonna    |
|       | 24 | testify that the defendant's technical expert, Mr. Seil, is  |
|       | 25 | using impermissible hindsight to say, hey, yeah, I coulda    |

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 31 of 106   Page ID
#:8089
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 31 of 106   Page ID
#:3137

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | made this from this.                                          |
| 11:43 | 2  | There are more -- oh, so this is the Damda Cotton            |
|       | 3  | manufactured and sold by the defendants.  It's a predecessor  |
|       | 4  | to the Verus Damda Slide that we looked at.  And the          |
|       | 5  | defendants take the Damda Cotton into consideration in their  |
|       | 6  | analysis of obviousness.  And so the defendants had the       |
|       | 7  | Damda Cotton.  And the CS Slim Armor was released in May of   |
|       | 8  | 2014.  The Damda Slide was released in September -- five      |
|       | 9  | months later -- 2014.  You're gonna see design drawings for   |
|       | 10 | the Damda Slide, but no dates.                                |

11:43   2    There are more -- oh, so this is the Damda Cotton
3    manufactured and sold by the defendants.  It's a predecessor
4    to the Verus Damda Slide that we looked at.  And the
5    defendants take the Damda Cotton into consideration in their
6    analysis of obviousness.  And so the defendants had the
7    Damda Cotton.  And the CS Slim Armor was released in May of
8    2014.  The Damda Slide was released in September -- five
9    months later -- 2014.  You're gonna see design drawings for
10   the Damda Slide, but no dates.

11:44   11   Additionally, when the Damda Slide came out, the
12   evidence is gonna show that the Damda Cotton dropped off in
13   sales and actually stopped selling, as I understand it.  But
14   Mr. Stein will talk more about that.

11:45   15   So the problem is how do we objectively look at
16   hard data to determine whether the '283 patent was obvious.
17   There's something called "secondary considerations."  And
18   the secondary considerations look at -- you know, if you hit
19   any of the secondary considerations, it's strong evidence
20   that the '283 patent was not obvious.

11:45   21   So the first one we look at is commercial success.
22   Evidence is gonna show this is great commercial success for
23   Spigen.  The -- Matt Stein, our expert, looked at the
24   commercial success of this.  Our damages expert, Dr. Kamin,
25   an economist, looked at the sales numbers for these.  Great

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 32 of 106   Page ID
#:8090
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 32 of 106   Page ID
#:3252

1    commercial success for Spigen.  The evidence is also gonna

2    show that the Damda Slide was a gravity commercial success

3    for the defendants.  25 percent -- I think it was

4    25 percent, but don't hold me to that -- close to 25 percent

5    of their gross profit.  So when we look at obviousness, we

6    have to look at objective commercial success.  That's one of

7    the things that shows that the evidence will show the

8    '283 patent was not obvious.

11:46    9         Now, another factor, secondary consideration you

10   look at to determine whether a patent or patented product

11   was obvious is praise or industry acclaim.  And the evidence

12   is going to show that both the Spigen Slim Armor CS and out

13   Damda Slide were almost always top-ten cell phone cases.

14   Great industry praise, great industry acclaim.

11:47    15        Now, there are other factors.  One is called long

16   felt, but unsolved need.  And we're not applying that factor

17   here.  We only need one factor out of nine.

11:47    18        Failure of others to make the product or make the

19   patent or invent it, that doesn't apply.  We're not applying

20   that here.

11:47    21        Claimed invention proceeded in a direction

22   contrary to experts in the field.  Doesn't apply here.

11:47    23        Unexpected or surprising results.  And Mr. Stein,

24   our technical expert, is going to testify that the Spigen

25   Slim Armor did provide unexpected or surprising results.  It

11:48 was just clean-slate pioneering, unexpected, slim, elegant, compact, and two credit cards.

11:48 So Mr. Stein will cover that in greater detail.

11:48 Licensing by others. Doesn't apply. Spigen doesn't license any of its products. It's not gonna apply.

11:48 And then copying by others. And the evidence is going to show that others have copied. And the evidence is going to show -- and Mr. Kim is going to discuss it. He's a CEO of Spigen. Mr. Stein is going to discuss it. He's our technical expert. And Dr. Kamin is going to discuss it, that the Damda Slide product is a copy of the Spigen product. And if you go through the components: Soft TPU, raised wall forming the credit card compartment, sliding cover with rails, hard protective frame with grooves, an aperture on the Spigen product.

11:49 On the Damda Slide, soft TPU, raised wall, sliding cover with rails, hard protective, removable hard protective frame, aperture.

11:49 Additionally, additional evidence of copying is going to come out in this trial for copying by others. And what Mr. Kim is going to testify to is he received the Verus product. And he looked at the cases. They've got the same hangtag. Same clam shell design. They've got the same type of picture, the same cutout on the paper. They've got a plastic insert on the inside that you'll get a chance to

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 34 of 106   Page ID
#:8098
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 34 of 106   Page ID
#:3147

```
        1   see.

11:50   2              On the back, we have Verus, and I have the Spigen.

        3   And a picture of the product on the back.  But more than

        4   that, there's six languages on the back of each of the

        5   covers.  The six languages are the identical six languages.

        6   Additionally, the evidence is going to show that they're in

        7   the exact same order.

11:50   8              Hologram in the same place.  I hope my finger's

        9   not on it, but there -- and you'll note that, interestingly

       10   enough, on each package, there will be a copyright up here

       11   on the packaging.

11:51  12              And Mr. Kim's going to go in more detail on

       13   copying by others.  There's more, and I just wanna briefly

       14   point out some of the things.

11:51  15              So copying by others.  Additionally, the Slim

       16   Armor CS has been copied.  You know, there are other

       17   knockoffs pirated.  And the evidence will show that the

       18   Damda Slide products have been copied, knockoffs.  So again,

       19   the copying by others, objective look at obviousness is

       20   going to be demonstrated and proven.

11:52  21              Now, on obviousness, we have to go through --

       22   Mr. Seil gave opinions that ten different combinations or

       23   individuals, uh, phones that I've shown you would make the

       24   '283 patent obvious.  Well, you saw the video.  The patent

       25   examiner has already determined -- made a determination that
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 112 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 35 of 106  Page ID
#:8299
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 35 of 106  Page ID
#:35

```
    1   it's not obvious.  To refute the obvious allegations, we

    2   will be going through each of Mr. Seil's ten opinions, and

    3   it will be very tedious.  Additionally, Mr. Seil offered

    4   some other opinions that other claims are obvious.  To

    5   refute that, again, we will be going through each of those

    6   independently.  And I just wanted to let you know it will be

    7   a tedious process.

11:53   8           Now, Spigen is alleging -- and that's what we're

    9   going to show on obvious, that -- that the '283 pioneering,

   10   clean slate design, compact, elegant, nothing else like it

   11   on the market; not obvious at all.

11:53  12           Spigen is alleging that the defendants willfully

   13   infringed on the '283 patent, and the evidence is going to

   14   show that the defendants received a cease and desist letter

   15   and a complaint for this action here, oh, I guess a year, a

   16   year and a half ago simultaneously.  And the evidence is

   17   going to show that the defendants are still selling, in

   18   spite of this, the Damda Slide products.

11:54  19           Now, there are some products for -- that Spigen

   20   sells that -- that, uh -- there are some products, or

   21   accused products, that defendants sell that Spigen doesn't

   22   make a product for.  Okay?  And I'll show you -- I'm gonna

   23   put these up.  I'll hold them up.  They're -- for instance,

   24   this is for -- accused product for iPhone 6 and Galaxy

   25   Note 4.  You'll see that the elements are virtually
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 113 -

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | identical throughout all of 'em.                             |
| 11:54 | 2  | This is of a Damda Slide for the 6 -- Galaxy 6.              |
| 11:55 | 3  | Damda Slide for the Galaxy 6 Edge.                           |
| 11:55 | 4  | Damda Slide for the Galaxy 6 Edge Plus.                      |
| 11:55 | 5  | And this would be, I believe, the Galaxy Note 5 --           |
|       | 6  | the Damda Slide for the Galaxy Note 5.                       |
| 11:55 | 7  | All have the same elements.  When you get a chance           |
|       | 8  | to look at them closely.  You'll see that, except for maybe  |
|       | 9  | dimensionally and a few little things, they're all virtually |
|       | 10 | identical -- function in virtually identical -- the same     |
|       | 11 | manner.  So you'll get those.                                |
| 11:55 | 12 | So Spigen is alleging that the defendants                    |
|       | 13 | willfully infringed on Spigen's '283 patent.  They had       |
|       | 14 | knowledge of it, and they continued to manufacture and sell  |
|       | 15 | the product.                                                 |
| 11:55 | 16 | Now, Spigen is going to be asking you to award               |
|       | 17 | damages for the infringement.  And Spigen is going to be     |
|       | 18 | asking you to award lost profits.  And we have Dr. Jules     |
|       | 19 | Kamin.  He's an economist, and he's an expert at calculating |
|       | 20 | damages, lost profits, and royalties, which is way beyond    |
|       | 21 | the scope of my ability.                                     |
| 11:56 | 22 | And Mr.-- Dr. Kamin is going to show that some of            |
|       | 23 | these products here are competing products.  For instance,   |
|       | 24 | if Spigen sells a case for the iPhone 6 and there is a Damda |
|       | 25 | Slide for the iPhone 6, those are competing products.  Okay? |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 114 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 37 of 106  Page ID #:8095
8:15-CV-1050-DOC — 11/8/2016 — Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 37 of 106  Page ID
3:7

```
 1    There might be cell phone cases, Damda Slide cases that are

 2    for a Galaxy that Spigen doesn't make.  Okay?  Still

 3    entitled to royalties for the sales of those products.

 4         Now, Dr. Kamin calculated total lost profits for

 5    iPhone cases at 1,189,068.  And that's what he's going to

 6    testify to.

 7         And how he calculated that amount -- and I'm going

 8    to go very basic.  He has a much more detailed analysis than

 9    I'm gonna give you here.  Took the number of units sold, and

10    then he calculated Spigen's cost, sales, took that amount,

11    uh, multiplied it by the amount Spigen would've sold it,

12    less -- sorry, I misspoke -- he calculated the total number

13    of units sold on the Damda Slide.  He multiplied -- he took

14    that by the amount Spigen would've sold those products for,

15    took out Spigen's cost of sales, and then additionally took

16    out an additional 25 percent for variable costs.  Costs that

17    aren't fixed to Spigen.  And he's gonna give that to you in

18    much more detail than I will now.

19         Additionally, Dr. Kamin calculated that Spigen is

20    entitled to royalties in the amount of $146,123.

21         And those royalties are based on Galaxy, Samsung

22    Galaxy cases that are not sold by Spigen.  But Spigen would

23    be entitled to a royalty to be paid for those cases, because

24    those cases, even though they're for an iPhone or Galaxy or

25    Note, or whatever it is, infringe on the '283 patent.
```

11:57 (line 4)
11:57 (line 7)
11:58 (line 19)
11:58 (line 21)

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 38 of 106   Page ID
#:8098
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 38 of 106   Page ID
#:38

| | | |
|---|---|---|
| 11:58 | 1 | Now, if you don't find lost profits, the royal -- |
| | 2 | Dr. Kamin calculated royalties for both the iPhone and the |
| | 3 | Galaxy cases.  So he calculated a royalty amount for all of |
| | 4 | the cases.  And that amount is $287,063. |
| 11:59 | 5 | And ladies and gentlemen of the jury, thank you |
| | 6 | very much, and thank you for your service. |
| 11:59 | 7 | THE COURT:  Thank you, Counsel. |
| 11:59 | 8 | Why don't we take a recess for lunch and come |
| | 9 | back. |
| 11:59 | 10 | If it's possible, I'd like to let you go early |
| | 11 | today just -- voting.  And I don't know how many of you have |
| | 12 | voted this morning or intend to this evening. |
| 11:59 | 13 | *(Clerk and court confer.)* |
| 11:59 | 14 | THE COURT:  Can we take a really short lunch |
| | 15 | today, like 45 minutes to an hour?  Get you back in and let |
| | 16 | you go early.  Would that be okay?  Do you want to try for |
| | 17 | 45 minutes and see if it works and get right back to work, |
| | 18 | then? |
| 12:00 | 19 | I'm going admonish you not to discuss this matter |
| | 20 | nor form or express any opinion.  Let's do our best.  If we |
| | 21 | can do it in 45 minutes, go down and grab a sandwich real |
| | 22 | quick.  We'll get right back to work.  And we'll let you go. |
| 12:00 | 23 | Counsel, there's a cafeteria downstairs.  Just be |
| | 24 | careful with clients, et cetera, any conversation. |
| 12:00 | 25 | *(Jury recesses for lunch at 12:00 p.m. )* |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 116 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 39 of 106   Page ID
#:8093
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 39 of 106   Page ID
#:39

| | | |
|---|---|---|
| 12:00 | 1 | *(Outside the presence of the jury.)* |
| 12:00 | 2 | THE COURT:  All right.  Counsel, we'll see you in |
| | 3 | 45 minutes.  Have a nice lunch. |
| 12:00 | 4 | MR. HEWITT:  Thank you, Your Honor. |
| 12:00 | 5 | *(Lunch recess held at 12:00 p.m.)* |
| 12:48 | 6 | *(Proceedings resumed at 12:48 p.m.)* |
| 12:48 | 7 | *(In the presence of the jury.)* |
| 12:48 | 8 | THE COURT:  The jury is present.  All counsel are |
| | 9 | present.  The parties are present.  Counsel, if you would be |
| | 10 | seated.  Thank you for your courtesy.  And this would be the |
| | 11 | opening statement on behalf of the defense, or would you |
| | 12 | like to reserve your opening statement until the beginning |
| | 13 | of your case? |
| 12:48 | 14 | MR. POOLE:  I will give it now, Your Honor. |
| 12:48 | 15 | THE COURT:  Please. |
| 12:48 | 16 | MR. POOLE:  Thank you. |
| 12:48 | 17 | THE COURT:  Once again, let me remind you, this is |
| | 18 | not evidence.  This is the defense opening statement. |
| 12:48 | 19 | **DEFENSE OPENING STATEMENT** |
| 12:48 | 20 | MR. POOLE:  Good afternoon, ladies and gentlemen. |
| | 21 | And we are very grateful for your service.  And we will |
| | 22 | attempt to put on a case that's interesting and |
| | 23 | understandable. |
| 12:49 | 24 | And one of the challenges I know you're probably |
| | 25 | facing already is you may feel like you're drinking water |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 117 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 40 of 106   Page ID
#:8098
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 40 of 106   Page ID
#:40

```
 1   from a hydrant 'cause you're getting a lot of information

 2   and you're hearing about a lot of products and you're

 3   getting a lot of terminology that may be new to you.  So I'm

 4   going to try to give a simple overview of the defense case,

 5   which you have a little bit of a preview from in terms of

 6   what the Court read to you.  And I will present our

 7   perspective, which -- as you're probably not gonna be

 8   surprised -- is the quite different from the plaintiffs in

 9   this case.

10        First, let me identify my clients.  ISpeaker and

11   Verus.  And I wanted to write that out for you so you could

12   see them.  We've been throwing those names at you.

13        We will have -- on behalf of ISpeaker, we will

14   have two witnesses from the ISpeaker Corporation in Korea.

15   Mr. Y.S. Chung is here.  And we will have Mr. Dae Jin No.

16   Mr. Chung is the CEO of ISpeaker.  And Mr. No is the design

17   team leader for the project that ended up with the product

18   which the plaintiffs are accusing as infringing on their

19   patent.

20        We will also have from Verus Jay Yu, who is the

21   CEO of this American company.  Basically, ISpeaker is the

22   designer of the products in Korea, and Verus sells and

23   distributes those in the United States.  So that's why

24   they're both here in this particular matter.

25        Mr. Chung is going to come and he's going to give
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 118 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 41 of 106  Page ID
#:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 41 of 106  Page ID
#:4477

```
 1    you a bit of the history of the company.  It is not a

 2    fly-by-night, knock-off company.  We know you may have heard

 3    there are those companies that do very little research and

 4    development, very little original design.  They grab

 5    something from somebody else and go and manufacture it and

 6    flood the market with knockoffs.  That's not what ISpeaker

 7    is.  In fact, ISpeaker has actually been manufacturing cases

 8    before Spigen has.  Spigen originally made protective, um,

 9    protectors for -- for the phone glass.  And ISpeaker has

10    been designing cases in a relatively new market for ten

11    years.  This is -- you -- and you'll get more of the history

12    of protective cases for phones, in particular, because it's

13    a relatively new market where we have, particularly with the

14    advent of the iPhone in 2007, a fairly uniform phone and the

15    ability of accessory manufacturers to make a product that

16    can sell to a lot of people, and it's much easier than

17    making a different product for 25 or 30 different phones.

12:52  18          The company has -- ISpeaker has 60 to 70

19    employees.  It has a design and development department of

20    almost 14 employees, six in the research and development,

21    eight in production, testing, and quality control.

12:52  22          And Mr. Chung is gonna tell you that like every

23    company in the business and probably every company in the

24    world, everybody is watching what's going on in the

25    marketplace.  The goal, of course, is to sell product.  And
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 119 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 42 of 106   Page ID
#:3900
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 42 of 106   Page ID
#:2795

 1    to sell product, you have to know what the consumers want.

 2    And there's, obviously, trends that come and go.  There's

 3    things that happen every year, where somebody comes up with

 4    an idea, concept, and everybody else seems to want to follow

 5    and develop that concept.

12:53   6         In this particular area of phone protection cases

 7    that have the ability to have a card in storage, the

 8    originator of that concept was a company called Design Skin.

 9    That really seems to be the tree from which everybody else

10    has grown.  And in 2013, 2014, there was a growing demand

11    among consumers for phones that had that kind of capability:

12    The ability to both protect the case and provide some

13    storage for a credit card or two.

12:54  14         And you will hear about an ISpeaker product, which

15    Mr. Hewitt showed you, the Damda Clip or Cotton.  Others

16    were coming into the market.  And both ISpeaker and Verus

17    and the plaintiffs in this case were developing products on

18    a regular basis to address the needs of consumers.

12:54  19         One of the other things that began happening in

20    the marketplace is you may recall the unusual buildup of

21    enthusiasm for the release of the new iPhones every couple

22    of years.  You may remember people lining up, and there was

23    a lot of to-do for people wanting to get the latest iPhone.

24    Every time a new iPhone came out, it created a great new

25    marketing opportunity for people who manufactured and

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 43 of 106   Page ID
#:8007
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 43 of 106   Page ID
#:5

          1    designed accessories.  And these companies, both of 'em,

          2    were no different from anybody else.  They anticipated the

          3    release of that, and they began coming up with the latest

          4    and greatest to provide to consumers what they were wanting

          5    with regard to their phone cases.

12:55     6             As we've approached 2014, there was indeed in the

          7    Fall of that year going to be a release of a new iPhone.

          8    And everybody was gearing up in anticipation of that.  And

          9    so you're gonna see and you're gonna hear evidence from

         10    Mr. Chung and Mr. No that in anticipation of that release

         11    and looking at what else is going on in the marketplace,

         12    there was a desire to come up with a new protective product

         13    that had this feature.  And a lot of this was buildup on the

         14    time frame of when Apple was gonna release the next iPhone.

12:55    15             And, of course, Samsung and others had smart

         16    phones that were also a big player in the market.  So

         17    everybody was getting geared up for that iPhone release.

12:56    18             And Mr. Chung will tell you that he tasked his

         19    design group to begin to develop a new product for that

         20    anticipated new release and other products on the market.

         21    Mr. No will come and he will tell you basically what I call

         22    the story of creation, how the accused product came into

         23    being, from its very original concept design.  You'll see

         24    original drawings, early conceptual drawings that started in

         25    February of 2014.  You'll see 2D, two-dimensional renderings

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 121 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 44 of 106   Page ID
#:8008
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 44 of 106   Page ID
#:44

```
 1    that took place and then three-dimensional modeling of that

 2    product over several months -- not just a couple months,

 3    several months, as they were developing and looking at

 4    various options for that phone.  You'll see some that had a

 5    kickstand.  You'll see various things they were considering

 6    as they were developing this particular product.  And then

 7    they had to not only take that concept, they had to then

 8    determine how to manufacture that specifically.  And Mr. No

 9    will tell you about some of the challenges that they

10    encountered in some of the manufacturing aspects of that.

11            So what was the finished design?  Well, it was a

12    design that had a lot of features in common with a lot of

13    other prior phones.  Not a big surprise because that's

14    generally what happens.  Everybody's looking to improve on

15    what's out in the marketplace.  "Improve on" doesn't mean

16    copy a patented idea.  It means to improve the product and

17    make it address the functional demands of the public and

18    demands of the consumer for what they're looking for in a

19    protective phone device.

20            So in this particular -- the phone which is

21    accused, yes, it had a soft protective cover like other

22    devices.  It had a hard protective frame.  On top of that,

23    it had a storage compartment.  It had a cover for storage.

24    And the door in the product that you're looking at right in

25    front of you -- some of you still have that -- the door was
```

12:57   11

12:57   20

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 122 -

  1    secured and moved in a structure that was created by the

  2    interaction of the hard protective frame and the soft

  3    protective cover.

12:58    4         It's of very important distinction for this case.

  5    You're gonna see in the patent language, and Mr. Hewitt went

  6    over some of it, that the -- the grooves that are called out

  7    in the Spigen '283 patent -- remember, that's the patent

  8    which they're suing on -- the grooves are in the hard

  9    protective case.

12:58    10        And what you're gonna see as explained by both the

  11   witnesses who are gonna testify about how it was

  12   manufactured and also our expert -- I'll talk about him in a

  13   minute -- is that in this particular case the -- the door,

  14   the sliding door moved in this structure that was created by

  15   the interaction of the hard protective frame and the soft

  16   protective case.  And then, in fact, as you open the door,

  17   you actually have to push down, and it -- it tracks along

  18   the soft protective cover.  And you'll see some resistance

  19   in that, and actually, that's a design feature that Mr. No

  20   will talk about, which was a difference from what was in the

  21   marketplace and that's certainly different from the

  22   patent -- the '283 patent.

12:59    23        Mr. Yu -- we will call Mr. Yu, who's a CEO of

  24   Verus, and he's gonna talk about some of the marketplace

  25   history here in the United States market that he's

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 123 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 46 of 106   Page ID
#:8070
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 46 of 106   Page ID
46

1    encountered and that Verus and ISpeaker are dealing with to

2    compete.  And there's a lot a competition.  As you've

3    already seen, there are lots and lots of phones out there.

4    And there's a lot more than this *(indicating)*.

12:59    5    And the -- if you shopped for protective cases,

6    depending on where you go, the choices are almost

7    overwhelming there's so many -- so many different ones.  And

8    everybody's watching everybody else.

01:00    9    So what do we know -- so that's what was going on

10    in 2014 up until the point where they begin selling product

11    in September of 2014.  That's when they were able to take

12    their conceptual design, get it to the point of manufacture,

13    and again selling and distributing it in September, October

14    of 2014.  You'll see that that tracks almost identically

15    with the time period in which the plaintiff, Spigen, has

16    started selling their product.  From sales numbers that we

17    have from documents produced from them, we see that their

18    fair -- first sales were -- uh, were, uh, globally in

19    September, late September of 2014, and the first U.S. sales

20    were in November of 2014.

01:00    21    So not surprisingly, given the anticipated release

22    of the iPhone and the development that goes on, generally,

23    we see a chronology where the companies are somewhat

24    tracking in terms of a development and release of the

25    product in the market and the sale of that.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 124 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 47 of 106   Page ID
#:8075
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 47 of 106   Page ID
#:47

01:01    1           The -- so what's going on over at Spigen.  Well,

         2    Mr. Hewitt has told you some of the evidence that they'll be

         3    producing about their development efforts.  We know a couple

         4    things in terms of timing.  We know that they first applied

         5    for what's called a provisional patent in June.  June 16th

         6    of 2014.  So it's right around that same time that

         7    development efforts were well underway over at ISpeaker.

         8    And in June 16, 2014, there was this provisional patent

         9    application with the U.S. Patent and Trademark Office, or

        10    the PTO.

01:01   11           Now, the significance of it being a provisional

        12    patent application is that at that point in time, that is

        13    not published to the world.  Nobody could see that patent

        14    application.  It was known to the Patent and Trademark

        15    Office, and it was known to Spigen and their attorneys who

        16    filed that.

01:02   17           The sales of their products, which is the -- which

        18    Mr. Hewitt showed you -- the sales of their products appear

        19    to be in the fall of that year, 2014.  And then the first --

        20    um, the actual patent application, which would have become

        21    public, where this design woulda been evident in public in

        22    the form of a patent would've been on December 5, 2014.

        23    That is the date which the patent was actually filed and

        24    became public and the Patent and Trademark Office began

        25    evaluating.  So -- and that patent ultimately was issued on

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 125 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 48 of 106  Page ID
#:8078
8:15-CV-1050-DOC — 11/8/2016 — Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 48 of 106  Page ID
48

```
        1    June 2nd of 2015.

01:02   2            But the date by which, uh, there -- they claim the

        3    invention is the June of 2014 date.  And then we have the

        4    formal filing of the full patent application in December.

01:03   5            So what's the defense to this case?  Well, there's

        6    two aspects of it, and the evidence that we're gonna produce

        7    and most of my questions that you might hear in

        8    cross-examination go to these two issues:  Invalidity and

        9    infringement.  And invalidity as was explained in the

        10   videotape that the Court showed you is in this case directed

        11   at what we contend is obviousness.

01:03   12           And the position that the defense is bringing to

        13   you is that the patent should not have issued.  To get a

        14   patent, you -- a claimed invention has to be new; it has to

        15   be useful; and it has to be not obvious to a person of

        16   ordinary skill in the art.  I think you heard that term.  We

        17   sometimes use this abbreviation, POSITA, which is just

        18   another shorthand term for "person of ordinary skill in the

        19   art."  So it's somebody who operates in this arena.  And the

        20   law says that even if what's being submitted as a new patent

        21   application is -- is new, it is not valid for a patent if a

        22   person of ordinary skill in the art looking at the prior

        23   art, both patents and other things on the market that aren't

        24   patented, would be able to say this is obvious.  This is not

        25   so nuanced, so unique that a person of ordinary skill in the
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 126 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 49 of 106   Page ID
#:8073
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 49 of 106   Page ID
#:8045

01:04

01:05

01:05

01:05

01:05

 1   art wouldn't look at this and go, essentially, "duh."

 2          In this particular instance, the importance of

 3   that is the U.S. Patent and Trademark Office had certain

 4   things they looked at and evaluated.

 5          And we're going to be looking at what it looked

 6   at.  Mr. Hewitt addressed some of it.  But a patent can be

 7   invalid if there are important facts that were not

 8   considered in the determination of the validity of the

 9   patent.  And in this particular instance, we're gonna be

10   talking about that term "prior art."  Prior art.

11          And we're looking at things that are both

12   pre-existing patents, so things that are formally filed as

13   patents, but they don't have to be patents.  They can be

14   products that are already in the marketplace.

15          And if either of those things individually or in

16   combination would have been obvious to a person of ordinary

17   skill in the art, then it would not be valid.

18          So how does it happen that the Patent and

19   Trademark Office might not be aware of all of the relevant

20   prior art?  Well, one way -- and it is talked about in the

21   tape we saw earlier -- it wasn't located by the Patent and

22   Trademark Office.  Mistakes can be made.  As the video

23   pointed out, they're busy.  And often they don't have the

24   expertise and knowledge of what's going on in the

25   marketplace.  They may be able to look up patents, but they

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 50 of 106   Page ID
#:8078
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 50 of 106   Page ID
50

```
 1    don't know all the products that are out there.

 2         Significantly, another problem is when it's not

 3    disclosed by the applicant.  Obviously, in this case, the

 4    issue that we're gonna be bringing to you is that there was

 5    information there was prior art that the applicant knew

 6    about -- we know they knew about it in certain instances --

 7    and they did not disclose it to the Patent and Trademark

 8    Office.  And in doing so, they violated what's called the

 9    "duty of candor."

10         And we'll spend quite a bit of time talking about

11    the duty of candor and the obligations associated with

12    anybody who's going to file a patent application.  Not

13    having significant relevant facts, prior art can lead to

14    mistakes in issuance.  And we believe in this instance

15    that's what occurred.

16         Now, the evidence here regarding prior art is

17    going to be largely presented by an expert for ISpeaker and

18    for Verus named Oliver Seil.  Mr. Seil works for a company

19    called Belkin.  Mr. Seil is intimately familiar with this

20    industry.  He has been designing protective cases for

21    personal electronic devices, cell phones, those sorts of

22    things.  And like most people in the marketplace, has lived

23    and breathed this area, studies it all the time and is

24    well-aware of the trends that have taken place in the

25    marketplace and the great body of prior art that's out
```

01:06  (line 2)
01:06  (line 10)
01:07  (line 16)

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 128 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 51 of 106  Page ID
#:8079
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 51 of 106  Page ID
51

1    there.

01:08    2         He is going to confirm to you what -- uh, what our

3    other witnesses will have told you:  That in that time frame

4    of 2012 to 2014, there -- the consumers were wanting -- at

5    least a significant number of consumers were wanting that

6    kind of functionality in a cell phone that, uh, had the

7    ability to have a credit card in it.  This was not something

8    unknown.  In fact, even Mr. Hewitt held up prior examples,

9    and you could see there was a lot -- there were a number of

10   manufacturers that were designing phones that had that

11   capability.

01:08   12         So he will go through an overview of the prior art

13   in some detail for you.  And that's gonna be important

14   evidence as you consider whether a person of ordinary skill

15   in the art could have put -- would have put those together

16   and been able to determine that what is claimed as an

17   invention in the patent really isn't all that unique, isn't,

18   in fact, worthy of the standards that are required to patent

19   a product.

01:09   20         I'm not gonna go through right now all those

21   before -- Mr. Hewitt touched on some of those.  But there

22   will be a list of things, and we'll demonstrate to you and

23   we believe the evidence will show that vir- -- that every

24   single claimed intervention, claimed feature of the two --

25   Spigen '283 patent exists in the prior art and would've been

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 129 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 52 of 106   Page ID
#:8070
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 52 of 106   Page ID
52

```
01:09

01:10

01:10

01:10
```

| | |
|---|---|
| 1 | readily and easily apparent to somebody who works in that |
| 2 | area and was looking at what was going on. |
| 3 | So he has concluded, and he will give you that |
| 4 | opinion, that the prior art -- the claimed intervention of |
| 5 | Spigen '283 would be invalid in light of the prior art and |
| 6 | that that would render that invalid. |
| 7 | There will be evidence -- I mentioned the duty of |
| 8 | candor earlier.  We'll be putting on evidence with regard to |
| 9 | what that duty is and the fact that the plaintiffs failed to |
| 10 | disclose that to the Patent and Trademark Office. |
| 11 | I heard Mr. Hewitt say remarkably that, despite |
| 12 | the fact that the CEO of his client had filed at least ten |
| 13 | applications in the United States before, he was apparently |
| 14 | unware of the duty of candor.  And the duty of candor will |
| 15 | be detailed for you.  It Basically imposes an obligation on |
| 16 | anybody who applies for a patent to disclose material |
| 17 | information, prior art that the patent examiner should be |
| 18 | able to look at to determine if or not this would be obvious |
| 19 | looking at the prior art. |
| 20 | And in this instance and -- and details -- there's |
| 21 | a whole section of the code of federal regulation that |
| 22 | spells out in detail what an applicant is supposed to |
| 23 | disclose to the Patent and Trademark Office.  And -- and |
| 24 | specifically, I want to point out information's material to |
| 25 | patentability when it is not cumulative and it establishes |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 130 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 53 of 106   Page ID #:3077
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 53 of 106   Page ID #:53

1    by itself or in combination with others a prima facie case

2    of unpatentability of a claim.

01:11    3         And for all the reasons that I described for you

4    before and that were evident from looking at the tape,

5    people who live and work and breathe and manufacture in this

6    particular area are gonna be far more knowledgeable with

7    regard to what's out there, products that are already in the

8    market.  And we're gonna show you products that were already

9    in the market that have every -- in one instance, every

10    single claim except for one, which was removability, which

11    was evident in other prior art.  So it's not like we're

12    having to piece -- it's not like the person of ordinary

13    skill in the art is having to piece together elements of

14    inventions from 14 or 15 prior arts.  We're talking about

15    one that has everything plus one feature that would be

16    combined.  And that is essentially how the obviousness

17    analysis is done.

01:12    18         So the -- and the law is clear that not only does

19    the applicant have that obligation to disclose that, but the

20    obligation, the duty of candor, is imposed on the

21    applicant's attorney.  So the attorneys who prosecuted that

22    patent here in the U.S. had that obligation to make sure

23    that there was a disclosure of prior art.

01:12    24         So the Patent and Trademark Office got the

25    application, the provisional application.  It got the full

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 131 -

```
 1   application in December of 2014.  And the evidence will be
 2   that with regard to what the applicant provided to the
 3   United States Patent and Trademark Office with regard to the
 4   issuance of this patent, the prior art that it disclosed to
 5   the Patent and Trademark Office was exactly nothing.  Not
 6   one piece of information about prior art was provided by the
 7   applicant to the United States Patent and Trademark Office.
01:13    8        So that's the invalidity part of the case.  And
 9   that particular part of the case is the case in which we
10   have the burden of proof to show that there -- that the
11   patent should be rendered invalid by virtue of this feature
12   of obviousness.
01:13   13        The second part of the case, which is
14   infringement, is the plaintiff's burden, and they have to
15   prove that all of the elements of the claimed inventions
16   were, in fact, met and exist in the accused infringing
17   device.  And Oliver Seil, our witness from Belkin, who works
18   in this field, is going to describe to you -- and I touched
19   on a little bit before -- that what Spigen '283 -- remember
20   that's the descriptor we're giving to the patent -- what it
21   teaches a person of ordinary skill in the art is not what
22   exists in the ISpeaker Verus phone.
01:14   23        Now, it may sound funny for me to use the term
24   "teaches," but essentially what you're gonna learn is that a
25   patent is essentially a -- an agreement -- and the film
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 132 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 55 of 106   Page ID
#:8979
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 55 of 106   Page ID
#:55

 1    talked about it -- between the United States government and

 2    the applicant for the patent in which it trades the secrecy

 3    of its product for a property protection.

01:14   4            So what's critical is what's that patent actually

 5    teach people?  What does it tell them that, hey, this is our

 6    property line, and if you cross it, you trespass?  So

 7    Mr. Seil will explain to you what a person of ordinary skill

 8    in the art in the area that he works in, person of ordinary

 9    skill in the art would understand the language to mean.  And

10    in this instance, he's going to tell you that they would not

11    understand that the structure that's being taught as a

12    groove structure in Spigen '293 is the structure that we

13    have that exists in the Verus ISpeaker device.  It's not the

14    same thing.

01:15   15           And I mentioned it before.  The structure in the

16    ISpeaker device is combined with the door slides and is

17    combined by the interaction of the hard protective case and

18    the soft protective frame.  And the second aspect of that,

19    and it's related, is that the other key aspect of their

20    claim is that it is -- the groove is in the hard protective

21    frame.  And in this instance, it's in the two interacting

22    together.

01:15   23           Now, there are indeed many claims of the patent

24    which are claimed by the plaintiffs to have been violated.

01:15   25           I'll just touch on this briefly and not to

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 133 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 56 of 106   Page ID
#:8080
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 56 of 106   Page ID
56

 1  complicate it too much, but there's a difference between an

 2  independent claim, which stands on its own, and a dependent

 3  claim.  And in the patent which is being prosecuted, there

 4  are two independent claims 1 and 16.  And if those do -- if

 5  those two claims are not met -- either of those two claims

 6  are not met, or both of them are not met, then there's no

 7  infringement.  The others are all dependent on that.  So you

 8  don't have to remember the details of that right now.  The

 9  Court will instruct later.  But keep in mind there are a

10  couple of claims where much of the focus will be spent

11  because those are the independent claims.  And if those

12  independent claims don't exist, then the rest fall because

13  there is no infringement by virtue of that.

01:16  14       So this case is really gonna be fought over those

15  two primary issues.  First of all, is there infringement at

16  all?  Does the accused device have all of the elements,

17  every single one, of the property lines that have been

18  defined by the scope of the '283 patent?  If it doesn't,

19  then there's no infringement.

01:17  20       Additionally, they're claiming that there was a

21  willful infringement, essentially saying, "we knew where

22  those property lines were, not withstanding that we climbed

23  over their fence, and we're claiming to own a piece of their

24  property."  And, of course, we dispute that, and we'll put

25  on evidence regarding that.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 134 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 57 of 106   Page ID
#:9085
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 57 of 106   Page ID
57

01:17    1              And then the -- and then the second major issue is

         2    the issue of invalidity, which here is obviousness.   In

         3    light of the prior art, would a person of ordinary skill in

         4    the art be able to look at that and go this is quite clear

         5    and, therefore, it would not be entitled to patent

         6    protection?

01:17    7              We will attempt to keep it focused and to the

         8    point.  We very much appreciate your service and look

         9    forward to ultimately, at the end of this case when the

        10    evidence is presented, ask you for vindication of the

        11    conduct of my clients, ISpeaker and Verus, that they did not

        12    violate the patent, and that in any event, the patent would

        13    be invalid by virtue of this doctrine of obviousness.

01:18   14              Thank you very much.

01:18   15              THE COURT:  Thank you, Counsel.

01:18   16              And Counsel on behalf of the plaintiff, would you

        17    call your first witness, please.

01:18   18              MR. HEWITT:  Yes, Your Honor.

01:18   19              Spigen calls Dae Young Kim.

01:18   20              THE COURT:  Thank you.

01:18   21              Does Mr. Kim require an interpreter?

01:18   22              MR. HEWITT:  Yes, he does, Your Honor.

01:18   23              THE COURT:  Mr. Kim, if you would stop at that

        24    location, would you please raise your right hand.

        25

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 135 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 58 of 106   Page ID
#:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 58 of 106  58  Page ID

01:18    1           **DAE YOUNG KIM, CALLED BY THE PLAINTIFF, SWORN**

01:18    2              *(Testifies as follows through the Korean*

         3        *Language Interpreter:)*

01:19    4              THE WITNESS:  Yes, I do.

01:19    5              THE COURT:  Thank you, sir.  If you would please

         6    be seated in the witness box.

01:19    7              If you would state your full name for the jurors,

         8    please.

01:19    9              THE WITNESS:  Yes.  My name is Dae Young Kim.

01:19   10              THE COURT:  Would you spell your last, sir.

01:19   11              THE WITNESS:  Yes.  K-I-M.

01:19   12              THE COURT:  Thank you.  And direct examination,

        13    please.

01:19   14              MR. HEWITT:  Thank you, Your Honor.

01:19   15                      **DIRECT EXAMINATION**

01:19   16    BY MR. HEWITT:

01:19   17    Q.   Good afternoon, Mr. Kim.  How are you today?

01:19   18    A.   Yes, I'm fine.

01:19   19    Q.   I'd like to talk a little bit about your personal and

        20    professional background.  Are you a citizen of the

        21    United States?

01:20   22    A.   No, I'm not.

01:20   23    Q.   Do you have a green card?

01:20   24    A.   Yes, I do.

01:20   25    Q.   And where do you reside?  In the United States?

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 136 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 59 of 106   Page ID
#:8087
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 59 of 106   Page ID
59

| | | |
|---|---|---|
| 01:20 | 1 | A.    Yes.  I'm residing in Irvine, Orange County. |
| 01:20 | 2 | Q.    And approximately how long have you lived in |
| | 3 | Orange County? |
| 01:20 | 4 | A.    I think it's been about four years. |
| 01:20 | 5 | Q.    And can you give me some of -- have you had upper-level |
| | 6 | education? |
| 01:20 | 7 | A.    Yes, that's correct. |
| 01:20 | 8 | Q.    Can you tell me what that is? |
| 01:21 | 9 | A.    Yes.  I major in physics in the university. |
| 01:21 | 10 | Q.    And was that in Korea? |
| 01:21 | 11 | A.    Yes, that's correct. |
| 01:21 | 12 | Q.    Now, what is your position with Spigen Korea Company, |
| | 13 | Limited? |
| 01:21 | 14 | A.    Yes, I'm the CEO of the company. |
| 01:21 | 15 | Q.    And are you also the founder? |
| 01:21 | 16 | A.    Yes, that's correct. |
| 01:21 | 17 | Q.    Have you been designing cell phone cases? |
| 01:21 | 18 | A.    Yes, that's correct. |
| 01:21 | 19 | Q.    For approximately how long? |
| 01:22 | 20 | A.    I think it's been more than seven years. |
| 01:22 | 21 | Q.    Now, does Spigen have a U.S. subsidiary? |
| 01:22 | 22 | A.    Yes, that's correct. |
| 01:22 | 23 | Q.    And where is the U.S. subsidiary located? |
| 01:22 | 24 | A.    Yes, it's also in Irvine. |
| 01:22 | 25 | Q.    And approximately how many employees does the U.S. |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 137 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 60 of 106   Page ID
#:8088
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 60 of 106   Page ID
60

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | subsidiary of Spigen employ?                                 |
| 01:22 | 2  | A.   Yes, a little under 100, I believe.                     |
| 01:22 | 3  | Q.   And Spigen Korea -- does Spigen also have employees in   |
|       | 4  | Korea?                                                        |
| 01:22 | 5  | A.   Yes, that's correct.                                     |
| 01:22 | 6  | Q.   And approximately how many employees does Spigen have    |
|       | 7  | in Korea?                                                     |
| 01:23 | 8  | A.   About 180 employees.                                     |
| 01:23 | 9  | Q.   What year was Spigen Korea founded?                      |
| 01:23 | 10 | A.   Yes.  It was established in 2009.                        |
| 01:23 | 11 | Q.   Going back to the time that you were designing the       |
|       | 12 | Spigen Slim Armor CS, did you hold any U.S. patents?         |
| 01:23 | 13 | A.   You mean only at about that time, right?                 |
| 01:23 | 14 | Q.   You are correct.                                         |
| 01:23 | 15 | A.   Yes, I think so.                                         |
| 01:23 | 16 | Q.   Now, in Korea at the time that you designed the Slim     |
|       | 17 | Armor CS, did you hold patents, Korea patents?              |
| 01:24 | 18 | A.   Yes, several.                                            |
| 01:24 | 19 | Q.   In Korea, are you familiar with the Korean patent        |
|       | 20 | application process?                                         |
| 01:24 | 21 | A.   Yes, I am.                                               |
| 01:24 | 22 | Q.   Was there any obligation to submit what we've called     |
|       | 23 | "prior art" in the Korean patent application process?       |
| 01:24 | 24 | A.   I don't think so.                                        |
| 01:24 | 25 | Q.   Okay.  When you applied for the '283 patent, were you    |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 138 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 61 of 106   Page ID
#:8089
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 61 of 106   Page ID
#:6161

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | aware of any obligation to submit prior art to the U.S.      |
|       | 2  | Patent Office?                                               |
| 01:25 | 3  | A.   I did not know.                                         |
| 01:25 | 4  | Q.   Is intellectual property important to Spigen?          |
| 01:25 | 5  | A.   Yes, very important.                                    |
| 01:25 | 6  | Q.   And today how many patents does Spigen hold?          |
| 01:25 | 7  | A.   Around 120.                                             |
| 01:25 | 8  | Q.   And at some point in time, did you become aware that  |
|       | 9  | there is an obligation to submit prior art to the U.S.      |
|       | 10 | Patent Office with a patent application?                     |
| 01:25 | 11 | A.   I found out through the litigation, uh, this particular |
|       | 12 | litigation in progress.                                      |
| 01:26 | 13 | Q.   Now, does Spigen have registered trademarks?          |
| 01:26 | 14 | A.   Yes, that's correct.                                    |
| 01:26 | 15 | Q.   Approximately how many?                                 |
| 01:26 | 16 | A.   Around 150.                                             |
| 01:26 | 17 | Q.   Now, why has Spigen applied for some patent           |
|       | 18 | applications?                                                |
| 01:26 | 19 | A.   As we're the forerunner and pioneer in the industry, a |
|       | 20 | lot of copies -- a lot of other companies made a lot of    |
|       | 21 | copies of our company's products.  To block these efforts in |
|       | 22 | order to have interest in our property's protection, we are |
|       | 23 | making all these patent applications.                        |
| 01:27 | 24 |        MR. HEWITT:  Now, if we could put up the           |
|       | 25 | '283 patent, please.                                         |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 139 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 62 of 106   Page ID
#:8080
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 62 of 106   Page ID
62

```
01:27    1            (Document displayed.)

01:28    2            MR. HEWITT:  Your Honor, may I proceed without the

         3   exhibit?

01:28    4            THE COURT:  You may.  It's running time.  It's

         5   very valuable time.

01:28    6            MR. HEWITT:  May counsel approach with the

         7   exhibit, Your Honor?

01:28    8            THE COURT:  Certainly, you may.

01:28    9            MR. HEWITT:  Thank you.

01:28   10            THE CLERK:  Is there an exhibit number?

01:28   11            MS. KIM:  330.

01:28   12            MR. HEWITT:  We've marked as Exhibit No. 330 the

        13   '283 patent.

01:28   14            Do you have that in front of you, Mr. Kim?

01:28   15            THE WITNESS:  Yes.

01:28   16   BY MR. HEWITT:

01:28   17   Q.   And on the first page'a that patent, the '283 patent

        18   identifies you as the inventor.  Are you the inventor?

01:29   19   A.   Yes, that is correct.

01:29   20   Q.   And did you assign the '283 patent to Spigen?

01:29   21   A.   Yes, that's correct.

01:29   22   Q.   And are you the designer of the CS Slim Armor -- the

        23   Slim Armor CS?  Sorry.

01:29   24   A.   Yes, I am also as well.

01:29   25   Q.   How did you come up with the idea for the
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 140 -

1    Slim Armor CS?

01:29    2    A.    I had the biggest objective in coming up with this idea

3    for this product.  First of all, I had to have many cards to

4    be able to inserted in the compartment.  And the product had

5    to be made to be very slim.  And these two characteristics

6    have opposite characteristics, I will say.  So my objective

7    was, while allowing various cards to be placed, but at the

8    same time have a very slim product with a slim property.

9    Those were the objectives that I had when I had the idea for

10   this product.

01:31   11    Q.    Did you see anything that led you to the idea of the

12   practicing product, the Slim Armor CS?

01:31   13    A.    No, nothing that I saw.

01:31   14    Q.    Did you see -- prior to designing the Slim Armor CS,

15   did you see what we call the OtterBox?

01:31   16    A.    No, I didn't get to see.

01:31   17    Q.    And prior to designing the Slim Armor CS, did you see

18   the Incipio Stowaway, which is this phone (indicating)?

01:32   19    A.    No, I didn't get to see that either.

01:32   20    Q.    And prior to designing the Slim Armor CS, did you see

21   the design Skin Slider?

01:32   22    A.    That I did not see.

01:32   23    Q.    Prior to designing the Slim Armor CS, did you see what

24   we've called the Damda Cotton?

01:32   25    A.    No, I did not see.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 141 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 64 of 106   Page ID
#:8988
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 64 of 106   Page ID
#:7788
64

01:32  1    Q.   Did you see, prior to designing the Slim Armor CS, the

       2    bifold wallets that held a cell phone and credit cards?

01:33  3    A.   Yes, that I saw.

01:33  4    Q.   Is Spigen's Slim Armor CS -- was there anything else

       5    like it on the market when you designed it?

01:33  6    A.   No.  None.

01:33  7    Q.   On the Spigen Slim Armor CS, the storage compartment is

       8    soft.  Is there a reason for that?

01:34  9    A.   Yes, there is.

01:34  10   Q.   What is the reason for that?

01:34  11   A.   As I told you before, it has to allow for various cards

       12   to be inserted, yet it has to have the objective of being

       13   made very slimly.  In order to do that, there has to be

       14   storage in that side.

01:34  15   Q.   How long did it take you to design the Slim Armor CS?

01:34  16   A.   I think it took about one month, close to one month.

01:35  17   Q.   On the Slim Armor CS?

01:35  18   A.   Yes, that's correct.  I think for the design, that's

       19   all, yes.

01:35  20   Q.   And then how long did it take you -- did you design

       21   what's called the Spigen-1?

01:35  22   A.   Yes, that's correct.

01:35  23   Q.   And then how long did it take you to design the

       24   Spigen-1?

01:35  25   A.   Took about one week, I believe.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 142 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 65 of 106   Page ID
#:8089
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 65 of 106   Page ID
65

01:35   1    Q.   After you designed the Slim Armor CS, what did you do?

01:35   2    A.   Yes, and then I decided to apply for the patent.

01:35   3    Q.   And prior -- when you decided to apply for the

        4    '283 patent, did you ever hear the term "prior art"?

01:36   5    A.   No, I have not.

01:36   6    Q.   Now, at some point in time, you became aware of the

        7    '435, what we call the -- it's a Korean utility model,

        8    ending in '435.  You became aware of the KUM '435 patent; is

        9    that true?

01:36   10   A.   Yes, that's correct.

01:36   11   Q.   And approximately when did you become aware of the

        12   '435 patent?

01:37   13   A.   Yes, I think it was around the fall of 2014.

01:37   14   Q.   And that was after the application had been made for

        15   the '283 patent, correct?

01:37   16   A.   Yes, that's correct.

01:37   17   Q.   When you looked at the '435 patent, what did you look

        18   at?

01:37   19   A.   I saw the concerns regarding what the claim --

        20   regarding the claim.

01:37   21   Q.   So to be clear, did you see the illustrations in the

        22   '435 patent?

01:38   23   A.   I saw the drawing that was applicable to the claim

        24   number.

01:38   25   Q.   And so did you see the body of the '435 patent?

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 143 -

| 01:38 | 1  | A.   No, that I did not see. |
| 01:38 | 2  | MR. HEWITT:  Like to put on the ELMO what we have |
|       | 3  | marked as Exhibit 316? |
| 01:38 | 4  | THE COURT:  Three-one-six? |
| 01:38 | 5  | MR. HEWITT:  Three-one-six, Your Honor. |
| 01:38 | 6  | The KUM '435 patent. |
| 01:38 | 7  | *(Exhibit displayed.)* |
| 01:39 | 8  | BY MR. HEWITT: |
| 01:39 | 9  | Q.   And do you have the '435 patent in front of you? |
| 01:39 | 10 | A.   Yes. |
| 01:39 | 11 | Q.   And is that one of the diagrams that you looked at when |
|       | 12 | you saw the '435 patent? |
| 01:39 | 13 | A.   Yes, that is correct. |
| 01:39 | 14 | Q.   And then there are ten claims, six of which have been |
|       | 15 | deleted. |
| 01:39 | 16 | A.   Yes. |
| 01:39 | 17 | Q.   And did you read those claims? |
| 01:40 | 18 | A.   Yes, I read them all. |
| 01:40 | 19 | Q.   And you have the Korean translation in front of you, |
|       | 20 | correct? |
| 01:40 | 21 | A.   Yes, correct. |
| 01:40 | 22 | Q.   And you read the '435 patent in Korean, correct? |
| 01:40 | 23 | A.   Yes, that is correct. |
| 01:40 | 24 | Q.   And anywhere in the claims did you see any call for a |
|       | 25 | piercing? |

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 67 of 106   Page ID
#:8095
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 67 of 106   Page ID
#:6787

01:40  1   A.   No, none.

01:40  2   Q.   And you did not read the body of the '435 patent, did

       3   you?

01:41  4   A.   That's correct.  I only read the claim.

01:41  5   Q.   When you read -- now, when you read the '435 patent,

       6   you did not have the practicing product, did you?

01:41  7   A.   That is correct.  I did not have it.

01:41  8   Q.   Is there any reason why you didn't give the '435 patent

       9   to the patent examiner?

01:42  10  A.   I did not know that I had to do so.

01:42  11  Q.   Now, another product is the -- what we call the

       12  Spigen-1, which we've marked as Exhibit 303.  You're the

       13  designer on the Spigen-1, correct?

01:42  14  A.   Yes, that is correct.

01:42  15  Q.   Is there any reason why you did not submit the Spigen-1

       16  product to the patent examiner of the '283?

01:42  17  A.   Because I -- first of all, I did not know the fact that

       18  I had to do that.  And even if I knew, between the two

       19  products, Spigen-1 product and Slim Armor CS, those two are

       20  completely different products.

01:43  21  Q.   Did you feel the same way about the Slim Armor CS and

       22  the '435 patent?

01:43  23  A.   Yes, that's correct.

01:43  24  Q.   And why is that?

01:43  25  A.   For the '435 patent, for the technology itself, for the

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 145 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 68 of 106  Page ID
#:8098
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 68 of 106  Page ID
68

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | number two party -- for the number two body for to be        |
|       | 2  | inserting the card into its body, our product, it -- for our |
|       | 3  | product, it's in number one body.                            |
| 01:44 | 4  | Q.   So on the '435 product, you read that the card inserts  |
|       | 5  | into this body; is that correct?  *(Indicating.)*            |
| 01:44 | 6  | A.   Number two body for the '435.                           |
| 01:44 | 7  | Q.   Number two?                                             |
| 01:44 | 8  | A.   (No response.)                                          |
| 01:44 | 9  | Q.   And on the Spigen Slim Armor, it inserts into a         |
|       | 10 | different body?                                              |
| 01:44 | 11 | A.   That's correct, yes.                                    |
| 01:44 | 12 | Q.   Are there any other reasons?                            |
| 01:45 | 13 | A.   Uh, what other reasons do you mean specifically?        |
| 01:45 | 14 | Q.   Well, did you note that the body on the '435 patent     |
|       | 15 | calls for it to be fixed to the TPU?                         |
| 01:45 | 16 | A.   Yes.                                                    |
| 01:45 | 17 | Q.   And that there is a plate for the credit card on the    |
|       | 18 | '435?                                                        |
| 01:45 | 19 | A.   Yeah, that is correct.                                  |
| 01:45 | 20 | Q.   And that there is no soft-raised wall on the '435?      |
| 01:45 | 21 | A.   That's correct.  There isn't.                           |
| 01:45 | 22 | Q.   And that the '435 only accepts one credit card?         |
| 01:45 | 23 |          MR. POOLE:  Objection.  Leading, Your Honor.        |
| 01:45 | 24 |          THE COURT:  Sustained.                              |
|       | 25 |                                                              |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 146 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 69 of 106  Page ID
#:8097
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 69 of 106  Page ID
#:6969

01:45  1   BY MR. HEWITT:

01:45  2   Q.   When you read the '435 patent, how many credit cards

       3   did it accept?

01:46  4   A.   I don't think within the patent itself that I'm reading

       5   that there is a quantity of cards.

01:46  6   Q.   Mr. Kim, when is the first time that you saw a Damda

       7   Slide product?

01:46  8   A.   I think it was after October of 2014.

01:46  9   Q.   And when you received the Damda Slide product, what was

       10  your reaction?

01:47  11  A.   First of all, the product was received.  Before looking

       12  at the product itself, starting from the package, it almost

       13  maliciously copied our product, I felt.

01:47  14             MR. HEWITT:  I'd like to give Exhibits 219 and 439

       15  to the witness.

01:48  16             (Exhibits provided to the witness.)

01:48  17             THE WITNESS:  Yes, yes, I received them.

01:48  18  BY MR. HEWITT:

01:48  19  Q.   Why did you feel -- did you consider the Damda Slide to

       20  be a competing product?

01:48  21  A.   Yes, that is correct.

01:48  22  Q.   And why did you feel that the Damda Slide was a

       23  competing product and a copy of the Spigen Slim Armor?

01:48  24  A.   Yes, first of all, when I saw this product, the concept

       25  itself was completely identical I got to feel.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 147 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 70 of 106   Page ID
#:8098
8:15-CV-1050-DOC-DFM - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 70 of 106   Page ID
#:70

01:49   1    Q.   What gave you that feeling?

01:49   2    A.   First of all, we used a transparent plastic case, but

        3    it's also here identical completely.  In the front, we put

        4    in the image of the product.  The shape and the position

        5    location are completely identical.  And at the left bottom,

        6    we inserted our company's logo.  Even that is put in the

        7    identical location.  And then the product name was written

        8    inside.  Even the location was identical.  And it said Damda

        9    Slide brand.  That was my first impression.  And looking at

        10   the back, I was even more astonished.  I start to wonder how

        11   maliciously this could've been done.

01:50   12         On the top, there was our product's image, and it was

        13   also in the other one -- the other image as well on the

        14   identical position.  And we use six foreign languages in

        15   order.  And that's what we selected -- we had to, first of

        16   all, select six different foreign languages to use.  And at

        17   the top, it was English, and then Japanese, and then

        18   Chinese, and then German, and then French, and Korean.  That

        19   was the sequence by which we put in our product explanation.

01:51   20         Also, in the Verus product, it was in a similar

        21   position -- location, but completely identically with same

        22   sequence and position.

01:51   23         And we had a function called "air cushion," and we

        24   explained about it.  But the other company also used the

        25   word "airspace structure" and used almost similar

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 148 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 71 of 106   Page ID
#:8998
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 71 of 106   Page ID
#:7171

1    terminology.

01:51  2        So just by looking at the exterior and that's what I

3    thought.  Once I opened it up and looked at the product,

4    before looking at the product, I looked at the paper insert.

5    I was even more astonished when I looked at this insert.

6    This is ours, and this is the other competing product paper

7    insert.  They look identical.

01:52  8        I think to this extent copying is a malicious copying.

01:52  9        Even the copyright is put in right here in the same

10    location.  It's in the identical location in the same

11    direction.  Even the content is almost identical.

01:52  12        This is how I felt just by looking at the package

13    itself.

01:52  14        And then I got to actually look at the product itself.

15    As you look and see the product, there are three components

16    to this product.  And identically also for the Verus

17    product, it has three components.

01:53  18        There's the soft material.  This is where compartment

19    for the card storage -- and it's also identical in the other

20    product.

01:53  21        And there's the aperture -- frame with the aperture.

22    We have the same PC frame.  They are identical configuration

23    in terms of their manufacture.

01:53  24        And there's a sliding.  There's a sliding cover here.

25    And identically, there's also a cover sliding with a sliding

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 149 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 72 of 106   Page ID
#:3090
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 72 of 106   Page ID
#:2

72

```
        1   structure.
01:54   2        And then I looked at the product itself.  When
        3   designing this product, I put in so that when the card is
        4   entered and you can put in a finger -- there's a space for
        5   finger to be put in to be able to take out the card well as
        6   what I wished, but it's in the same identical shape.  Look
        7   at this same shape exactly identical.  There's also a
        8   triangular shape that I have drawn for -- finger.  But
        9   there's the same triangle shape configuration.
01:54  10        Of course, the direction happens to be the opposite
       11   direction.  Other than that, all the configuration are
       12   identical, completely.
01:55  13        In the end, because of so many, uh, products (sic) --
       14   which copy our products, in order to have original
       15   authenticity card, this shows that this product is original
       16   authentic product.
01:55  17        Theirs also has the same authentication card they've
       18   made.  And they put in here as well.
01:55  19        So I looked at everything.  And it was such a malicious
       20   copying overall.  That's why I got to think.
01:55  21        That's it.
01:56  22   Q.  Mr. Kim, did anyone ever tell you that you had to
       23   submit prior art -- strike that.
01:56  24        At the time you applied for the '283 patent, did anyone
       25   ever tell you that you had to submit prior art to the PTO?
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 150 -

| 01:56 | 1 | A.   No, no one. |
| 01:56 | 2 | Q.   And the first Galaxy -- I'm sorry -- what on the Spigen |
|  | 3 | Slim Armor -- what cell phone was the first Slim Armor CS |
|  | 4 | case designed for? |
| 01:56 | 5 | A.   Galaxy S5 it was. |
| 01:56 | 6 | Q.   So it wasn't -- the first case -- CS Slim Armor was not |
|  | 7 | designed for the iPhone; is that correct? |
| 01:57 | 8 | A.   That's correct. |
| 01:57 | 9 | Q.   And when was the first Slim Armor CS released? |
| 01:57 | 10 | A.   In, I believe, early part of 2014. |
| 01:57 | 11 | Q.   Could you -- would it be May of 2014?  Do you know? |
| 01:57 | 12 | A.   Yes, I think so. |
| 01:57 | 13 | Q.   When you designed the Slim Armor CS, were you |
|  | 14 | researching other cell phone cases? |
| 01:58 | 15 | A.   Not in particular. |
| 01:58 | 16 | Q.   Did you consider the Slim Armor CS to be a pioneering |
|  | 17 | design? |
| 01:58 | 18 | A.   Yes, that is correct. |
| 01:58 | 19 | Q.   Were you aware of anything else on the market at the |
|  | 20 | time you designed the Slim Armor CS that was like the |
|  | 21 | Slim Armor CS? |
| 01:58 | 22 | A.   No, I didn't see any. |
| 01:58 | 23 | Q.   Has the Slim Armor CS been commercially successful for |
|  | 24 | Spigen? |
| 01:59 | 25 | A.   Yes, that is correct. |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 151 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 74 of 106   Page ID
#:8098
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 74 of 106   Page ID
#:7772

| | | |
|---|---|---|
| 01:59 | 1 | Q.   And are you aware of any industry praise that the |
| | 2 | Slim Armor CS has received? |
| 01:59 | 3 | A.   Yes, that's correct. |
| 01:59 | 4 | Q.   Is that on the -- in -- in trade or -- can you tell me |
| | 5 | a little bit about that, please? |
| 01:59 | 6 | MR. POOLE:  Object.  Object.  Hearsay, Your Honor. |
| 01:59 | 7 | THE COURT:  Overruled. |
| 01:59 | 8 | You can answer the question, sir. |
| 01:59 | 9 | THE WITNESS:  At that time there were technical |
| | 10 | phone videos and the online media.  And it said our phone |
| | 11 | case was the best Samsung Galaxy S5 phone case and that it |
| | 12 | was one of the best.  And those kinds of writings kept going |
| | 13 | into the Internet. |
| 02:00 | 14 | MR. HEWITT:  Thank you. |
| 02:00 | 15 | THE COURT:  All right.  Cross-examination, please. |
| 02:00 | 16 | MR. POOLE:  Yes, Your Honor.  Thank you. |
| 02:00 | 17 | **CROSS-EXAMINATION** |
| 02:00 | 18 | BY MR. POOLE: |
| 02:01 | 19 | Q.   Good afternoon, Mr. Kim. |
| 02:01 | 20 | A.   Yes, how are you? |
| 02:01 | 21 | Q.   Spigen is in a very competitive industry; isn't that |
| | 22 | correct? |
| 02:01 | 23 | A.   Yes, that is correct. |
| 02:01 | 24 | Q.   In fact, there are many competitors to Spigen in the |
| | 25 | marketplace of protective devices for cell phones; isn't |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 152 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 75 of 106   Page ID
#:8099
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 75 of 106   Page ID
#:8675

1   that correct?

02:01   2   A.   Yes, that's correct.

02:01   3   Q.   Many of them are in China?

02:01   4   A.   Actually, we sell a lot of products on the Amazon

5   online as well as China, of course, and Korea.  I believe,

6   uh, those are the countries, yes.

02:02   7   Q.   The two biggest manufacturers of protective cases for

8   cell phones are Korea and China, correct?

02:02   9   A.   Are you talking about the market or what?

02:02   10   Q.   Where the people who compete with you to sell cell

11   phone protective cases to consumers.

02:02   12   A.   I think actually the U.S. Amazon is where it would be

13   the most.

02:02   14   Q.   Okay.  And do you believe that you sell more -- Spigen

15   sells more in Amazon than Chinese manufacturers?

02:02   16   A.   Yes, that's correct.

02:02   17   Q.   And ISpeaker is one of your competitors in Korea,

18   correct?

02:03   19   A.   You talking now only about the Korean market only?

02:03   20   Q.   Yes.

02:03   21   A.   Well, I'm in the U.S, and I'm focusing on the U.S.

22   market right now.  So as far as the entire overall business,

23   supervision of Korean business is handled by the

24   headquarters, and then someone else is doing that at the

25   headquarters.  So I'm talking about as far as Verus is

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 153 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 76 of 106   Page ID
#:8300
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 76 of 106   Page ID
#:7876

|      |    |
|------|----|
|      | 1  | concerned in Korea, I don't even know if it's doing a good |
|      | 2  | business in Korea.  That's something that I don't know |
|      | 3  | about.  And I'm not interested in. |
| 02:04 | 4  | Q.   Yeah, that was not my question.  But Verus competes |
|      | 5  | with you in the United States, correct? |
| 02:04 | 6  | A.   In U.S. market, I think out of the U.S. market only on |
|      | 7  | Amazon, I believe. |
| 02:04 | 8  | Q.   Okay.  But that -- Amazon's a substantial part of your |
|      | 9  | sales, isn't it, for Spigen? |
| 02:04 | 10 | A.   Uh, more than a majority I would say, yes. |
| 02:04 | 11 | Q.   Okay.  Now, you keep an eye on your competitors, don't |
|      | 12 | you? |
| 02:04 | 13 | A.   Yes.  On Amazon, uh, yes, I take a look at the -- and |
|      | 14 | keep my eye on competitors, yes. |
| 02:05 | 15 | Q.   And part of being a good businessman is understanding |
|      | 16 | what your competitors are doing and also understanding what |
|      | 17 | the consumers want; isn't that correct? |
| 02:05 | 18 | A.   For example, on Amazon, in 2014, around October, if you |
|      | 19 | search iPhone 6 cell phone case, the results would show over |
|      | 20 | 4.5 million results are yielded. |
| 02:05 | 21 |     If you look at the entire 4.5 millions, it would be |
|      | 22 | impossible to be able to take a look at all 4.5 million |
|      | 23 | searches.  And when you make a search, you can look at the |
|      | 24 | first page of Amazon about -- that's about how much you can |
|      | 25 | look at, that you have a capability of looking at just the |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 154 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 77 of 106   Page ID
#:8395
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 77 of 106   Page ID
#:77

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | first page of Amazon.  That's -- that's all you can look at.        |
| 02:06  | 2  | As far as the products on second or third pages of                 |
|        | 3  | Amazon online, as I told you would be applicable to one of          |
|        | 4  | the many, uh, of the searches out of 4.6 million search            |
|        | 5  | results.  So looking at all of them itself would be                |
|        | 6  | impossible.                                                         |
| 02:06  | 7  | Q.   There are not 4.6 million competitors, are there?             |
| 02:07  | 8  | A.   When I said 4.6 million, I was talking about number of        |
|        | 9  | products.                                                           |
| 02:07  | 10 | Q.   I'm asking, do you keep an eye on your competitors?           |
| 02:07  | 11 | A.   And answer to that I would say applicable to the first        |
|        | 12 | page of the competitors on that page I will take a look at.        |
|        | 13 | That's what I do.                                                   |
| 02:07  | 14 | Q.   Okay.  So you keep an eye on your major competitors and       |
|        | 15 | what products they're offering; isn't that true?                  |
| 02:07  | 16 | A.   Not always.  Not really very well.                           |
| 02:07  | 17 | Q.   Did you know in 2013, uh, 2000 *(sic)* -- that time frame     |
|        | 18 | that there was a demand in the marketplace for protective          |
|        | 19 | cases that could have credit card storage?                        |
| 02:08  | 20 | A.   But not on Amazon.                                            |
| 02:08  | 21 | Q.   I didn't ask about Amazon.                                    |
| 02:08  | 22 | Were you aware in 2013 that consumers were starting to             |
|        | 23 | buy cell phones that had credit card storage in them?             |
| 02:08  | 24 | A.   As I told you before, we mostly sell our products            |
|        | 25 | through Amazon.  At the time of development of Amazon in           |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 155 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 78 of 106   Page ID
#:8308
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 78 of 106   Page ID
78

|  | 1 | 2014, according to my recollection, even if I look at up to |
|---|---|---|
|  | 2 | page 5, there were no card cases at all.  Of course, there |
|  | 3 | was this leather shape.  There was this bilateral that I |
|  | 4 | remember.  But not for the product with the hard case.  That |
|  | 5 | I did not see too much. |
| 02:09 | 6 | Q.   Were you aware in 2013 that DesignSkin had a phone |
|  | 7 | protection device that had storage for credit cards? |
| 02:09 | 8 | A.   Well, first of all, let me ask, was that product on |
|  | 9 | sale on Amazon? |
| 02:09 | 10 | Q.   I just simply asked the question:  Were you aware in |
|  | 11 | 2013 that DesignSkin had a product that had credit card |
|  | 12 | storage? |
| 02:10 | 13 | A.   I'm sorry.  What was that again? |
| 02:10 | 14 | Q.   Were you aware in 2013 that DesignSkin had a credit |
|  | 15 | card storage feature? |
| 02:10 | 16 | A.   But you are actually asking me where I was when that |
|  | 17 | product was being sold.  Isn't that your question? |
| 02:10 | 18 | Q.   That was not my question. |
| 02:10 | 19 | A.   Then what are you asking? |
| 02:10 | 20 | Q.   I'm asking if you were aware in the 2013 time frame |
|  | 21 | that there was a product on the market manufactured by |
|  | 22 | DesignSkin that had credit card storage? |
| 02:10 | 23 | A.   That I did not know. |
| 02:10 | 24 | Q.   Is it your testimony that the idea of having the credit |
|  | 25 | card storage in a cell phone protective case was the first |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 156 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 79 of 106   Page ID
#:8393
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 79 of 106   Page ID
79

|        | 1  | time in the history of the cell phone protective device? |
| 02:11  | 2  | A.   Can you just repeat the question again?  I'm sorry. |
| 02:11  | 3  | Q.   Is it your testimony that the product that you came up |
|        | 4  | with, that became ascribed in the Spigen '283 patent was the |
|        | 5  | first time anyone had come up with the idea of a credit card |
|        | 6  | storage in a cell phone protective device? |
| 02:11  | 7  | A.   It was not the very first one, no. |
| 02:11  | 8  | Q.   There was one by DesignSkin, wasn't there? |
| 02:12  | 9  | A.   I was talking about the product called Speck.  And if |
|        | 10 | it was sold on Amazon by DesignSkin at that time, if -- and |
|        | 11 | then those were -- products were substantially sold, then I |
|        | 12 | would've known, naturally.  But at that time, it was not |
|        | 13 | present, I don't think. |
| 02:12  | 14 | Q.   Were you familiar in 2013 with the Incipio credit card |
|        | 15 | case for the iPhone 4? |
| 02:12  | 16 | A.   No, I did not know. |
| 02:12  | 17 | Q.   What about the OtterBox computer series in 2013?  Were |
|        | 18 | you familiar with that? |
| 02:12  | 19 | A.   That, I did not know. |
| 02:12  | 20 | Q.   Did you go to trade shows on behalf of Spigen? |
| 02:13  | 21 | A.   No, I did not go to trade shows. |
| 02:13  | 22 | Q.   Did people from Spigen go to trade shows in 2013 and |
|        | 23 | 2014? |
| 02:13  | 24 | A.   Yes, there were. *(Verbatim.)* |
| 02:13  | 25 | Q.   And Spigen and other manufacturers of cell phone |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 157 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 80 of 106   Page ID
#:8398
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 80 of 106   Page ID
#:80

|  |  |  |
|---|---|---|
|  | 1 | protective devices put their products on display to try to |
|  | 2 | get attention from people who would buy them; isn't that |
|  | 3 | correct? |
| 02:13 | 4 | A.   Yes, those products are exhibited, yes. |
| 02:13 | 5 | Q.   There was a new iPhone coming out in the Fall of 2014; |
|  | 6 | isn't that correct? |
| 02:14 | 7 | A.   Yes. |
| 02:14 | 8 | Q.   Okay.  And in anticipation of that release, you were |
|  | 9 | coming up with a new -- a new product that could be sold in |
|  | 10 | connection with that; isn't that correct? |
| 02:14 | 11 | A.   Yes, that's correct. |
| 02:14 | 12 | Q.   And it wouldn't surprise you if every other |
|  | 13 | manufacturer of cell phone protective devices was doing the |
|  | 14 | same thing in 2014, would it? |
| 02:14 | 15 | A.   Correct.  Naturally. |
| 02:14 | 16 | Q.   And everyone in your position is looking to improve on |
|  | 17 | products that are already in the marketplace; isn't that |
|  | 18 | correct? |
| 02:14 | 19 | A.   Yes, I think so.  I guess. |
| 02:14 | 20 | Q.   Okay.  Now, you were identified as the inventor on the |
|  | 21 | '283 patent; is that correct? |
| 02:15 | 22 | A.   Yes, that's correct. |
| 02:15 | 23 | Q.   And you testified several times in response to |
|  | 24 | questions by Mr. Hewitt that you had no idea that you were |
|  | 25 | to disclose to the Patent and Trademark Office prior art? |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 158 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 81 of 106   Page ID
#:8398
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 81 of 106   Page ID
#:81

02:15    1    A.    That's correct; I did not know.

02:15    2    Q.    And I believe your testimony is you applied for patents

         3    at least ten occasions in the U.S.

02:16    4    A.    Yes.

02:16    5    Q.    Mr. Kim, you understand that you're gonna know a lot

         6    more about what's going on in the cell phone protective case

         7    world than a patent examiner at the U.S. Patent and

         8    Trademark Office; wouldn't you agree?

02:16    9               MR. HEWITT:  Objection, Your Honor.

02:16   10               THE COURT:  Overruled.

02:16   11               You can answer the question, Mr. Kim.

02:16   12               THE WITNESS:  Well, as to the question, I cannot

        13    tell you if I know more.  I cannot say.

02:16   14    BY MR. POOLE:

02:16   15    Q.    So you wouldn't think you would know more than a person

        16    sitting in an office in Washington D.C. about the state of

        17    the art?

02:16   18               THE COURT:  Well, the difficulty with the

        19    question -- Counsel may be right -- is the "do you know

        20    more."

02:17   21               MR. POOLE:  I'll withdraw --

02:17   22               THE COURT:  That's an unfair question.

02:17   23               MR. POOLE:  Yeah.  I'll withdraw the question,

        24    Your Honor.

02:17   25               THE COURT:  I'll sustain the objection.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 159 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 82 of 106   Page ID
#:8300
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 82 of 106   Page ID
#:82

02:17    1                MR. POOLE:  Yes.

02:17    2                THE COURT:  It's an incorrect ruling by the Court.

02:17    3                You can reask it -- about his awareness.

02:17    4    BY MR. POOLE:

02:17    5    Q.   Mr. Kim, in connection with your patent application for

         6    Spigen '283, you didn't file that yourself without the help

         7    of an attorney, did you?

02:17    8    A.   Correct.

02:17    9    Q.   And you hired a U.S. patent attorney to prosecute that

         10   patent; isn't that correct?

02:17    11   A.   That's correct, yes.

02:17    12   Q.   And was that patent attorney a brand new patent

         13   attorney, if you know?

02:17    14   A.   As to that, I didn't -- don't really know.

02:18    15   Q.   Isn't it true that he was an experienced patent

         16   attorney?

02:18    17   A.   What is your standard of being experienced or not?

02:18    18   Q.   Well, the attorney you hired was Mr. Chae; isn't that

         19   right?

02:18    20   A.   Yes, that is correct.

02:18    21   Q.   Now, you indicated -- in connection with the patent,

         22   you indicated that when you first saw the Verus product,

         23   that you were quite upset because of the similarity and the

         24   transparent plastic case; is that correct?

02:19    25   A.   Yes, correct.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 160 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 83 of 106   Page ID
#:8307
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 83 of 106   Page ID
#:3

| 02:19 | 1 | Q. The packaging, correct? |
| | 2 | A. Yes, yes. |
| 02:19 | 3 | Q. Now, that packaging is not a part of your patent, is |
| | 4 | it? |
| 02:19 | 5 | A. It's not. |
| 02:19 | 6 | Q. And there are no trade dress claims in this case; is |
| | 7 | that correct? |
| 02:19 | 8 | A. There isn't. No, there isn't. |
| 02:19 | 9 | Q. And so the location of the logo, the number of |

02:19    1    Q.   The packaging, correct?

02:19    2    A.   Yes, yes.

02:19    3    Q.   Now, that packaging is not a part of your patent, is

         4    it?

02:19    5    A.   It's not.

02:19    6    Q.   And there are no trade dress claims in this case; is

         7    that correct?

02:19    8    A.   There isn't.  No, there isn't.

02:19    9    Q.   And so the location of the logo, the number of

       10    language -- all of that is just something that upset you

       11    when you first saw the packaging; but it doesn't go to

       12    whether there's patent infringement here, does it?

02:20    13    A.   What I was trying to say was there's Damda Slide,

       14    Exhibit No. 439, benchmark.  Lot of parts of our product and

       15    copy many aspects, including our packaging.  And I was just

       16    emphasizing that it was that identical in terms of

       17    manufacture.  And I really felt very strong intent.  That's

       18    what I wanted to tell you.  That's why I mentioned what I

       19    said.

02:20    20    Q.   So -- so you were upset just when you saw the

       21    packaging, even before you saw the actual device; isn't that

       22    correct?

02:21    23    A.   Well, the product is overall almost identical.  So

       24    there is a high degree of probability consumer will be

       25    confused between our product and their product.  Products

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 161 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 84 of 106   Page ID #:8308
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 84 of 106   Page ID #:4

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | are similar.  And the concept is similar.  And impressions |
|       | 2  | are the same in terms of manufacture.  And I think the     |
|       | 3  | intent is trying to appeal to the consumer that it is the  |
|       | 4  | same product as our product.  That was conclusion that I   |
|       | 5  | made.                                                      |
| 02:21 | 6  | Q.   But it didn't exactly look like your product, did it, |
|       | 7  | in every respect?                                          |
| 02:22 | 8  | A.   Consumer is thinking very importantly of how it looks.|
| 02:22 | 9  | Q.   My question was the Verus product, it didn't look     |
|       | 10 | exactly like this embodiment of the -- of your product;    |
|       | 11 | isn't that correct?                                        |
| 02:22 | 12 | A.   But, to this extent, I would have to say they are     |
|       | 13 | identical.                                                 |
| 02:22 | 14 | Q.   And, in fact, in fairness, we're comparing the Verus  |
|       | 15 | product to the patent -- what's described in the patent,   |
|       | 16 | correct?                                                   |
| 02:22 | 17 | A.   What is your exact question?  I don't understand.     |
| 02:22 | 18 | Q.   Well, I'll actually let the -- we can address that    |
|       | 19 | later with instructions.  Let me ask you a couple more     |
|       | 20 | questions.                                                 |
| 02:23 | 21 | The -- Mr. Hewitt ask you about KUM '435.  You recall      |
|       | 22 | those questions generally?                                 |
| 02:23 | 23 | A.   Yes.                                                  |
| 02:23 | 24 | Q.   And do you recall getting a letter from DesignSkin in |
|       | 25 | July of 2014?                                              |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 162 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 85 of 106   Page ID
#:8309
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 85 of 106   Page ID
#:85

02:23   1              MR. HEWITT:  Objection.  Your Honor, this was

        2     subject to the motion in limine.

02:23   3              THE COURT:  Well, I'm not certain if it is,

        4     Counsel.  I must be missing this objection.  I don't want a

        5     speaking objection.  Why don't you two consult for just a

        6     moment.  I don't think it is.

02:23   7              *(Plaintiff and defense counsel confer off the*

        8         *record.)*

02:24   9              THE COURT:  I'll overrule the objection.

02:24   10             Ask your question, Counsel.

02:24   11             MR. POOLE:  Thank you, Your Honor.

02:24   12    BY MR. POOLE:

02:24   13    Q.   You were receiving a letter in July of 2014 from

        14    DesignSkin in which they ask you to stop selling a

        15    particular Spigen product?

02:24   16    A.   Yes, I recall.

02:24   17    Q.   And do you recall responding to that letter on July

        18    6th, 2014, three days later?

02:24   19    A.   Not three days later.

02:24   20             THE COURT:  Now, just a moment.

02:25   21             THE WITNESS:  I replied as soon as possible.

02:25   22             THE COURT:  Mr. Kim, just a moment.  Is this

        23    letter -- or DesignSkin allegedly prior art --

02:25   24             MR. POOLE:  Yes.

02:25   25             THE COURT:  -- in terms of the design of the --

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 163 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 86 of 106   Page ID #:8340
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 86 of 106   Page ID #:86

02:25   1          MR. POOLE:  Yes, it relates to KUM '435.

02:25   2          THE COURT:  You may proceed.

02:25   3   BY MR. POOLE:

02:25   4   Q.   And do you recall responding to the letter you got from

       5   DesignSkin?

02:25   6   A.   Yes, I remember.

02:25   7   Q.   Okay.  I'd like to show you Exhibit 563.

02:26   8          (Exhibit displayed.)

02:26   9          MR. POOLE:  I represent that this is -- this is an

       10   English translation, and it's attached to all -- a part of

       11   Exhibit 563 includes a copy of the Korean, which I'm going

       12   to show Mr. Kim first.

02:27   13   BY MR. POOLE:

02:27   14   Q.   Mr. Kim, do you recognize Exhibit 563?

02:27   15   A.   Yes.

02:27   16   Q.   And is that the correspondence you sent back to

       17   DesignSkin in response to their cease and desist letter?

02:27   18   A.   Yes, that is correct.

02:27   19   Q.   And in that response -- and I'm gonna read from an

       20   English translation, which is the first page of that

       21   document -- you indicate in Item 2 -- I'll put the Korean

       22   back up there so he can follow --

02:28   23   A.   Yes.

02:28   24   Q.   You indicate in item two that you had conducted a

       25   detailed review of the warning letter, which referenced

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 164 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 87 of 106   Page ID
#:8345
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 87 of 106   Page ID
#:8787

    1   utility model registration No. 20-0472435.  That's what
    2   we've been calling KUM '435; is that correct?

02:28   3   A.   Yes.
02:28   4   Q.   And you indicated in your product it was different
    5   because the recessed card storage was not in the second
    6   body; is that correct?
02:28   7   A.   Yes, that is correct.
02:28   8   Q.   But then you said in Item No. 4 -- in response to their
    9   claim that you were violating their patent, you said,
02:28  10           "In addition, a product with a card
   11           storage with a sliding case has already
   12           been commercialized prior to
   13           November 2013.  See the attached image."
02:29  14       Is that correct?
02:29  15   A.   Yes, this is correct.
02:29  16   Q.   So you were taking the position that their patent
   17   would've been invalid by virtue of prior art; isn't that
   18   correct?
02:29  19   A.   Not necessarily the case.  Actually the product on
   20   No. 4, it had a soft -- it did not have a soft casing
   21   material.  And it was actually different product.
02:30  22       And, as to Number 3, under dispute, our cards are
   23   inserted in another body; therefore, as to the differences,
   24   I simply had put it this way to show what were the
   25   differences.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 165 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 88 of 106   Page ID
#:8342
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 88 of 106   Page ID
#:88

| | | |
|---|---|---|
| 02:30 | 1 | Q.   Okay.  But you, in fact, told them that, in addition, a |
| | 2 | product with a card storage with a sliding case has already |
| | 3 | been commercialized prior to November 2013.  Those are your |
| | 4 | words, correct? |
| 02:30 | 5 | A.   Yes, that is correct. |
| 02:30 | 6 | Q.   And you attached to your e-mail a web -- a web page |
| | 7 | showing the device you were referring to, correct? |
| 02:31 | 8 | A.   Yes, that is correct. |
| 02:31 | 9 | Q.   You indicated, if I understood you correctly, in |
| | 10 | response to Mr. Hewitt's questions that part of your design |
| | 11 | for Spigen '283 was that it could hold multiple credit |
| | 12 | cards? |
| 02:31 | 13 | A.   Yes. |
| 02:31 | 14 | Q.   Is that claimed in your patent?  Is that actually |
| | 15 | claimed in your patent:  That it can hold multiple credit |
| | 16 | cards? |
| 02:32 | 17 | A.   It's not claimed.  I just thought that it was not |
| | 18 | proper to just put that in, in the claim, that -- just the |
| | 19 | fact that a number of cards can be inserted. |
| 02:32 | 20 | Q.   So -- so that's not part of the claimed invention? |
| 02:32 | 21 | A.   Well, technology patent was allowing many cards to be |
| | 22 | inserted.  That was the technology.  But there was no reason |
| | 23 | to put it in the claim that, uh, yes, we insert several |
| | 24 | cards.  That's not necessary at all. |
| 02:33 | 25 | Q.   And you understand that your patent, if it's not in the |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 166 -

Case 2:16-cv-09185-DOC-DFM  Document 113-3  Filed 05/03/18  Page 89 of 106  Page ID
#:8347
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM  Document 125  Filed 11/21/16  Page 89 of 106  Page ID
#:89

```
         1    patent, then nobody will know that that's what you're

         2    claiming as a property, right?  You understand that, don't

         3    you?

02:33    4    A.   Well, the technology is in the structure that allows

         5    for the various cards to be put in, but not the fact that it

         6    has various cards to be put in.  That's not the way it

         7    should be put in.  There's no reason to put into the patent

         8    that it allows for several cards to be put in place.  The

         9    technological patent is for the structure.  That is what

        10    it's for.

02:34   11    Q.   And my question was you understand if you don't ascribe

        12    a particular feature, that the people -- everyone else won't

        13    know that's what you're claiming as an invention?

02:34   14    A.   You -- it is explained as -- I believe sufficiently.

02:34   15    Q.   And you understand the patent has to be clear so that

        16    people won't infringe on what you think is your property,

        17    right?

02:35   18    A.   Okay.  Let me give you an example.  In the claim

        19    so-and-so we talk about -- okay? -- it allows for two cards

        20    to be inserted.  How would that be?  How would that be

        21    allowable in a claim?  It could not be.

02:35   22    Q.   All I'm saying is you understand that you have -- what

        23    you're claiming as an invention has to be described very

        24    clearly so everybody knows what property is yours?

02:35   25    A.   Yes, that is correct.  But we had clearly drawn
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 167 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 90 of 106   Page ID
#:6348
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 90 of 106   Page ID
#:90

|    |    |
|----|----|
|    | 1  | drawings to be very clear.  We have Section U.  And we had |
|    | 2  | an explanation with detail with numbering of each parts. |
|    | 3  | And all the explanation in the claim is included.  It is all |
|    | 4  | very clear in terms of the way it's written. |
| 02:36 | 5 | Q.   In response to a question from Mr. Hewitt, you said you |
|    | 6  | believed that the first embodiment of your Spigen device |
|    | 7  | that was, uh -- which -- which has been described as being |
|    | 8  | an embodiment consistent with the patent, was sold in the |
|    | 9  | early part of 2014 -- in Spring of 2014.  Do you recall that |
|    | 10 | testimony? |
| 02:36 | 11 | A.   Yes. |
| 02:37 | 12 | Q.   Are you aware of documents that we've been provided |
|    | 13 | that indicate that the first sales of your products were in |
|    | 14 | September and October of 2014, not earlier in the year? |
| 02:37 | 15 | A.   I think you're talking about for the iPhone product.  I |
|    | 16 | think that's when the iPhone was released.  But I believe |
|    | 17 | Galaxy S5 was already released in March of that year.  And |
|    | 18 | we made products for Galaxy S5.  Naturally our time period |
|    | 19 | was correct. |
| 02:37 | 20 | Q.   So if documents were produced that described when the |
|    | 21 | products first sold, would your memory or the documents be |
|    | 22 | more accurate? |
| 02:38 | 23 | A.   *(No response.)* |
| 02:38 | 24 | Q.   Let me ask it this way -- I'll withdraw that question. |
| 02:38 | 25 |     Are you certain of the date of your first sales of the |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 168 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 91 of 106   Page ID #:8349
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 91 of 106   Page ID 91

|          | 1  | product that is consistent with the '283 patent?        |
| 02:38    | 2  | A.   That -- I remember it being the first part of that |
|          | 3  | year.                                                   |
| 02:38    | 4  | MR. POOLE:  No further questions.                       |
| 02:38    | 5  | THE COURT:  Redirect.                                   |
| 02:38    | 6  | MR. HEWITT:  Thank you, Your Honor.                     |
| 02:38    | 7  | **REDIRECT EXAMINATION**                                |
| 02:38    | 8  | BY MR. HEWITT:                                          |
| 02:39    | 9  | Q.   Mr. Kim, David -- Mr. Poole put on a document from you |
|          | 10 | dated July -- it's Exhibit 563 -- dated July 6, 2014.  |
| 02:39    | 11 | *(Exhibit displayed.)*                                  |
| 02:39    | 12 | THE WITNESS:  Yes.                                      |
| 02:39    | 13 | BY MR. HEWITT:                                          |
| 02:39    | 14 | Q.   And there's an attachment to it?                   |
| 02:39    | 15 | A.   Yes.                                               |
| 02:39    | 16 | Q.   Did you first become aware of this attachment in or |
|          | 17 | about July of 2014?                                     |
| 02:39    | 18 | A.   Yes, that's correct.                               |
| 02:39    | 19 | Q.   And when you designed the CS Slim Armor, you'd never |
|          | 20 | seen this document, correct?                            |
| 02:40    | 21 | A.   That's correct.                                    |
| 02:40    | 22 | Q.   Now, I had asked you if the Damda Slide products are a |
|          | 23 | competing product with the CS Slim Armor?              |
| 02:40    | 24 | A.   Yes, you did.                                      |
| 02:40    | 25 | Q.   And you complained that you felt that it was a     |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 169 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 92 of 106   Page ID
#:8350
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 92 of 106   Page ID
#:92

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | competing product because the packaging had copied --        |
| 02:40 | 2  |           MR. POOLE:  Objection.  Form of the question.       |
|       | 3  | Leading.                                                     |
| 02:40 | 4  |           THE COURT:  Sustained.                             |
| 02:40 | 5  | BY MR. HEWITT:                                               |
| 02:40 | 6  | Q.   Why did you feel that the Damda -- well, strike that.   |
| 02:41 | 7  |           MR. HEWITT:  I don't need to go back over that,    |
|       | 8  | Your Honor.                                                  |
| 02:41 | 9  | BY MR. HEWITT:                                               |
| 02:41 | 10 | Q.   You aren't trying to allege that the packaging          |
|       | 11 | infringes on the patent, are you?                           |
| 02:41 | 12 | A.   Correct.  It has nothing to do with the patent itself.  |
| 02:41 | 13 | Q.   And Mr. Poole asked if Mr. Chae here was your patent    |
|       | 14 | attorney, correct?                                          |
| 02:41 | 15 | A.   Yes.                                                    |
| 02:41 | 16 | Q.   Did anyone, including Mr. Chae, ever tell you that      |
|       | 17 | there was an obligation to submit prior art to the PTO when |
|       | 18 | you applied for the '283 patent?                            |
| 02:42 | 19 | A.   No.  No one did.  No one did.                           |
| 02:42 | 20 | Q.   And now after this litigation, and you learned that     |
|       | 21 | prior art must be submitted, are you submitting it?         |
| 02:42 | 22 | A.   Yes.  Yes, I'm submitting it.                           |
| 02:42 | 23 |           MR. HEWITT:  Thank you.                            |
| 02:42 | 24 |           THE COURT:  And recross?                           |
| 02:42 | 25 |           MR. POOLE:  Nothing further, Your Honor.           |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 170 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 93 of 106   Page ID
#:8357
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 93 of 106   Page ID
93

| | | |
|---|---|---|
| 02:42 | 1 | THE COURT:  Ladies and gentlemen, why don't you |
| | 2 | take a recess, and we'll come back and get you in about 20 |
| | 3 | minutes.  Okay?  Please don't discuss the case or form any |
| | 4 | opinion concerning the case.  Have a nice recess. |
| 02:42 | 5 | Counsel, if you would remain for just a moment. |
| 02:43 | 6 | *(Jury recesses at 2:43 p.m.)* |
| 02:43 | 7 | *(Outside the presence of the jury.)* |
| 02:43 | 8 | THE COURT:  Well, Counsel, the jury's not present. |
| 02:43 | 9 | Mr. Kim, would you have a seat for just a moment, |
| | 10 | sir.  He can remain in the witness stand for just a moment. |
| 02:43 | 11 | Counsel, have a seat for just a moment. |
| 02:43 | 12 | **DISCUSSION** |
| 02:43 | 13 | THE COURT:  Is this a trade dress case? |
| 02:43 | 14 | MR. POOLE:  No. |
| 02:43 | 15 | MR. HEWITT:  No, Your Honor. |
| 02:43 | 16 | THE COURT:  Then why were all those questions |
| | 17 | asked?  Isn't that somewhat confusing to the jury? |
| 02:43 | 18 | MR. HEWITT:  I don't think so, Your Honor. |
| 02:43 | 19 | One -- should I step to the microphone? |
| 02:43 | 20 | THE COURT:  No.  Am I going to step in with an |
| | 21 | instruction at this point, which is harmful to you, Counsel. |
| 02:44 | 22 | MR. HEWITT:  I'm sorry, Your Honor? |
| 02:44 | 23 | THE COURT:  Am I going to step in with an |
| | 24 | instruction to the jury at this point, which is harmful to |
| | 25 | you. |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 171 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 94 of 106   Page ID
#:8358
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 94 of 106   Page ID
#:4

02:44    1              This is not a trade dress case?

02:44    2              MR. HEWITT:  This is not.

02:44    3              THE COURT:  This is not a trade dress case?

02:44    4              MR. HEWITT:  No, Your Honor.

02:44    5              THE COURT:  Counsel, why don't you sit down for a

         6    moment.  We're going to spend some time together.

02:45    7              Is this a claim that Mr. Chae, who's counsel of

         8    record, doesn't understand prior art?  In other words, when

         9    the witness answers -- and I'll say this in front of

        10    Mr. Kim, with his lack of wisdom and knowledge about prior

        11    art -- is this a case wherein Mr. Chae is incompetent?  Does

        12    he understand prior art?

02:45   13              Do you understand prior art?

02:45   14              MR. CHAE:  Yes, Your Honor.  I understand it.

02:45   15              THE COURT:  Is this misleading to the jury?  And

        16    the fact that I'm receiving responses now from the witness

        17    that he doesn't understand prior art -- are you about to

        18    testify in my court?

02:45   19              Do you understand prior art?

02:45   20              MR. CHAE:  Yes, Your Honor.

02:45   21              THE COURT:  Does it appear to you, Counsel, that

        22    this is potentially misleading to the jury, when your client

        23    claims -- and perhaps truthfully, that he doesn't understand

        24    prior art -- and Mr. Chae now is put in the position of

        25    being counsel of record?

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 172 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 95 of 106   Page ID
#:8350
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 95 of 106   Page ID
#:5

02:46   1            MR. HEWITT:  I don't -- I don't believe it's

2    misleading.

02:46   3            THE COURT:  Are we starting over again?

02:46   4            MR. HEWITT:  I hope not, Your Honor.

02:46   5            THE COURT:  We may be.

02:46   6            Counsel, have a serious discussion about this.

7    Because if there's a motion, I'll be declaring a mistrial on

8    this matter.

02:46   9            I think this is very misleading, Counsel.  This is

10   not a trade dress.  You put your own Counsel -- or

11   co-counsel -- in the position of your witness claiming no

12   knowledge of prior art, but hiring counsel.  So the

13   impression in front of this jury is he either has competent

14   counsel or no communication.  Or, if I got into in that

15   communication, which would be improper, it's privileged --

16   now sit down.

02:46   17           So you think about that, Counsel.  Because I've

18   got all the time in the world to try your case in the

19   future.

02:46   20           This issue of obviousness was very close for the

21   Court.  Very difficult position.  And regardless of your

22   future responsibilities, you're going to be ordered to

23   remain in my court through the duration of this trial.

02:47   24           Now, who's the president of your corporation?

02:47   25           MR. POOLE:  *(Indicates.)*

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 173 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 96 of 106   Page ID #:8320
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 96 of 106   Page ID 96

02:47   1          THE COURT:  You're ordered to remain also.

02:47   2          Both of the presidents of these respective

3   companies will remain in my court, by order of this Court.

4   And you'll remain in my court every day or in the hallway.

02:47   5          Is that understood, Mr. Kim?

02:47   6          THE WITNESS:  Yes.  Yes, Your Honor.

02:47   7          THE COURT:  I'm not going to step in at this

8   point, Counsel.  But I find this incredibly misleading to a

9   jury who's struggling with these kind of issues in a patent

10   case.  And I'm not, Counsel, yet concerned about, let's say,

11   an intent.  But this is not a trademark case.

02:47   12         Now, I can get your response, so you have a clear

13   record on this, Counsel; but I'm very close to starting this

14   case over again.

02:47   15         MR. HEWITT:  Would you like my response,

16   Your Honor?

02:47   17         THE COURT:  You can -- I would suggest you create

18   your record, and you get a good response, Counsel.

02:47   19         MR. HEWITT:  Yes, Your Honor.

02:47   20         There's absolutely no intent to create a

21   misleading record.

02:48   22         THE COURT:  How are we going to clear that up

23   without an instruction by the jury (verbatim)?  In other

24   words, I delayed until the jury wasn't present.  But I was

25   about to step in on two areas.

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 174 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 97 of 106   Page ID
#:8355
8:15-CV-1050-DOC-DFM – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 97 of 106   Page ID
#:7

| | | |
|---|---|---|
| 02:48 | 1 | First of all, Mr. Kim, answer the question that's |
| | 2 | asked of you.  This is a timed trial.  It's unduly |
| | 3 | consumptive of the defendant's time when you go through a |
| | 4 | long answer that isn't related to the question.  Quite |
| | 5 | frankly, it strikes at your credibility. |
| 02:48 | 6 | Now, how are we going to clear this up, Counsel? |
| | 7 | Is there going to be a stipulation between the two of you? |
| | 8 | Because I really don't want to step in.  Or are we starting |
| | 9 | over again? |
| 02:48 | 10 | You two go have a thoughtful discussion. |
| 02:48 | 11 | Mr. Kim, you may step down. |
| 02:48 | 12 | *(Recess held at 2:48 p.m. )* |
| 03:27 | 13 | *(Proceedings resumed at 3:27 p.m.)* |
| 03:27 | 14 | *(Outside the presence of the jury.)* |
| 03:27 | 15 | THE COURT:  All right.  We're back on the record. |
| | 16 | All counsel are present.  The parties are present. |
| 03:27 | 17 | And, Counsel, if you would like to be seated, |
| | 18 | please. |
| 03:27 | 19 | Counsel, what are your thoughts? |
| 03:27 | 20 | MR. POOLE:  Your Honor, the defendants intend to |
| | 21 | move at this time for a mistrial. |
| 03:27 | 22 | THE COURT:  All right.  I've indicated informally |
| | 23 | to counsel in chambers -- and I want both presidents to hear |
| | 24 | this.  So if Mr. Kim's present with the interpreter? |
| 03:28 | 25 | Interpreter? |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 175 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 98 of 106   Page ID
#:8328
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 98 of 106   Page ID
#:8328

03:28     1            THE INTERPRETER:  Yes, Your Honor.  I am

          2    interpreting for him.

03:28     3            THE COURT:  And does your client also have an

          4    interpreter?  Do you speak English?

03:28     5            MR. PARK:  I will interpret.

03:28     6            THE COURT:  Interpret, okay?  Thank you.

03:28     7            First, the Court hasn't interceded, but was very

          8    concerned about the lack of responsiveness on Mr. Kim's

          9    part.

03:28    10            Secondly, I've shared with counsel in chambers my

         11    concern about the obviousness question for summary judgment

         12    purposes.  I've let the case go forward, but was going to,

         13    once again, closely examine that at the time of directed

         14    verdict.  And I didn't quite know what the ruling would be

         15    at that time.  But it was still on the table for thoughtful

         16    consideration.  None of this has been expressed to the jury.

         17    It's been expressed strongly to counsel in chambers.

03:28    18            And let me say on the record that I think each

         19    counsel have been exemplary.  So let's get past that.

03:29    20            My concern is, Mr. Chae, you being brought into

         21    this matter.  Where is Mr. Chae?  Hold up your hand.

03:29    22            MR. CHAE:  Yes, Your Honor.

03:29    23            THE COURT:  And I was informed in chambers -- I

         24    didn't realize you were co-counsel -- but I was informed in

         25    chambers that you're co-counsel.  But you appear to be

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 176 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 99 of 106   Page ID
#:8327
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 99 of 106   Page ID
#:9

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | counsel of record, sitting at the table.                   |
| 03:29 | 2  | And when Mr. Kim answers -- perhaps truthfully,            |
|       | 3  | perhaps not truthfully -- that he has no knowledge about   |
|       | 4  | prior art, but he consulted you, Mr. Chae --               |
| 03:29 | 5  | MR. CHAE:  Yes, Your Honor.                                 |
| 03:29 | 6  | THE COURT:  -- and without asking you if you have          |
|       | 7  | knowledge of prior art, I'm going to assume that you might.|
| 03:29 | 8  | MR. CHAE:  Uh.                                              |
| 03:29 | 9  | THE COURT:  No.  You don't have to respond to              |
|       | 10 | that.                                                       |
| 03:29 | 11 | It puts the Court in an absolutely insurmountable          |
|       | 12 | position concerning ethics.  Because the defense is one of |
|       | 13 | "prior art."  And it would appear to the jury right now, if|
|       | 14 | they believe Mr. Kim, that he had no knowledge about prior |
|       | 15 | art, but he hires counsel -- and I'm assuming competent    |
|       | 16 | counsel.  And you do have prior art.                        |
| 03:30 | 17 | Now, counsel obviously has to proceed with this            |
|       | 18 | issue of prior art, and he can't call you.  If he did, you |
|       | 19 | have a privilege with your client.  And in responding to   |
|       | 20 | that privilege -- it's extraordinarily damaging, uh,       |
|       | 21 | claiming the privilege.                                     |
| 03:30 | 22 | And so I don't see any way that this case isn't            |
|       | 23 | coming back to this Court with that quandary.               |
| 03:30 | 24 | If you have any solutions, I'm happy to listen to          |
|       | 25 | them on the record before I act.  But I've indicated very  |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 177 -

1    strongly in chambers that I thought that this was a

2    mistrial, unfortunately, because I don't seem to be able

3    to -- at least in my mind -- resolve either how you

4    shouldn't be called to the stand; and, if you are called to

5    the stand, whether there's a waiver of the privilege.

03:31   6         And, number three, even if there is, how damaging

7    that is.  Because I'm going to assume you are competent

8    counsel.  And I'm going to assume you understand prior art.

9    And I'm going to understand that Mr. Kim's, as the president

10   of a company, is smart enough to hire a good attorney.

11   Okay?

03:31   12        And so the end result is, counsel has a difficult

13   time pursuing his line of questioning with prior art.  When

14   you're brought into the case, it makes it extraordinarily

15   difficult, if not impossible.

03:31   16        Now, if you have a solution, Mr. Chae -- 'cause

17   now apparently you're co-counsel.  And I was mistaken.  I

18   thought you were of the same firm.  You can consult other

19   counsel, quietly.  But I'm prepared to declare a mistrial in

20   this matter.

03:32   21        All of rest of it -- the trade dress frustration,

22   the undue you consumption of time by Mr. Kim because he

23   can't respond, or wouldn't respond, or didn't understand the

24   question -- I can overlook.  I won't intercede in front of

25   the jury.  But I don't have a resolution for this.  And I'm

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 178 -

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | not sure I have a resolution in the future, as long as      |
|       | 2  | you're sitting at that table, Mr. Chae.                     |
| 03:32 | 3  | Now, why don't you have one more conversation and           |
|       | 4  | if you come up with any solution so be it; otherwise, I'm   |
|       | 5  | going to bring the jury in and declare a mistrial.          |
| 03:32 | 6  | I'll set you sometime in 2017, just as we did               |
|       | 7  | before.  But you'll be on call.                             |
| 03:32 | 8  | Just consult one more time, just to make sure.  If          |
|       | 9  | you have any suggestions, I'm happy to try to overcome this,|
|       | 10 | but I don't see any solution to it.                         |
| 03:32 | 11 | MR. HEWITT:  Thank you.                                      |
| 03:32 | 12 | MR. CHAE:  Thank you, Your Honor.                           |
| 03:32 | 13 | THE COURT:  Counsel, I want to give them that               |
|       | 14 | opportunity.                                                 |
| 03:33 | 15 | MR. POOLE:  Yes.  Absolutely, Your Honor.                   |
| 03:33 | 16 | THE COURT:  And I'm quite prepared to back away if          |
|       | 17 | I can come up with a solution that is, uh, reasonable.       |
| 03:33 | 18 | *(Plaintiff's counsel exit the proceedings.)*               |
| 03:33 | 19 | *(Plaintiff's counsel return to the proceedings.)*          |
| 03:35 | 20 | THE COURT:  Counsel, your thoughts?                         |
| 03:35 | 21 | MR. CHAE:  Your Honor, uh, so I get the waiver             |
|       | 22 | from my client -- the waiver of attorney-client privilege.  |
|       | 23 | So next time, uh, I be deposed by defense counsel and I will |
|       | 24 | stand on the witness stand.                                 |
| 03:35 | 25 | THE COURT:  I'm sorry?                                       |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 179 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 102 of 106   Page ID
#:8380
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 102 of 106   Page ID
102 Page ID

03:35   1          MR. HEWITT:  Your Honor, what Mr. Chae is saying

       2   is that Mr. Kim has agreed to waive the attorney-client

       3   privilege.  So the next time Mr. Chae's open to being

       4   deposed, re- -- withdraw as, uh, co-counsel, an attorney of

       5   record, and proceed.

03:35   6          THE COURT:  Well, then, is there any possibility

       7   of proceeding now?  In other words, you alluded to the

       8   website before.  I just haven't checked that.  I depend upon

       9   you.

03:35  10          But, right now, he sits at table as co-counsel.

      11   And it seems to me to be devastating that he would now take

      12   the stand, and you'd have to explain -- in other words, the

      13   prejudice that's initially with the defendant would now flow

      14   to the plaintiff.  And you'd have to explain that, "You

      15   know, he's really not part of our team.  He's been sitting

      16   here at the table the whole time visually, and now he's

      17   co-counsel."  And I think that that's equally prejudicial

      18   now to the plaintiff.

03:36  19          MR. HEWITT:  I don't think we can proceed in that

      20   manner today, Your Honor.

03:36  21          THE COURT:  I don't either.

03:36  22          I'm going to declare a mistrial in this matter.

      23   And I'll bring the jury back in and try to be as kind as

      24   possible.  In fact, let me just talk to them back there.

03:36  25          Well, we can do it in open court.  We need a

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 180 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 103 of 106   Page ID
#:8387
8:15-CV-1050-DOC – 11/8/2016 – Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 103 of 106   Page ID
103

| | | |
|---|---|---|
| | 1 | record of it.  Why don't you sit down for just a moment. |
| 03:36 | 2 | And I want to see Mr. Kim.  If you'd come up with |
| | 3 | Mr. Kim, along with the translator. |
| 03:36 | 4 | And who's the president here? |
| 03:36 | 5 | MR. POOLE:  Mr. Chung. |
| 03:36 | 6 | THE COURT:  All right. |
| 03:36 | 7 | Now, listen, I'm happy to preside over your case. |
| 03:37 | 8 | I don't know if the gentleman can understand me? |
| 03:37 | 9 | MR. POOLE:  He can translate. |
| 03:37 | 10 | THE COURT:  No.  You just stand there, Mr. Kim. |
| | 11 | We've had enough of you on the witness stand now for a |
| | 12 | moment. |
| 03:37 | 13 | I'm happy to preside over your case.  But I'm a |
| | 14 | little puzzled now.  And I'm going to take some action |
| | 15 | concerning this in just a few moments, and keep the two of |
| | 16 | you here in my jurisdiction. |
| 03:37 | 17 | Regardless of your respective market share, my |
| | 18 | guess is you're being ripped off also by Chinese knockoffs, |
| | 19 | et cetera, and other competitors.  So you're fighting for, |
| | 20 | you know, different slices of a market now that's being |
| | 21 | interdicted, quite frankly, by people far beyond your |
| | 22 | control.  And you need to come to a sense of reality. |
| 03:38 | 23 | And it appears to me -- although, I think your |
| | 24 | counsel are absolutely excellent -- let me pay the |
| | 25 | compliment to present counsel on both sides -- you two need |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 181 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 104 of 106   Page ID
#:8388
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 104 of 106   Page ID
104

         1    a sense of reality.  And I don't know how we're going to

         2    accomplish that.  But I have the two of you here, so we're

         3    just gonna sit for a while.  And I'm gonna talk to this jury

         4    so that they can be on the way, and then I want to talk to

         5    the two of you.

03:38    6         This is taxpayers' dollars.  And this is

         7    ridiculous, frankly.  You two are gonna reach a resolution.

         8    So you two are gonna talk, or I'm going to have you here

         9    quite a while talking.  So have a seat.

03:38   10         Now bring the jury back in.

03:40   11         Counsel, have a seat for a moment, along with your

        12    clients.

03:40   13         *(In the presence of the jury.)*

03:40   14         THE COURT:  First of all, I want to thank you for

        15    sitting on this case.

03:40   16                    **MISTRIAL DECLARED**

03:40   17         THE COURT:  I've just declared a mistrial, out of

        18    your presence.  You're going to go home, with my apologies

        19    to you.  Something has occurred that makes this impossible

        20    to go forward in terms of prejudice to one or both of the

        21    parties.

03:40   22         And if we proceeded forward, I think that it would

        23    be an impression that would be almost difficult to overturn

        24    and probably would come back to the Court a year or two from

        25    the Circuit, frankly.  So the parties just have to start

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 182 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 105 of 106   Page ID
#:8329
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 105 of 106   Page ID
#:805

| | | |
|---|---|---|
| | 1 | over at some future time, with my deepest apologies. |
| 03:40 | 2 | So knowing that, I'd still like to show you the |
| | 3 | courthouse, if I could.  You worked hard for three hours, |
| | 4 | maybe four, so I would like to spend a little bit of time. |
| | 5 | Let me show you what's going on a little bit. |
| 03:41 | 6 | So this jury's discharged because a mistrial's |
| | 7 | been declared by the Court. |
| 03:41 | 8 | *(To the clerk:)* If you would take 'em out, Debbie, |
| | 9 | that door in my chambers. |
| 03:41 | 10 | *(Jury excused.)* |
| 03:41 | 11 | THE COURT:  Thank you very much. |
| 03:41 | 12 | Now we're of the record. |
| 04:18 | 13 | *(Proceedings adjourned at 3:41 p.m.)* |
| 04:18 | 14 | -oOo- |
| 04:18 | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 183 -

Case 2:16-cv-09185-DOC-DFM   Document 113-3   Filed 05/03/18   Page 106 of 106   Page ID
#:8380
8:15-CV-1050-DOC - 11/8/2016 - Day 1
Case 8:15-cv-01050-DOC-DFM   Document 125   Filed 11/21/16   Page 106 of 106   Page ID
106

```
04:18    1                          -oOo-

04:18    2

04:18    3                       CERTIFICATE

04:18    4

04:18    5         I hereby certify that pursuant to Section 753,

         6    Title 28, United States Code, the foregoing is a true and

         7    correct transcript of the stenographically reported

         8    proceedings held in the above-entitled matter and that the

         9    transcript page format is in conformance with the

        10    regulations of the Judicial Conference of the United States.

04:18   11

04:18   12    Date:  November 8, 2016

04:18   13

04:18   14
04:18                              /s/ Debbie Gale
04:18   15                         _____
04:18                              DEBBIE GALE, U.S. COURT REPORTER
04:18   16                         CSR NO. 9472, RPR, CCRR

04:18   17

        18

        19

        20

        21

        22

        23

        24

        25
```

**DEBBIE GALE, U.S. COURT REPORTER**

EXHIBIT C
- 184 -