# EXHIBIT 2

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

**PAGES LABELED IN HEADERS BELOW ARE
HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**Rebuttal Expert Report of Joel Delman
Regarding Non-Obviousness and Validity of US Patents
D771,607, D775,620 and D776,648**

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

**Table of Contents**

Table of Exhibits ............................................................................................................................. ii
I. Introduction ............................................................................................................................... 1
II. Materials Reviewed in Preparing this Report ........................................................................... 1
III. Summary of Opinions ............................................................................................................. 2
IV. Overview of Relevant Legal Principles ................................................................................... 5
    A.   The Significance of Prior Art .................................................................................. 5
    B.   Functionality and Design Patents ........................................................................... 5
    C.   Anticipation of Designs by Prior Art ....................................................................... 7
    D.   Non-Obviousness as a Requirement for Validity ................................................... 8
    E.   The Ordinary Observer .......................................................................................... 10
    F.   Designer of Ordinary Skill in the Art ...................................................................... 12
V. Mr. Hatch's Conclusions with Respect to Functionality of the Patents at Issue ...................... 13
    A.   Proper Analysis of Functionality Requires Evaluation of Overall Visual Impression ........ 13
    B.   Assertion that the Front and Back Chamfers are Dictated by Function ........................... 15
    C.   Assertion that the Shape and Position of the Circular Logo Aperture is Dictated by Function .............................................................................................................. 23
    D.   Assertion that the Parting Lines of the Outer Shell are Dictated by Function ................. 28
    E.   Assertion that the Aperture for the Ringer Switch, Volume Buttons and Power Button are Dictated by Function .............................................................................. 32
VI. Mr. Hatch's Understanding of the Tests for Anticipation and Obviousness ........................... 36
VII. Overarching Shortcomings in Mr. Hatch's Methodology ........................................................ 38
VIII. Assessment of Mr. Hatch's "State of the Art" ...................................................................... 39
IX. Mr. Hatch's Application of the Test for Obviousness ............................................................. 45
    A.   The Spigen Slim Armor Alone or With Modifications Does Not Render the Patents at Issue Obvious ............................................................................................. 45
    B.   The Spigen Slim Armor Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious ...................................................................................... 51
    C.   The Spigen Slim Armor Combined with the U.S. D714,274 Does Not Render the Patents at Issue Obvious ...................................................................................... 55
    D.   The U.S. D729,218 Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious ...................................................................................... 60
    E.   The Spigen Ultra Hybrid Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious ...................................................................................... 66
X. Objective Evidence of Non-Obviousness ................................................................................. 72
XI. Conclusion .............................................................................................................................. 73

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

**Table of Exhibits**

| NO. | DESCRIPTION |
|---|---|
| A | Article - Millennials Smartphone Users, Nielsen.Com, http://www.nielsen.com/us/en/insights/news/2016/millennials-are-top-smartphoneusers.html |
| B | Article - Americans Replace Their Cell Phones Every 2 Years, Finns—Every Six, a Study Claims, PhoneArena.Com, https://www.phonearena.com/news/Americans-replace-theircell-phones-every-2-years-Finns--every-six-a-study-claims_id20255 |
| C | Article - The Must-Have Effect: When an Upgrade is Available, People Tend to Break What They'd Like to Replace, Scientific American, https://www.scientificamerican.com/article/the-must-have-effect-when-an-upgrade-isavailable-people-tend-to-break-what-they-d-like-to-replace/ |
| D | Oxford Dictionary, Definition of "chamfer", www.en.oxforddictionaries.com/defnition/chamfer |
| E | Spigen Product- iPhone SE Case Slim Armor, https://www.spigen.com/products/iphone-se-case-slim-armor?variant=16522703553 |
| F | Spigen Product- iPhone 5S/5 Case Tough Armor, https://www.spigen.com/products/iphone-5s-5-case-tough-armor?variant=1165533129 |
| G | Spigen- iPhone 5S/5 Case Ultra Hybrid, https://www.spigen.com/products/iphone-5s-5-case-ultra-hybrid?variant=1166640421 |

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

**I. <u>Introduction</u>**

1. My name is Joel Delman. I am the founder and Chief Design Officer at Informed Innovation. My business address is 2176 W 24th Street, Los Angeles CA 90018, and I have been involved in the industrial design field for 24 years. I am over 18 years of age and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial, hearing or deposition.

2. I have been retained as an industrial design independent expert witness by the law firm of Lewis Brisbois Bisgaard & Smith LLP, on behalf of Plaintiff Spigen Korea Co., LTD., to provide my opinion regarding whether US patents D771,607, D775,620 and D776,648 have been infringed, and matters related thereto. This report has been prepared in response to the Expert Report of Paul Hatch, dated September 19, 2018 (the "Invalidity Report") regarding the validity of these patents, which I may collectively refer to as the "Patents at Issue."

3. I understand my task is to review materials and offer my opinion, perspective and insights regarding this subject. I hold the opinions expressed in this report, but as my study of the case continues I may acquire additional information that leads to new insights relevant to these opinions. With that in mind, I reserve the right to supplement this report if and when such additional information becomes known to me. I may also provide supplemental and rebuttal reports at a later date, in response to arguments which may be proposed by the Defendants.

4. I incorporate all information with respect to my background and qualifications by reference to Section II of my Expert Report, dated September 19, 2018, on the subject of infringement of the Patents at Issue (the "Infringement Report".)

5. I am being compensated at my usual and customary hourly rate of $250, and I have no financial interest in, or affiliation with, either the Plaintiff or Defendant in this matter. Furthermore, my compensation is completely independent of the outcome of this litigation.

**II. <u>Materials Reviewed in Preparing this Report</u>**

6. In reaching the conclusions and opinions set forth in this report, I approached the questions presented by making inquiries and reviewing relevant materials in order to gain a thorough understanding of the issues to be considered. In this process I have relied upon the Invalidity Report, the documents and items upon which I relied in the Infringement Report, those in the exhibits attached hereto, as well as other materials cited and referenced in this report.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

### III. Summary of Opinions

7. I disagree with Mr. Hatch's conclusion that the Patents at issue are invalid as entirely or primarily functional. The subject matter of the Patents at Issue is primarily ornamental. Moreover, to the extent that certain limited functional elements may be present in these (as with any) ornamental designs, Mr. Hatch fails to recognize that the functionality of certain elements does not in any way diminish their ornamental appearance, and the contribution their ornamental appearance makes to the overall visual impression of the Patents at Issue. Mr. Hatch focuses his evaluation on discreet elements in isolation, and fails to apply the proper analysis which must account for the design in its entirety, including the ornamental contribution made by functional elements to the overall visual appearance of the claimed designs.

8. With respect to functionality and as discussed in detail below, Mr. Hatch alleges the following aspects of the smartphone case design claimed in the Patents at Issue are functional: the chamfers around outside edges, circular aperture for displaying the Apple logo, parting lines on the back, and volume buttons, ringer mute aperture, and power button. Mr. Hatch's analysis is flawed for the reasons summarized below.

   (a) The chamfers featured on the Patents at Issue are not primarily or entirely functional. A chamfer is merely one of many alternative ways to create a transition between surfaces, as shown by the numerous alternative variations featured on other smartphone case designs. The use of chamfered surfaces is almost always a purely aesthetic decision, used by designers to create various visual impressions, including ruggedness. Mr. Hatch's claim that chamfered surfaces are functionally driven by the need to "offset" the surfaces of the underlying iPhone for manufacturing purposes is shown to be false through the numerous case designs which do not feature any chamfers to offset the iPhone's surfaces, including cases with chamfers for iPhone models which have no chamfers to offset, and cases without chamfers for iPhone models which incorporate chamfers. Further, Mr. Hatch's claim that the chamfered surfaces of the Patents at Issue are functionally required to closely follow the contours of the underlying iPhone is shown to be false through the many alternative designs available which closely follow the contours of the iPhone without the use of chamfers, as well as the incorrect assumption that closely following the contours of the underlying phone is a functional, or even a desirable, feature.

   (b) The size and position of the circular aperture featured on the Patents at Issue are not primarily or entirely functional. The decision to reveal the Apple logo through such an aperture is entirely ornamental, as demonstrated by the many alternative designs which do not reveal the logo through an aperture – or through any means. The use of a circular aperture, or an aperture of any shape, is entirely ornamental, as demonstrated by the numerous alternative designs which incorporate non-circular shapes through which the Apple logo is revealed, and by means of displaying the Apple logo which do not utilize an aperture at all. The alleged functionality of the circular aperture as a place for a user to rest his or her finger for a "secure grip" is a strained assumption, completely lacking in any evidence of such a purpose, based on the incorrect reasoning that something is functional for a particular purpose merely because it can theoretically be used in some manner which was never contemplated by its design. The alleged functionality of the circular "rim" surrounding the aperture as a means to prevent scratches on the back of the case is a strained assumption, completely lacking in any evidence of such a purpose, and based on the incorrect reasoning that something is functional for a particular purpose merely because it can theoretically be used in some manner which was never contemplated by its design.

2

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

(c) The parting lines featured on the Patents at Issue are not primarily or entirely functional. The existence of these parting lines is merely a consequence of the existence of the ornamental outer shell featured on the Patents at Issue, and the parting lines formed by such a purely ornamental feature cannot in any way be considered functional. As numerous alternative designs demonstrate, including the design of prior art Mr. Hatch himself cites, the location of the parting lines is determined by purely ornamental considerations, and not the imagined manufacturing constraints alleged. Mr. Hatch's claim that the location of the parting lines has been dictated by "Apple's design guidelines" is unsupported by any evidence, and belied by the fact that the outer shell forming the parting lines is manufactured from plastic, thus making the guideline he references entirely inapplicable to the Patents at Issue.

(d) The location, shape and size of the volume buttons, ringer mute aperture, and power button featured on the Patents at Issue is not a primarily or entirely functional feature. The numerous and varied alternative designs available for the shape and size of these elements clearly demonstrate the entirely ornamental nature of their design. The fact that the location of these elements of the Patents at Issue is in part influenced by their need to interface with analogous features on the iPhone within the case does not in any way detract from the significant ornamental contribution they make to the visual impression of the Patents at Issue, or the fact that their shape and size are driven by ornamental decisions to create buttons and apertures which work with, and enhance, the novel overall visual impression of the Patents at Issue.

9. Mr. Hatch erroneously concludes that the Patents at Issue are invalid under 35 U.S.C. §§ 102 and 103 as either anticipated or obvious. As an initial matter, Mr. Hatch does not appear to conduct an anticipation analysis, so it is unclear why he references and discusses anticipation. Further, Mr. Hatch fails to apply the proper standards of "ordinary observer" and "designer of ordinary skill in the art" to his analysis of obviousness, and in so doing evaluates the critical factors related to substantial similarity and "basically the same" from a vantage point which improperly makes it easier to reach the flawed conclusions he has reached.

10. The Patents at Issue claim a novel ornamental design for a smartphone case, and Mr. Hatch's analysis with respect to Defendants' claims of obviousness is wholly unsupported by the prior art, by the comparisons he makes with the prior art, or by the hypothetical design combinations he presents. Mr. Hatch presents obviousness analysis directed to five sets of prior art references. Below is a summary of the major flaws in Mr. Hatch's analysis.

(a) Three out of the five obviousness analyses that Mr. Hatch presents are based on a design, U.S. D772,209, that is not prior art to the Patents at Issue, and thus these four obviousness analyses cannot show that the Patents at Issue are invalid even if all of Mr. Hatch's analysis is accepted.

(b) The remaining two obviousness analyses that Mr. Hatch presents are based on Spigen's Slim Armor case design either alone, with modifications, or in a combination, but this reference was considered by the U.S. Patent Office during prosecution of the Patents at Issue and it was not used to reject the Patents at Issue. Thus, it is not surprising the Mr. Hatch's conclusion that a designer of ordinary skill in the art would find the Slim Armor to be "basically the same" is incorrect. Indeed, the Slim Armor case would need to be modified in major and significant ways to make it look more like the Patents at Issue, which means that the Slim Armor case cannot qualify as the primary reference for an obviousness analysis. Because the starting point required in the first step of an analysis of whether a design patent is obvious

3

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

must begin with a primary reference that is "basically the same" as the Patents at Issue, Mr. Hatch's analysis relying on the Spigen Slim Armor as a primary reference cannot show that the Patents at Issue are invalid as obvious.

(c) Mr. Hatch's overall selection of prior art for use as primary and secondary references in his obviousness analysis is also flawed, in that none of the prior art selected as the primary reference is "basically the same" as the Patents at Issue, and he fails to provide any analysis or evidence to support this fundamental requirement. Further, the hypothetical combinations he creates though modification of primary references by secondary references do not appear in the least "substantially the same" in overall visual impression to the Patents at Issue, and he fails to provide analysis or evidence to support the claim that these combinations appear substantially the same as the Patents at Issue.

(d) Mr. Hatch also fails to make a proper comparison between the Patents at Issue and the prior art he presents, and between the Patents at issue and the design combinations he creates, in that he focuses on only a few discreet elements and views, as opposed to conducting a comprehensive comparison of the overall visual impression of these designs. Invalidity analysis requires a comparison of all of the views included in the Patents at Issue to the corresponding views of the prior art references; Mr. Hatch fails to make any such comparison, drawing conclusions with respect to alleged visual similarity from verbal descriptions and a limited selection of images which do not accurately represent the designs he presents for analysis.

(e) Mr. Hatch's obviousness analysis is also flawed because he fails to offer any rational or reason why a designer of ordinary skill in the art would be motivated to, or would find any suggestion in the prior art, to make the modifications required to create the hypothetical combinations he has created, and fails to show how the secondary references he uses are so related to the primary references that the appearance of ornamental features in one suggests the application of those features to the other.  He fails to even mention, let alone demonstrate, how the hypothetical combinations he creates address the numerous and substantial differences between these combinations and the Patents at Issue, beyond the limited isolated elements he incorrectly appropriates from his secondary references.

4

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

## IV. Overview of Relevant Legal Principles

11. Although I bring knowledge of certain background aspects of patent law to the task of writing this report in a general sense, it should be noted that my opinions and perspectives are those of an industrial designer skilled in the design and development of smartphone cases, consumer electronics, medical devices, toys and other categories of consumer, industrial, military and aerospace products – not as an attorney. I have applied my understanding of patent law recited herein to the facts of this case, but the opinions expressed and reasoning applied are those of an experienced industrial design consultant viewing the relevant questions from the relevant perspectives (e.g., ordinary observer, person of ordinary skill in the art.)

### A.   The Significance of Prior Art

12. I understand that, subject to certain exceptions, "prior art" generally refers to a design that was patented, described in a printed publication, on sale, in public use, or otherwise available to the public anywhere in the world before the effective filing date of the patent. One exception provides that disclosures made directly or indirectly by the inventor are not prior art to the patent, unless the disclosure was made more than one year before the effective filing date of the patent.

13. I understand that, under the ruling set forth in *Egyptian Goddess*, "[w]here there are many examples of similar prior art designs... differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008).

14. I have been informed that, in the context of analyzing whether a design patent is valid or invalid based on anticipation, prior art must be shown to be "substantially the same" as the claimed design for that design to have been anticipated by the prior art. With respect to the analysis required to show that a design patent is invalid based on obviousness, however, prior art must first be shown to create "basically the same" visual impression as the claimed design. These tests are discussed in more detail below.

### B.   Functionality and Design Patents

15. It is my experience that most products and designs sold into the stream of commerce serve some function or purpose. Design patents, as I understand them, are intended to protect the ornamental appearance of functional items, and a lack of functionality is in no way a requirement for the issuance of a design patent. Rather, I understand that all articles of manufacture have a function, and that in a design patent "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prods. v. Just Toys,* 122 F.3d 1396,1405 (Fed. Cir. 1997).

16. I understand that, with respect to patenting such designs, "a design patent, unlike a utility patent, limits protection to the ornamental design of the article. *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988) (citing 35 U.S.C. § 171). If the patented design is primarily functional rather than ornamental, the patent is invalid. *Id.* However, when the design also contains ornamental aspects, it is entitled to a design patent whose scope is limited to those aspects alone and does not extend to any functional elements of the claimed article. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

(Fed. Cir. 1993) ('The elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent.')" *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).

17. I have been informed that "[t]he function of the article itself must not be confused with 'functionality' of the design of the article." Ethicon Endo-Surgery, Inc. v. Covidien, Inc., 796 F.3d 1312, 1328 (Fed. Cir. 2015). The proper inquiry into a design's functionality must evaluate "the overall appearance of the article—the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." Id. at 1329. As long as the overall design is not primarily functional, "the design claim is not invalid, even if certain elements have functional purposes." Id. at 1333.

18. I also understand that the fact that an element of a design serves a functional purpose does not mean that the specific design of the element is dictated by functional considerations. L.A. Gear 988 F.2d at 1123. L.A. Gear acknowledged that certain elements comprising the claimed design of an athletic sneaker each had a utilitarian purpose, including a "delta wing" supporting the foot and reinforcing the shoelace eyelets, side mesh paneling further supporting the foot, a "moustache" at the back of the shoe cushioning the Achilles tendon and reinforcing the rear of the shoe, and the particular positioning of each of these elements within the design of the shoe. Id. at 1123. Nevertheless, the Court explained that "the utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent" because whether a design is primarily functional or primarily ornamental requires viewing the claimed design "in its entirety." *Id. See also Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed. Cir. 1997) ("[T]he determination of whether [a] patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its overall appearance."). As another example, in *Hupp v. Siroflex of Am., Inc.*, the Federal Circuit separated the function inherent in a concrete mold—producing a simulated stone pathway by molding concrete—from the particular pattern of the stone produced by the mold itself—an aesthetic design choice. 122 F.3d 1456, 1461 (Fed. Cir. 1997). Thus, even though the claimed design pattern was embedded within the functional concrete mold, the proper analysis required a determination of whether the design pattern within the mold—and not the concrete mold itself—was "dictated by" its function.

19. With respect to the foregoing legal principles, I have been informed that courts have held that non-functional and functional aspects of a patented design are distinguished to ensure that only the non-functional aspects of the patented design are considered in the analysis. See OddzOn 122 F.3d at 1396, 1405 ("Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.") This is because a design patent only protects the novel, ornamental features of the patented design. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed.Cir.1993); *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188 (Fed.Cir.1988) ("[I]t is the non-functional, design aspects that are pertinent to determinations of infringement.") "The fact finder should not focus on the particular design of these elements, but should instead focus on what these elements contribute to the design's overall ornamentation." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016). "[T]he utility of each of the various elements that comprise the design is not the relevant inquiry  . . ." *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301,1316 (Fed. Cir. 2013).

20. I have also been informed that courts have not "mandated applying any particular test for determining whether a claimed design is dictated by its function and therefore impermissibly functional." Ethicon, 796 F.3d at 1329.  Courts have, however, "focused … on the availability of alternative designs as an important—if not dispositive— factor in evaluating the legal functionality of a claimed design" as a first step. Id. at 1329-30. For

6

InformedInnovation

2176 W. 24ᵗʰ Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

example, the *L.A. Gear* court referenced the evidence of many alternative designs that accomplished the same functionality associated with the underlying athletic sneaker. 988 F.2d at 1123. The Federal Circuit has also noted that "[w]hen there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose. *L.A. Gear*, 988 F.2d at 1123; *see also Rosco, Inc. v. Mirror Lite, Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002) ("[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional."); *Hupp*, 122 F.3d at 1460 (same).  As a second step where the existence of alternative designs is not dispositive of whether the design as a whole is impermissibly functional, the Federal Circuit has noted that several other factors should be considered, including "'[a] whether the protected design represents the best design; [b] whether alternative designs would adversely affect the utility of the specified article; [c] whether there are any concomitant utility patents; [d] whether the advertising touts particular features of the design as having specific utility; and [e] whether there are any elements in the design or an overall appearance clearly not dictated by function.'" *Sport Dimension*, 820 F.3d at 1322 (quoting *PHG Technologies, LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006) (quoting *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997)).


### C.   Anticipation of Designs by Prior Art

21. I understand that the test for whether a design patent is invalid as being anticipated by prior art is the same as the test for whether a design patent has been infringed by another design. "[It] has been well established for over a century that the same test must be used for both infringement and anticipation." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir.  2009); *see also High Point Design, LLC v. Buyer's Direct, Inc.*, 621 F. App'x 632, 638 (Fed. Cir. 2015) (same).  "This general rule derives from the Supreme Court's proclamation 120 years ago in the context of utility patents: '[t]hat which infringes, if later, would anticipate, if earlier.'" *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889). The same rule applies for design patents. *See Bernhardt*, 386 F.3d at 1378 (explaining that the test for determining anticipation of a design patent is the same as the test for infringement); *Door-Master*, 256 F.3d at 1312 (stating that the test for infringement is the same as the test for anticipation in the design patent context); *Litton,*728 F.2d at 1440." *Id.* at 1239.

22. With respect to both design patent infringement and anticipation, I understand that "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." Gorham Co. v. White, 81 U.S. 511, 528 (1872); see also High Point Design, 621 F. App'x at 638. In other words, a design patent is infringed if an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental.

23. Design patents claims are shown in drawings. The scope of the claim of a patented design "encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.' *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002) (quoting *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 104-05 (Fed. Cir. 1996)).

24. I have been informed that an invalidity analysis, in the same manner as an infringement analysis, requires a comparison of all of the views included in the allegedly invalid design patent to the corresponding views of the prior art reference. *Contessa Food*,  282 F.3d at 1379 ("[T]he 'ordinary observer' analysis is not limited to the ornamental features of a

7

InformedInnovation

2176 W. 24ᵗʰ Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

subset of the [patent's] drawings, but instead must encompass the claimed ornamental features of all figures of a design patent."); *High Point Design*, 621 F. App'x at 639 ("the district court should perform a side-by-side comparison of the claimed and prior art designs as part of the proper obviousness determination"). The comparison extends to all views that are visible during "normal use" of the article. *Contessa Food*, 282 F.3d at 1379.

25. I understand that the overall appearance of the designs must be substantially similar for infringement or anticipation to be found, and that differences in specific features or individual elements of a design are not relevant to infringement or anticipation if the overall appearance of the accused design is substantially similar to the patented design. Infringement and anticipation analysis requires a determination of whether the patented design as a whole is substantially similar in appearance to the accused design to an ordinary observer, and the patented and accused designs do not have to be identical for design patent infringement or anticipation to be found. *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 820 (Fed. Cir. 1992). It is the visual appearance of a design as a whole, and the visual impression it creates, which is key to determining infringement. *Litton Sys. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984) (". . . minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement"); *Crocs, Inc. v Int'l Trade* Comm'n, 598 F.3d 1294, 1303 (Fed. Cir. 2010). Rather, the question is one of "substantial similarity" under the "ordinary observer" test. *Id.* The underlying idea is that customers looking to purchase a patented product should not be deceived by a similar looking accused product. *Id.* "[T]he mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another." *Int'l Seaway* 589 F.3d at 1243.

26. I am also aware that infringement and anticipation must be determined "in light of the prior art" by "applying the ordinary observer test through the eyes of an observer *familiar with the prior art*." *Egyptian Goddess*, 543 F.3d at 677 (emphasis added). Thus, the hypothetical ordinary observer is presumed to have a complete knowledge of all pertinent prior art.

27. I further understand that design patents are presumed to be valid, and that a party challenging a patent's validity must show by clear and convincing evidence that the patent is invalid. See *L.A. Gear*, 988 F.2d at 1123 (citing 35 U.S.C. § 282).

   **D.   Non-Obviousness as a Requirement for Validity**

28. I am aware of 35 U.S Code §103 - Conditions for patentability; non-obvious subject matter, which states that "A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made."

29. I have been informed that design patents are presumed to be valid, and that a party challenging a patent's validity must show by clear and convincing evidence that the patent is invalid. See *L.A. Gear*, 988 F.2d at 1123 (citing 35 U.S.C. § 282).

30. I understand that the test for whether a design patent is invalid as obvious under §103 is an inquiry as to ". . . whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Apple Inc. v. Samsung Electronics*

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

*Co., Ltd.*, 678 F.3d 1314, 1329-30 (Fed Cir. 2012). A two-step test applies to determining whether "one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design." First, "one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" *Id.* Second, "other references may be used to modify the primary reference to create a design that has the same overall visual appearance as the claimed design." *Id.* However, the "secondary references may only be used to modify the primary reference if they are 'so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* (internal citations omitted).

31. Notably, the "ordinary designer" perspective is used for obviousness analysis, whereas the "ordinary observer" test is used for anticipation analysis.  *See High Point Design*, 730 F.3d at 1313 ("The use of an "ordinary observer" standard to assess the potential obviousness of a design patent runs contrary to the precedent of this court and our predecessor court, under which the obviousness of a design patent must, instead, be assessed from the viewpoint of an ordinary designer"); *High Point Design*, 621 F. App'x at 638 (Fed. Cir. 2015) ("Two designs are substantially the same [for purposes of anticipation analysis] 'if the resemblance is such as to deceive [an ordinary observer], inducing him to purchase one supposing it to be the other[.]'") (internal citations omitted).

32. Further to the above, I understand that a patent cannot be invalidated as obvious without a primary reference which creates "basically the same visual impression" as the asserted patent,. *Durling,* 101 F.3d at 104-05; *In re Rosen,* 673 F.2d 388, 391 (C.C.P.A. 1982) ("[T]here must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness.")

33. I have been informed that if "major modifications would be required to make [the prior art design] look like the claimed designs, it cannot qualify as a [primary reference]." *In re Harvey*, 12 F.3d 1061, 1063 (Fed Cir. 1993), and that when creating a design by selecting a primary reference and then modifying the appearance by adding an element from a secondary reference, it is important that the design is considered as a whole, and not just the individual parts. "In considering patentability of a proposed design the appearance of the design must be viewed as a whole . . . and compared with something in existence – not with something that might be brought into existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature. *In re Rosen*, 673 F.2d at 391 (quoting *In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950)). If the prior art suggests "components of [the patented] design, but not its overall appearance, an obviousness rejection is inappropriate." *In re Harvey*, 12 F.3d at 1063 (citation omitted).

34. Further with respect to modification of the prior art for purposes of obviousness analysis, I understand that there must be some incentive, or reason, for the ordinary designer to modify the primary reference with a secondary reference. "'[I]n order for secondary references to be considered, . . . there must be some suggestion in the prior art to modify the basic design with features from the secondary references.'" *MRC Innovations, Inc. v. Hunter Mfg.*, LLP, 747 F.3d 1326, 1334 (Fed. Cir. 2014) (quoting *In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996)).  That is, "the teachings of prior art designs may be combined only when the designs are 'so related that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* (quoting *In re Borden*, 90 F.3d at 1574-75 (internal citation omitted)). "[T]he mere similarity in appearance [] itself [may] provide[] the suggestion that one should apply certain features to another design." *Id.* The modification, or motivation for the modification, however, must not be induced by a conclusion arrived at through knowledge which the ordinary designer

would not have possessed: "As with utility patents, obviousness is not determined as if the designer had hindsight knowledge of the patented design." *L.A. Gear*, 988 F.2d at 1124.

35. I understand that "the focus in a design patent obviousness inquiry should be on visual appearances rather than design concepts." *Durling*, 101 F.3d at 104; *In re Harvey*, 12 F.3d at 1064.  Because of the recognized difficulties entailed in trying to describe a design in words, care must be taken to not to describe and analyze the designs at "'too high a level of abstraction'" by failing to focus "'on the distinctive visual appearances of the reference and the claimed design.'" *High Point Design*, 730 F.3d at 1314 (quoting *Apple*, 678 F.3d at 1331-32); *see also Durling*, 101 F.3d at 104 ("The error in the district court's approach is that it construed [the] claimed design too broadly. The district court's verbal description of [the] claimed design does not evoke a visual image consonant with the claimed design. Instead, the district court's description merely represents the general concept of a sectional sofa with integrated end tables.").

36. Under the *Graham v. John Deere Co.* factors for determining obviousness of a patent, one must evaluate any objective evidence of nonobviousness (i.e., so called "secondary considerations") such as (a) the invention's commercial success, (b) long felt but unresolved needs, (c) the failure of others, (d) skepticism by experts, (e) praise by others, (f) teaching away by others, (g) recognition of a problem, and (h) copying of the invention by competitors.  Secondary considerations "can be the most probative evidence of non-obviousness in the record, and enables the . . . court to avert the trap of hindsight." *Crocs*, 598 F.3d at 1310 (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed.Cir.1986)).

**E.  The Ordinary Observer**

37. For purposes of assessing whether there is anticipation or infringement of the Patents at Issue, I have been informed that the ordinary observer is deemed to be "the ordinary purchaser of the article charged to be an infringement." *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116 (Fed. Cir.1998).

38. Per the legal principles summarized above, particularly the ruling in *Egyptian Goddess*, it is my understanding that the hypothetical ordinary observer is assumed to be familiar with the prior art, and that the test must be applied through the eyes of one who gives the degree of attention to the purchase as would normally be given by someone making a purchase of the product at issue.

39. The ordinary observer test similarly applies in cases where the patented design incorporates some functional elements. See *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006) (holding that while it is proper to factor out the functional aspects of various design elements, that discounting of functional elements must not convert the overall infringement test to an element-by-element comparison). In evaluating infringement, courts determine whether "the deception that arises is a result of similarities in the overall design, not of similarities in ornamental features considered in isolation." *Id.* at 1371.

40. I have been informed and understand that the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent. *See Arminak and Associates v. Saint-Gobain Calmar,* 501 F.3d 1318, 1323 (Fed. Cir. 2017) The Supreme Court in *Gorham* described "ordinary observers" as people possessing "ordinary acuteness, bringing to the examination of the

InformedInnovation

2176 W. 24ᵗʰ Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

article upon which the design has been placed that degree of observation which men of ordinary intelligence give." 81 U.S. at 528.

41. In determining who the appropriate ordinary observer would be in this instance, I have considered the following criteria:

   (a)  Age of the purchaser
   (b)  Price point of the product
   (c)  Expected length of time the product will be used by the purchaser
   (d)  Where the products would be viewed and compared

   With respect to the above criteria, it is my understanding that, while people of all ages use smartphones, in the United States ownership is highest among those aged 18-44, approximately 97% of whom own such phones. See *Millennials are Top Smartphone Users,* NIELSEN.COM, http://www.nielsen.com/us/en/insights/news/2016/millennials-are-top-smartphone-users.html (last visited August 29, 2018) (attached as Exhibit A).

42. I have been informed that the average list retail price for the Commercial Embodiments (as previously defined in my Infringement report, and hereby incorporated by reference) on Amazon.com is approximately $35 (sometimes around $17-20 on sale), while the average list retail price for the Accused Products (as previously defined in my Infringement report, and hereby incorporated by reference) is approximately $20-25 (sometimes around $15 on sale).

43. I am aware of studies which show that, through the desire to "upgrade", or due to damage or loss, the average consumer in the United States trades their phone for a new model within 21.7 months of purchase. This is a more rapid pace than any other country in the world. These new phones will, in most all instances, require new cases.  See Victor H., *Americans Replace Their Cell Phones Every 2 Years, Finns—Every Six, a Study Claims,* PHONEARENA.COM,(Jul. 11, 2011), https://www.phonearena.com/news/Americans-replace-their-cell-phones-every-2-years-Finns--every-six-a-study-claims_id20255 (attached as Exhibit B); *see also* Francesca Gino, *The Must-Have Effect: When an Upgrade is Available, People Tend to Break What They'd Like to Replace*, SCIENTIFIC AMERICAN (May 19, 2015), https://www.scientificamerican.com/article/the-must-have-effect-when-an-upgrade-isavailable-people-tend-to-break-what-they-d-like-to-replace/ (attached as Exhibit C).

44. I am personally aware through my work as an industrial designer, a husband and parent to two boys, and knowledge of the consumer electronics industry, that people often change the case on their phone once or twice per year, due either to damage incurred to the case (through drops or other handling) or merely a desire for "something new."

45. I have been informed that all of Spigen's Commercial Embodiments and the Accused Products are sold online, and that Spigen's Commercial Embodiments and the Accused Products are purchased primarily through online retailers, such as Amazon.com and the Spigen and Ultraproof corporate websites. Furthermore, Ultraproof has stated, in its second supplementary response to Interrogatory 6, that "The Accused Product is not distributed in the classic sense in that sales are all conducted on the Amazon.com website."

46. When making purchases from online retailers like Amazon, the ordinary observer is only able to perceive and evaluate the Commercial Embodiments and Accused Products as online images, and cannot easily compare the image of one product to another simultaneously onscreen. When viewing products online, the details of designs are often obscured through the small size of the images viewed, as well as the dark colors

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

frequently used on portions of phone cases, which make observation of many features challenging. Similarly, shoppers on Amazon cannot examine the quality, or authenticity, of the items they are considering. In addition, consumers are often viewing these cases on the smaller screens of smartphones or tablets, and not on larger computer monitors.

47. Further to the above, while a product may be examined via the photographs on any given page at Amazon or the Parties' websites, it is generally impossible to compare images of one product to another at the same time, on the same page, onscreen. At best, a consumer interested in discerning the ornamental differences between similar products would have to open separate pages or "tabs" for each, then rapidly click between them to make some approximation of a comparison.

48. A prospective purchaser's ability to perceive differences between the ornamental designs of products viewed onscreen at sites like Amazon is severely restricted. Under these circumstances, an ordinary observer would find it challenging to discern even meaningful differences between two generally similar products, let alone more subtle differences which may exist between isolated, small elements of the cases.

49. Giving due consideration to the above, it is my opinion that the ordinary observer in this instance would be a man or woman in the age range of 18 - 44. The attention given to the purchase of a case for their smartphone would be rather limited, as the observer is shopping online and often on a small smartphone or tablet screen, by clicking through pages for a low price-point item that they will not be using for a lengthy period of time. The purchase of such items is sometimes referred to as a "low investment purchase" by designers and marketing professionals, referring to a decision for which the potential downside is perceived as minimal by the purchaser, and for which an accordingly limited amount of decision making is devoted to the transaction.

50. As such, an observer would generally not spend an extended amount of time in his or her comparison of products, or spend a great deal of time attempting to discern subtle differences amongst and between the product designs when they appear similar, knowing that it will be possible to replace the case later, and that they will likely do so in the near future.

## F. Designer of Ordinary Skill in the Art

51. I have been informed that the obviousness analysis for design patents centers on "whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *MRC Innovations, Inc. v. Hunter Mfg.*, LLP, 747 F.3d 1326, 1331 (Fed. Cir. 2013); *see also Apple*, 678 F.3d at 1329 (quoting *Durling*, 101 F.3d at 103).

52. As noted earlier, it is my understanding that it is this designer of ordinary skill who's perspective is central to a determination of obviousness or non-obviousness, and that the perspective of the ordinary observer is not relevant to this evaluation. "The use of an 'ordinary observer' standard to assess the potential obviousness of a design patent runs contrary to the precedent of this court and our predecessor court, under which the obviousness of a design patent must, instead, be assessed from the viewpoint of an ordinary designer." *High Point Design*, 730 F.3d at 1313 (citing *Apple*, 678 F.3d at 1329 ("In addressing a claim of obviousness in a design patent, 'the ultimate inquiry … is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved.'") (quoting *Durling*, 101 F.3d at 103)); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009) (same); *In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("The central inquiry in analyzing an ornamental design

12

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

for obviousness is whether the design would have been obvious to 'a designer of ordinary skill who designs articles of the type involved.'").

53.   As also noted earlier, it is my understanding that "a designer of ordinary skill in the art" is a different individual, holding a different perspective, from the "ordinary observer" who's vantage point is central to the test for design patent anticipation and infringement. The designer of ordinary skill in the art "is a hypothetical person who is presumed to know the relevant prior art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art may include: (a) "type of problems encountered in the art;" (b) "prior art solutions to those problems;" (c) "rapidity with which innovations are made;" (d) "sophistication of the technology; and" (e) "educational level of active workers in the field. In a given case, every factor may not be present, and one or more factors may predominate." *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc*., 807 F.2d 955, 962 (Fed. Cir. 1986); *Envtl. Designs, Ltd. V. Union Oil Co*., 713 F.2d 693, 696 (Fed. Cir. 1983).

54.   It is my understanding that this is not a minor or inconsequential issue, in that "[t]he importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc*., 950 F.2d 714, 718 (Fed. Cir. 1991). The analysis must ascertain what would have been obvious to one of ordinary skill in the art at the time the invention was made, and not to the inventor, a judge, a layman, those skilled in remote arts, or to geniuses in the art at hand. *Envtl. Designs, Ltd. v. Union Oil Co*., 713 F.2d 693, 697 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984). Indeed, I have been informed that it has been held to be reversible error to apply an "ordinary observer" standard rather than an "ordinary designer" standard to an analysis of obviousness. *High Point Design,* 730 F.3d at 1313.

55.   Considering the factors discussed above, in the context of my experience designing and managing the design of phone cases and analogous products, it is my opinion that a designer of ordinary skill in the art with respect to the design of a smartphone case would be an individual with a bachelor's degree in industrial or product design, and 2-3 years of experience designing products of similar complexity, in the employ of a design consultancy or manufacturer of such cases. While designers with more extensive experience regularly design smartphone cases, the level of difficulty and relatively straightforward nature of the challenge involved in such a project is such that a more junior designer would generally be equipped with the necessary skill.

56.   In ¶¶35 and 36 of his Invalidity Report, Mr. Hatch describes and defines his views on the "ordinary designer" and "ordinary observer", as those terms are used in his report. As I will describe in Section VI below, Mr. Hatch's understanding of the critical perspectives from which his analysis of obviousness and anticipation are made is at various times throughout his report contradictory and unclear.

**V.   Mr. Hatch's Conclusions with Respect to Functionality of the Patents at Issue**

   **A.   Proper Analysis of Functionality Requires Evaluation of Overall Visual Impression**

57.   As I understand the applicable law described in more detail in Section IV(B) above, it is understood that most every design is functional to some degree, and of necessity incorporates features and elements which are functional. But the functionality of those elements, I have been informed, does not in any way diminish the ornamental value they also provide to a design. It is, I have been informed, critical that any analysis of invalidity focus on the ornamental aspects of such functional features, as part of the entirety of the

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

ornamental design claimed by the Patents at Issue, prior art, and hypothetical designs created to argue in favor of obviousness.

58. As I read Mr. Hatch's analysis with respect to the alleged functionality of the Patents at Issue, he has improperly singled out individual and isolated elements of the claimed designs, and the real or imagined functional purposes they may serve, while ignoring the significance of these elements to the overall visual ornamental impression they contribute to the Patents at Issue. Throughout his report, Mr. Hatch does not speak about or analyze prior art, hypothetical "combined" designs, or the designs claimed by the Patents at Issue in their entirety, or the visual impression they present, but instead centers his discussion only on discrete elements, concluding that the "overall design" of the Patents at Issue is dictated by function merely because a button or similar detail are located where they need to be located. And, as I will note throughout this report, Mr. Hatch offers this analysis only through discussion, as in most every case he fails to illustrate visually that which he describes in words.

59. It is my understanding that the shape, angle, size, location, or inclusion of any single element cannot, on its own or in the aggregate with other features, allow for Mr. Hatch's conclusion that the design of the Patents at Issue is dictated "largely, if not entirely, by function." And to the extent that some functionality can truly be ascribed to an element which Mr. Hatch identifies, he fails to consider the ornamental contribution which every element he cites makes to the overall visual impression of the Patents at Issue. The proper inquiry into a design's functionality must evaluate "the overall appearance of the article—the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." *Ethicon,* 796 F.3d at 1329.  Mr. Hatch thus failed to conduct a proper analysis and his functionality conclusions are not supported under the proper analysis.

60. Under a proper analysis, it would be immediately evident to a designer of ordinary skill that the Patents at Issue merely represent a particular design for a smartphone case.  The Patents at Issue do not preempt the entire field of smartphone cases or even a significant fraction of that field, which the numerous images of other smartphone case designs discussed in more detail below proves beyond any doubt. Courts have said the availability of alternative designs as an important—if not dispositive— factor that can show a claimed design is not functional.  When, as is the case here for the Patents at Issue, there are several ways to achieve the function of an article of manufacture, the design of the article is likely to serve a primarily ornamental purpose.  To the extent the existence of numerous alternative smartphone case designs is not dispositive, all of the factors courts consider for determining whether a design functional weigh in favor of finding the Patents at Issue to be non-functional:

(a) the Patents at Issue present a design for a smartphone case, not necessarily the "best design" from a functionality point of view (e.g., consumers might want a smartphone case with more or less protection).

(b) using an alternative smartphone case design, such as one of the many examples shown in the images below, clearly does not adversely affect the utility of the specified article.

(c) Mr. Hatch and Defendants have not identified any concurrent utility patents that are alleged to cover the ornamental designs in the Patents at Issue and my investigation and work in this matter to date has not revealed any such utility patents.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

(d) the advertising for the Spigen Commercial Embodiments does not advertise the specific features that Mr. Hatch claims are functional as having a specific functional utility.

(e) the overall appearance of the designs in the Patents at Issue are not dictated by function, nor are the individual elements that Mr. Hatch claims are functional in isolation. For example, the overall appearance of designs in the Patents at Issue is not dictated by function, because the claimed design is one particular design out of many alternatives, which the images of the other smartphone cases below clearly demonstrate. The design of individual elements alleged to be functional, such as the aperture on the back surface - which Mr. Hatch claims to be functional because it permits the smartphone logo to be visible - is not dictated by function, and the appearance of these individual elements is a matter of design choice. The aperture's alleged function of permitting the smartphone logo to be visible does not, in other words, mandate that the aperture must be a particular shape or design, which the images of the other smartphone cases below also establish.

61. I will also address Mr. Hatch's particular claims of functionality in the paragraphs which follow, but overarching shortcoming in his methodology discussed in the prior paragraphs applies throughout my response to his report. I will repeatedly note the issue in my discussion below, but may not mention it again in each and every instance.

**B.   Assertion that the Front and Back Chamfers are Dictated by Function**

62. A designer of ordinary skill would know, and it has been my experience as a designer, that a chamfer is merely one of many alternative ways by which a designer may choose to create a transition between surfaces. In over 24 years of designing products featuring radiused edges, sharp corners, chamfers, and variations on all of the foregoing, Mr. Hatch's contention is the first I have ever heard that a chamfered surface has been dictated by anything other than ornamental considerations.

63. The Oxford English Dictionary defines a chamfer as "a symmetrical sloping surface at an edge or corner."  (Attached as Exhibit D).  Designers generally consider a chamfer to be an angled edge, which often looks as if material has been "sliced" away, forming a surface between two other surfaces which would otherwise be joined by a sharp-edged juncture or radius. Chamfers are sometimes referred to as "beveled edges", particularly when designing for industries such as furniture or glass products.

64. The use of chamfered surfaces is a purely aesthetic decision, often implemented by designers to foster the visual perception of ruggedness or durability in products of all types.

The following illustrate a few examples of chamfered surfaces used in this manner:

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com



2018 Jeep Wrangler



Panasonic Lumix Ruggedized Camera



Thule Gauntlet Briefcase

65. Mr. Hatch asserts at ¶70 of his Invalidity Report, with respect to the functionality of the chamfers incorporated in the Patents at Issue, that they are dictated by the need to "offset" the chamfers on the iPhone 5, in order to create an "even plastic flow in injection molding." He goes on to state that "no alternative design would satisfy the desired function of closely following the contours of the phone placed within the case and maintaining a constant wall thickness." These claims would be unconvincing to a designer of ordinary skill in the art, and are unconvincing to me.

66. One need only look to the incredible variety of alternative edges and surface transitions featured on other smartphone cases designed to fit the iPhone 5 to understand that Mr. Hatch's contention is false. As the images below illustrate, any number of non-chamfered designs also closely follow the contours of the iPhone 5, and create perfectly acceptable plastic flow in their injection molds:

16

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com



Speck Candydhell for iPhone 5/5s/SE



BodyGuardz Contact for iPhone 5/5s/SE

17

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com



Incipio Phenom for iPhone 5/5s/SE



Eyn Wallet Case for iPhone 5/5s/SE



Griffin Kazoo Case for iPhone 5/5s/SE



Caseology Envoy for iPhone 5/5s/SE

18

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com




Cygnett Workmate for iPhone 5/5s/SE          Caseology Wavelength for iPhone 5/5s/SE

67. Furthermore, while it is true that a degree of constant wall thickness is an element of well-designed plastic products, to help ensure the even flow of plastic and proper cooling for injection molded parts, there exists (as evidenced by the small sample shown above) a degree of flexibility in plastic part design that does not require the exact offset of surfaces as Mr. Hatch contends. This flexibility can be extended to an even broader range of design options through the use of various techniques in mold engineering, including the placement of gates, inclusion of cooling features, and side actions in the injection molding tool. Additionally, the sensitivity to wall thickness Mr. Hatch cites is also dependent on the type of plastic used in the injection molded part, such that some plastics allow for a greater degree of variation in wall thickness than others, even without the inclusion of engineered tooling solutions that permit more variability.

68. Mr. Hatch also argues that "closely following the contours" of the iPhone within the case through use of chamfered surfaces is, itself, dictated by the functional need to create the most compact case. The cases shown below, in contrast to Mr. Hatch's assertion, are intentionally larger than "the most compact case around [the shape of the phone]", illustrating what a designer of ordinary skill in the art would know - that compactness is not always the goal in the design of smartphone cases. From my own personal experience in the design of such cases, which includes researching consumer preferences for smartphone cases, the perception of ruggedness provided by a larger case is in fact desirable to many consumers. Not only can larger cases create the visual perception of protectiveness to some purchasers, the additional size can also imply that such a case will be more comfortable to hold than "slim" cases.

69. As the images below illustrate, many iPhone cases have been designed which clearly do not closely follow the contours of the phone within, and which feature ornamental designs with larger surfaces surrounding the phone, and overall larger form factors, than Mr. Hatch

19

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

deems "functional." Such designs are popular with many consumers, and I have myself been engaged on design projects for which the clients' explicit direction was to create a "larger" case, rather than one which would be "form fitting" to the phone within.



Lunatik Taktik for iPhone 4



Hardcandy ShockDrop for iPhone 5/5s/SE



Zizo Bolt for iPhone 7

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

70. That Mr. Hatch errs in identifying "closely following the contours of the phone" as a functional determinant of these chamfers is further illustrated by the existence of Spigen's "Slim Armor" cases alongside Spigen's "Tough Armor" cases (which include the Commercial Embodiments of the Patents at Issue, as defined in my Infringement Report.) The chamfers on the Slim Armor design are small, at a gentle angle, and extremely limited in their width. Indeed, per the images below, the front edge is so small that it can hardly be considered a chamfer. In sharp contrast, the front and rear Chamfers on the Patents at Issue are different because they are "very prominent" (to use Mr. Hatch's own words.) They are much more steeply angled, with broad surfaces which appear to be almost 3x the width of the front chamfer on the Slim Armor. That two entirely distinct visual impressions have been created by the same manufacturer, one being a line of cases designed to look more compact, and the other a line of cases designed to look larger in volume, using entirely different chamfered surfaces, yet accommodating identical the identical iPhone, clearly demonstrates that these chamfers are wholly ornamental and not dictated by function as Mr. Hatch claims.

Slim Armor Photo 1
(Front Chamfer highlighted in yellow)

'607 Patent Figure 1
(Front Chamfer Highlighted in Yellow)





21



Spigen Slim Armor iPhone 5/5s/SE



Spigen Tough Armor iPhone 5/5s/SE

71. Mr. Hatch's assertion that the chamfers featured on the designs claimed by the Patents at Issue are functionally dictated by the need to "offset" the chamfers on the iPhone 5 is also shown to be false through the inclusion of identical chamfers across the range of Spigen's Commercial Embodiments for Apple's iPhone 6, 6S, 6Plus, 7, and 7 Plus. All iPhones released subsequent to the iPhone 5/5s/SE feature prominent radiused edges, without any chamfered surfaces whatsoever. Yet the Commercial Embodiments for all of these subsequent iPhone models still practice the design claimed by the Patents at Issue, including the "very prominent" chamfered surfaces Mr. Hatch argues are dictated by the

22

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

chamfers on the iPhone 5. This application of the Patents at Issue to cases for iPhones which have no chamfers clearly demonstrates the ornamental nature of these chamfered surfaces, and completely undermines Mr. Hatch's analysis with respect to functionality; the continued use of chamfers on iPhone 6 and 7 cases covered by the Patents at Issue shows that these chamfered surfaces are not "offsetting" anything at all on the underlying iPhone within. By Mr. Hatch's analysis, one would be led to believe that the failure to offset the radiused surfaces of the iPhone 6 and 7 (and their Plus variants) would lead to problems with plastic flow and significant manufacturing issues. That the continued use of chamfers does not lead to any such problems confirms that the inclusion of chamfers serves none of the functional purposes Mr. Hatch claims.

72. Lastly, to the extent that even some functionality could be attributed to the chamfered surfaces of the Patents at Issue, Mr. Hatch makes the mistake of focusing on these elements in isolation, and fails to consider the ornamental contribution which the chamfers make to the overall visual impression of the design. As I understand the applicable law as described in Section IV(B) above, it is understood that every design is also functional, and of necessity incorporates features and elements which are functional. But the functionality of those elements, as I understand the applicable law, does not in any way diminish the ornamental value they also provide to a design. It is, I have been informed, critical that any analysis of invalidity focus on the ornamental aspects of such functional features, as part of the entirety of the ornamental design. As I read Mr. Hatch's analysis, he has improperly singled out this particular feature of the claimed designs, and ignored the significance of these chamfers to the overall visual impression of the Patents at Issue.

73. It is my understanding that the shape, angle, size, location, or inclusion of any single element cannot, on its own or in the aggregate with other features, allow for Mr. Hatch's conclusion that the design of the Patents at Issue is dictated "largely, if not entirely, by function." And to the extent that some functionality can truly be ascribed to an element which Mr. Hatch identifies, he fails to consider the ornamental contribution which every element he cites makes to the overall visual impression of the Patents at Issue. The overall appearance of designs in the Patents at Issue is not dictated by function, because it is one particular design out of many alternatives, which the images of the other smartphone cases above clearly demonstrate. The design of individual elements alleged to be functional, such as the chamfers discussed above - which Mr. Hatch claims to be functional because they offset the surface of the phone, ensuring smooth flow of plastic and creating the most form-fitting case - is not dictated by function, and the appearance of these individual elements is a matter of design choice. The chamfer's alleged function of closely following the contours of the phone does not, in other words, mandate that the surfaces of the case must be a particular shape or design, which the images of the other smartphone cases below also establish. The proper inquiry into a design's functionality must evaluate 'the overall appearance of the article – the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." *Ethicon*, 796 F.3d at 1329.

   C. **Assertion that the Shape and Position of the Circular Logo Aperture is Dictated by Function**

74. Mr. Hatch next argues in his Invalidity Report at ¶71 that "the relative size and position of the circular cut-out on the back surface is dictated by its functional requirements." This is incorrect, in that the inclusion of this circular aperture is first and foremost a purely ornamental decision. While its position may be influenced by the location of the logo which is visible through the aperture, a designer of ordinary skill in the art would appreciate that its shape, overall size and existence on the rear surface is not entirely or primarily functional; that a wholly ornamental feature is influenced in its placement by an underlying

23

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

feature on the iPhone within does not in any way transform that ornamental feature into something purely functional, and Mr. Hatch misconstrues the very nature of functionality in the context of design patents by making this argument.

75. A designer of ordinary skill in the art would appreciate that the decision to reveal the Apple logo in some manner does not serve an entirely or primarily functional purpose. Indeed many, if not most, phone cases do not reveal the logo of the underlying phone manufacturer, including cases manufactured and sold directly by Apple. Many consumers, in my experience, prefer a more subdued and discreet appearance to their phones and smartphone cases, and do not wish to "advertise" – for cultural, demographic or security and safety concerns – the brand of phone they own. And a designer of ordinary skill in the art would in many instances, for purely ornamental reasons, prefer to leave the rear surface of a smartphone case uninterrupted by a logo, so that other ornamentation, surface treatment, material or finish application could be applied to this surface in a manner that would not be visually disrupted were an aperture included. A designer of ordinary skill would also understand that the visibility of the logo, along with the color and finish of the iPhone surface surrounding it, will often conflict with the color, finish or material of the case design, such that they would deem the visibility of this rear iPhone surface through an aperture an unattractive distraction from the visual impression of the case design.

76. The images below (in addition to several of the examples above) show just a small sample of iPhone cases which do not reveal the Apple logo in any manner:





Speck Mightshell for iPhone 5/5s/SE                    Incipio Phenom for iPhone 5/5s/SE

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com



LoHi Hybrid Impact for iPhone 6/6s



Belkin Lego Case for iPhone 5/5s/SE

77. To the extent that a designer of ordinary skill in the art wishes to make the Apple logo visible when the iPhone is placed in the case, however, Mr. Hatch makes the mistake of assuming that an aperture – let alone a circular one, of the size claimed by the Patents at Issue – is the only way to achieve this objective, and that this aperture must be "functional" as a result. This is an incorrect assumption, in that a designer of ordinary skill in the art would understand that there are many alternative ways to display the Apple logo on a smartphone case, should he or she wish to do so. Alternatives include apertures of entirely different shapes and sizes, the use of various translucent or tinted materials on the rear surface of the case, or the application of the logo through various means onto the surface of the case. Moreover, the function that Mr. Hatch alleges the aperture serves (i.e., permitting the logo to be visible), does not dictate that the aperture be any particular shape or design, which is yet another reason why the aperture is not entirely or primarily functional and its design is not dictated by function.

The images below show just a small sample of iPhone cases featuring alternative ways of displaying the Apple logo:

25

# InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com



LifeProof FRE Case for iPhone 5/5s/SE



Ailun Case for iPhone 5/5s/SE
(with transparent back)



Apple Case for iPhone 6 (with applied logo)



Spigen Rugged Armor for iPhone X





Silk Guardzilla for iPhone 7
(with large textured, tinted window)

Rockform Rugged Case for iPhone X

78. Mr. Hatch also notes at ¶71 of his Invalidity Report that the circular aperture claimed by the Patents at Issue is surrounded by a "rim" which protrudes slightly outward from the rear surface of the case, and concludes that this is a minor protrusion that serves "an important function; to protect the back surface from being in full contact with surfaces, thus avoiding scratching or marring of either surface." A designer of ordinary skill in the art would disagree, as such small changes in the way a surface intersects with those around it are frequently featured in designs in order to "catch the light" or "highlight" the edge of a feature, accenting its appearance in a way that would not be visible were it to lie "flush" or in-line with its neighboring surfaces. There is nothing functional about this rim. The rim is merely an ornamental detail that contributes to the overall design of the Patents at Issue, and it is surprising that Mr. Hatch has accorded this rim the "important" functional purpose he has. Moreover, Mr. Hatch's analysis overlooks that the Patents at Issue themselves disclose one of the many alternative ways that the back of a smartphone case could be prevented from making full contact with other surfaces, in the form of disclaimed raised "feet" at each corner. If any part of the Patents at Issue are for protecting the back surface of the smartphone case from being in full contact with surfaces, thus avoiding scratching or marring of either surface, it is these disclaimed raise "feet," not any protrusion from the circular aperture. Indeed, a designer of ordinary skill in the art would not use a localized protrusion extending from the circular aperture because doing so would make for a "tipsy" or unstable contact point, such that a user would find her case "wobbling" in a most non-functional manner each time it is placed on a table. A designer of ordinary skill would not wish to include such a feature if it in fact served the "function" Mr. Hatch describes, as it would create exactly the sort of instability, when placed on a flat surface, which many consumers would find undesirable.

79. It has also been proposed by the Invalidity Report that the circular aperture and its "protruding rim" serve the functional purpose of providing a "tactile anchor point for better handling in one-handed operation" of the phone. In raising this argument, Mr. Hatch makes the mistake of assigning function and purpose to something simply because it can

27

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

be used in the fashion he describes, as opposed to that thing being designed for, or intended, to serve such a purpose beyond its ornamental contribution to a design. By way of example, I have observed that some people enjoy cooking on the horizontal rear hatch, or "tailgate", of their vehicles at sporting events, and sometimes sit or lean on the fenders and hood of their vehicles as they eat. My children love to rest their feet on the ornamentally contoured surfaces on the rear of the front seats in my car. By Mr. Hatch's reasoning, these elements of a car's design must serve the functional purpose of providing a place to cook, sit, and rest one's feet, as they are sometimes used in that manner. Of course that is not the case, and making overwrought connections between elements of an ornamental design and the way they may occasionally be used does not transform them into functional elements.

80. Lastly, to the extent that some functionality could be attributed to the circular aperture on the Patents at Issue, Mr. Hatch makes the mistake of focusing on this element in isolation, and fails to consider the ornamental contribution which the aperture makes to the overall visual impression of the design. As I understand the applicable law as described in Section IV(B) above, it is understood that every design is also functional, and of necessity incorporates features and elements which are functional. But the functionality of those elements, as I understand the applicable law, does not in any way diminish the ornamental value they also provide to a design. It is, I have been informed, critical that any analysis of invalidity focus on the ornamental aspects of such functional features, as part of the entirety of the ornamental design. As I read Mr. Hatch's analysis, he has improperly singled out this particular feature of the claimed designs, and ignored the significance of this aperture to the overall visual impression of the Patents at Issue.

81. It is my understanding that the shape, angle, size, location, or inclusion of any single element cannot, on its own or in the aggregate with other features, allow for Mr. Hatch's conclusion that the design of the Patents at Issue is dictated "largely, if not entirely, by function." And to the extent that some functionality can truly be ascribed to an element which Mr. Hatch identifies, he fails to consider the ornamental contribution which every element he cites makes to the overall visual impression of the Patents at Issue. The overall appearance of designs in the Patents at Issue is not dictated by function, because it is one particular design out of many alternatives, which the images of the other smartphone cases above clearly demonstrate. The design of individual elements alleged to be functional, such as the aperture and "rim" discussed above - which Mr. Hatch claims to be functional because they reveal the Apple logo and offer a place for the user to rest her finger - is not dictated by function, and the appearance of these individual elements is a matter of design choice. The Aperture's alleged function of revealing the Apple logo does not, in other words, mandate that such an aperture must be a particular shape or design, which the images of the other smartphone cases below also establish. The proper inquiry into a design's functionality must evaluate "the overall appearance of the article— the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." *Ethicon*, 796 F.3d at 1329.  Mr. Hatch thus failed to conduct a proper analysis and his functionality conclusions are not supported under the proper analysis.

82. Mr. Hatch also fails to note that the circular aperture is disclaimed in the '648 patent, making its functionality (or lack thereof) entirely irrelevant to his analysis with respect to that Patent at Issue.

### D.  Assertion that the Parting Lines of the Outer Shell are Dictated by Function

83. As noted by Mr. Hatch's analysis of the Patents at Issue, lateral "parting lines" exist across the rear and side surfaces of the claimed designs, resulting from the intersection of

the phone case with the upper and lower edges of its ornamental outer shell. I have also described these ornamental features in detail in my Infringement Report, which descriptions I incorporate here by reference.

84. At ¶72 of his report, Mr. Hatch goes on to state that "the parting lines correspond to the largest possible dimension of a back cover without the portion of the back cover that wraps around onto the side surface needing to be curved to begin the transition into a rounded corner. A designer wishing to design a protective case having two individual parts that are later combined would be motivated to use flat surfaces where those parts combine to maintain dimensional tolerances, particularly where the individual parts are to be manufactured from different materials."

85. A designer of ordinary skill in the art would disagree with Mr. Hatch's conclusion, in that the ornamental decision to locate the parting lines where they have been placed has everything to do with good aesthetic design, and nothing to do with the alleged manufacturing consideration he cites. More particularly, designers are taught from the earliest stages of their education at school, and continue to learn "on the job" as they transition to work at consultancies or in-house design departments, to create alignments and rationale locations for all elements of a design. This creates a harmonious and balanced visual impression, tying each element of a design to those with which it interacts in a rationale and congruent fashion. I was taught, and have myself instructed many junior designers, to always design with intention, that every element of a design must have an ornamental purpose in its shape, size and placement.

86. As such, placing visual intersections of elements in a haphazard way, such as locating the juncture of these parting lines within the corner radiuses of the case (as Mr. Hatch states would create manufacturing challenges, and issues of "dimensional tolerances"), would in reality create no such complications. A designer of ordinary skill in the art would appreciate that placing the parting line as Mr. Hatch suggests was avoided for purely ornamental reasons - that to locate them where Mr. Hatch suggests would have created significant visual dissonance within the claimed design.

87. A designer of ordinary skill in the art would appreciate that It makes good design sense, and brings harmony among the elements of a smartphone case, to place these lateral parting lines where the corner radii begin, because to locate them within the corner radii would visually interrupt those radii in a manner that would significantly and negatively impact the overall visual impression of the claimed designs. A designer of ordinary skill in the art would consider the placement of these lateral part lines in the context of how they fit with the overall visual impression of the design, where they would best fit, and why. The placement of these parting lines in alignment with the start of the corner radii is just a reflection of this design consciousness, and is not in any way dictated by the supposed functional purposes cited by Mr. Hatch.

88. Further to the above, Mr. Hatch argues that the intersection of the start of the corner radii with the parting lines is the "only" location which would "use flat surfaces where those parts combine to maintain dimensional tolerances, particularly where the individual parts are to be manufactured from different materials". Yet the prior art cited by Defendants – namely Spigen's "Slim Armor" case for the iPhone 5 – illustrates this statement to be completely false. As the image below shows, a designer of ordinary skill in the art could have, and did, locate the intersection of the parting lines on the Slim Armor design *before* the start of the corner radii (i.e., the horizontal parting lines at the top and bottom of the case are *not* required to intersect the start of the corner radii as Mr. Hatch claims).  That an easy alternative to Mr. Hatch's "only" solution exists and still "correspond(s) to the largest possible dimension of a back cover without the portion of the back cover that wraps around onto the side surface needing to be curved to begin the transition into a

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

rounded corner" completely undermines Mr. Hatch's claim that these parting lines are entirely or primarily functional and proves that the placement of these parting lines is not dictated by function.  A designer of ordinary skill in the art could, as the Slim Armor design shows, simply move the parting line *away* from, rather than into, the corner radius, achieving the same result Mr. Hatch says is functional, while simultaneously creating a different overall visual impression from the Patents at Issue in doing so.



Parting lines intersect at start of radius

Parting lines intersect vertical edge of case, well before corner radius starts

Red lines indicate start of corner radius

'607 Patent
Parting lines intersect at start of corner radii

Slim Armor iPhone 5
Parting lines intersect vertical edge

89. It should also be noted, with respect to the above, that a designer of ordinary skill in the art would be aware that the manufacturing methodologies and technologies available at the time of the effective filing date of the Patents at Issue were more than capable of maintaining "dimensional tolerances" at any point of intersection between the parting line and radius, should that have been the visual impression desired by the designer of the designs claimed by the Patents at Issue. The concerns raised by Mr. Hatch would not have been considerations for most methods of mass-produced, injection molded plastic parts.

90. That Mr. Hatch's analysis with respect to the location of these parting lines is founded on the very inclusion of a separate outer shell in the claimed design must also be noted as being a purely ornamental decision. A designer of ordinary skill in the art would observe that, without the inclusion of this purely ornamental outer shell in the Patents at Issue (and as shown by the numerous examples above, most iPhone cases do not feature any such outer shell) there would be no parting lines. As the outer shell is itself entirely ornamental, the parting lines which it creates as a mere consequence of its existence cannot be said to be entirely or primarily functional.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

91. In his final argument in ¶73 of his report for the alleged functionality of these parting lines, Mr. Hatch references Apple's design guidelines, which recommend that metal parts should not obstruct certain "exclusion zones" of the iPhone 5. From this, Mr. Hatch concludes that "the inventor of the '607 patent kept the area of the back cover outside of the 'do not obstruct' zones demarked by the guidelines to allow the "optional use of metal for the back plate."

92. A designer of ordinary skill in the art would find these contentions puzzling on more than one count. Firstly, it is widely understood in the design community that many of Apple's "guidelines" are just that – guides, or recommendations. They are not requirements, and while Apple has on occasion prevented the sale of products at its own retail stores which do not follow certain of its guidelines, there is nothing to prevent a manufacturer from ignoring them, so long as they desire to sell their products through Amazon and other venues. Moreover, Mr. Hatch makes the incorrect and baseless assumption that the outer shell was to potentially be manufactured of metal and would have thus benefited from following the guideline, to ensure maximum functionality of the iPhone 5's antenna within the case. The outer shell, however, is manufactured of plastic, is designed as an injection molded plastic part, and offers no interference whatsoever to the phone antenna - the only concern contemplated by the guideline Mr. Hatch references. Simply put, the guideline does not and would not in any way apply to the ornamental outer shell of the Patents at Issue, and there cannot be any relationship between the location of its parting lines and the alleged "functional" purpose of following Apple's guideline.

93. Lastly, to the extent that even some functionality could be attributed to the parting lines on the Patents at Issue, Mr. Hatch makes the mistake of focusing on these elements in isolation, and fails to consider the ornamental contribution which the parting lines make to the overall visual impression of the design. As I understand the applicable law as described in Section IV(B) above, it is understood that every design is also functional, and of necessity incorporates features and elements which are functional. But the functionality of those elements, as I understand the applicable law, does not in any way diminish the ornamental value they also provide to a design. It is, I have been informed, critical that any analysis of invalidity focus on the ornamental aspects of such functional features, as part of the entirety of the ornamental design. As I read Mr. Hatch's analysis, he has improperly singled out this particular feature of the claimed designs, and ignored the significance of these parting lines to the overall visual impression of the Patents at Issue.

94. It is my understanding that the shape, angle, size, location, or inclusion of any single element cannot, on its own or in the aggregate with other features, allow for Mr. Hatch's conclusion that the design of the Patents at Issue is dictated "largely, if not entirely, by function." And to the extent that some functionality can truly be ascribed to an element which Mr. Hatch identifies, he fails to consider the ornamental contribution which every element he cites makes to the overall visual impression of the Patents at Issue. The overall appearance of designs in the Patents at Issue is not dictated by function, because it is one particular design out of many alternatives, which the images of the other smartphone cases, and the annotated figures above clearly demonstrate. The design of individual elements alleged to be functional, such as the location of the parting lines discussed above - which Mr. Hatch claims to be functional because they are placed to coincide with the widest part of the case before it begins to taper at the corner radiuses, or because they coincidentally appear to follow Apple's design guidelines- is not dictated by function, and the appearance of these individual elements is a matter of design choice. The alleged function of the location of these parting lines does not, in other words, mandate that they be located in the particular place they are, which the images above also establish. The proper inquiry into a design's functionality must evaluate "the overall appearance of the article—the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." *Ethicon*, 796 F.3d at 1329.  Mr.

Hatch thus failed to conduct a proper analysis and his functionality conclusions are not supported under the proper analysis.

### E.   Assertion that the Aperture for the Ringer Switch, Volume Buttons and Power Button are Dictated by Function

95. Mr. Hatch's final arguments attempting to support the functionality of the Patents at Issue, and thus their ineligibility for protection by a design patent, center around the location, shape and size of the various control interfaces featured on the Patents at Issue. These include the aperture for the iPhone's ringer mute switch (the "Ringer Aperture"), the buttons controlling volume (the "Volume Buttons") and the button controlling the iPhone's power switch (the "Power Button.") Collectively, I may refer to these elements as the "Interface Features."

96. While in a general sense the location of these ornamental features is influenced by the need to operate analogous controls on the iPhone within the case, a designer of ordinary skill in the art would immediately understand that a variety of alternative designs, of varying sizes and shapes, will allow a user to activate the mute switch, adjust the volume, and power on/off their phone with equivalent ease, and that the Interface Features are wholly ornamental with respect to the shape and size in which they are designed.

97. Further, a designer of ordinary skill in the art would appreciate that the shape and size of the Interface Features has been dictated not by entirely or primarily functional purposes, but rather to complement and augment the overall visual impression created by the Patents at Issue. Other shapes and sizes could have been implemented, but the particular shapes and sizes which were in fact included as elements of the Patents at Issue were designed as they were to present a coherent overall visual impression rather than independent, isolated visual elements. In other words, a designer of ordinary skill in the art would appreciate that the particular design of the Interface Features "fits" with the overall visual impression of the claimed designs. Indeed, Mr. Hatch's "piece-by-piece" approach to his analysis, which falls very short of the requirement to view the claimed design "in its entirety", is never more harmful to his conclusions than with respect to his analysis of these Interface Features.

98.  Rather than rely solely on a verbal discussion of this issue, I will first illustrate the availability of alternative shapes and sizes for the design of the Interface Features through images below.  The availability of these alternative shapes and sizes for the design of the Interface Features also shows that the design of these elements is not dictated by function because all of these designs accomplish the same functionality, but with a different design element.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com



LoHi Slim Case for iPhone 6



Rock Royce Case for iPhone 7



UAG Ultimate Armor for iPhone 5/5s/SE



Obliq Xtreme Pro for iPhone 5/5s/SE





InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

HardCandy Shockdrop for iPhone 5/5s/SE        Lifeproof FRE for iPhone 5/5s/SE





Pelican Voyager for iPhone 5/5s/SE        Eyn Wallet Case for iPhone 5/5s/SE





Caseology Envoy for iPhone 5/5s/SE        Speck Mightyshell for iPhone 5/5s/SE

99. Per the images above, and more particularly with respect to the Ringer Aperture, a
designer of ordinary skill in the art would understand that this hole could have been
designed as an oval, a "racetrack", a large "cut out" of material surrounding the entire
control area, a trapezoid of various shapes, or even a door (as featured on Defendants'
own Duranium cases.) On the Patents at Issue, a designer of ordinary skill in the art would
appreciate that the aperture is not simply a "rectangle", but has instead been carefully
shaped to integrate into the grouping of Volume Buttons below it. It is not merely a
rectangular hole, but an ornamental feature designed to visually fit with surfaces below,

above and on either side, to create an overall visual impression that the Ringer Aperture
belongs to these surfaces, in arrangement with the Volume Buttons just below.

100. Mr. Hatch also fails to note that the Ringer Aperture is disclaimed in the '620 and '648
patents, making its functionality (or lack thereof) entirely irrelevant to his analysis with
respect to two of the three Patents at Issue.

101. Per the images above, and more particularly with respect to the Volume Buttons, a
designer of ordinary skill in the art would also understand that these could also have been
designed in a multitude of shapes and sizes. Their ornamental appearance has no impact
on their ability to activate the buttons on the phone beneath them, and the images above
illustrate but a few of the many alternate possibilities for the design of these buttons. The
ornamental appearance of the Volume Buttons could have been designed as two circles
(as on Spigen's Slim Armor, cited by Defendants as prior art), a single long rectangle or
racetrack, two slender "slivers" with radius ends, various trapezoidal forms, or a large "cut
out" revealing the phone buttons and providing space for the user to directly activate them.

102. Instead, a designer of ordinary skill in the art would appreciate that the Volume Buttons
on the Patents at Issue have been carefully shaped to integrate with the side and
chamfered surfaces which these buttons follow. Indeed, a designer of ordinary skill would
appreciate that it is these surfaces – the slim, flat side surface with broad chamfers front
and rear – which would be looked to in creating the particular shapes designed for the
Patents at Issue. The Volume Buttons are not merely a pair of rectangles; they are shaped
to create an overall visual impression that these buttons are an extension of, and belong
to, the side surface and the chamfers to either side of that surface, and to fit with the
overall visual impression of the design claimed by the Patents at Issue.

103. Mr. Hatch also fails to note that the Volume Buttons are disclaimed in the '648 patent,
making their functionality (or lack thereof) entirely irrelevant to his analysis with respect to
that Patent at Issue.

104. Per the images above, and more particularly with respect to the Power Button, a
designer of ordinary skill in the art would also understand that this could have been in a
multitude of shapes and sizes. Its ornamental appearance has no impact on the ability to
activate or interface with the phone beneath it, and the images above illustrate but a few of
the alternate possibilities for the design of this button. The ornamental appearance of the
Power Button could have been designed as a long racetrack, a circle, a figure 8 with "coke
bottle" contours, any variety of trapezoidal forms, or a "cut out" revealing the phone button
and providing space for the user to directly activate it.

105. Instead, a designer of ordinary skill in the art would appreciate that the Power Button on
the Patents at Issue has been carefully shaped to integrate with the side and chamfered
surfaces that the button follows. Indeed, it is these surfaces – the slim, flat side surface
with broad chamfers front and rear – which would be looked to in creating the particular
shape of button created for the Patents at Issue. The Power Button is not merely a
rectangle; It has been designed to create an overall visual impression that is an extension
of, and belongs to, the side surface and the chamfers to either side of that surface, and
the entirety of the design claimed by the Patents at Issue.

106. Mr. Hatch actually contradicts his own conclusion of functionality with respect to the
power button, in stating at ¶76 of his Invalidity Report that "Additionally, the shape is
consistent with the shapes on the left-hand side of the case, which would also be desired."
I agree with Mr. Hatch's statement, and would also point out that this statement describes
an entirely ornamental feature, one that is, in Mr. Hatch's own words, dictated not by any
function, but by the desire of the designer to visually connect and match the appearance

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

of the Power Button to the Volume Buttons, to present exactly the kind of cohesive overall visual impression I have described above.

107. Mr. Hatch also fails to note that the Power Button is disclaimed in the '620 and '648 patent, making its functionality (or lack thereof) entirely irrelevant to his analysis with respect to two of the three Patents at Issue.

108. Lastly, to the extent that even some functionality could be attributed to the Interface Features of the Patents at Issue, Mr. Hatch makes the mistake of focusing on these elements in isolation, and fails to consider the ornamental contribution which they make to the overall visual impression of the design. As I understand the applicable law as described in Section IV(B) above, it is understood that every design is also functional, and of necessity incorporates features and elements which are functional. But the functionality of those elements, as I understand the applicable law, does not in any way diminish the ornamental value they also provide to a design. It is, I have been informed, critical that any analysis of invalidity focus on the ornamental aspects of such functional features, as part of the entirety of the ornamental design. As I read Mr. Hatch's analysis, he has improperly singled out these particular features of the claimed designs, and ignored the significance of the Power Button, Volume Buttons and Mute Aperture to the overall visual impression of the Patents at Issue.

109. It is my understanding that the shape, angle, size, location, or inclusion of any single element cannot, on its own or in the aggregate with other features, allow for Mr. Hatch's conclusion that the design of the Patents at Issue is dictated "largely, if not entirely, by function." And to the extent that some functionality can truly be ascribed to an element which Mr. Hatch identifies, he fails to consider the ornamental contribution which every element he cites makes to the overall visual impression of the Patents at Issue. The overall appearance of designs in the Patents at Issue is not dictated by function, because it is one particular design out of many alternatives, which the images of the other smartphone cases above clearly demonstrate. The design of individual elements alleged to be functional, such as the Volume Buttons, Power Button and Ringer Aperture discussed above - which Mr. Hatch claims to be functional because they reveal the Apple logo and offer a place for the user to rest her finger - is not dictated by function, and the appearance of these individual elements is a matter of design choice. The alleged function of the Interface Features' location and shape does not, in other words, mandate that these features must be a particular shape or design, which the images of the other smartphone cases above also establish.) The proper inquiry into a design's functionality must evaluate "the overall appearance of the article—the claimed design viewed in its entirety," "not the functionality of elements of the claimed design viewed in isolation." *Ethicon*, 796 F.3d at 1329.  Mr. Hatch thus failed to conduct a proper analysis and his functionality conclusions are not supported under the proper analysis.

**VI. <u>Mr. Hatch's Understanding of the Tests for Anticipation and Obviousness</u>**

110. Throughout his report, Mr. Hatch demonstrates a significant lack of clarity and consistency with regard to the appropriate test to be applied in an invalidity analysis, confusing the standards of "ordinary observer" and "ordinary designer", and uses these critically distinct standards as if they were interchangeable. As discussed above in Sections IV(C) to (F), these two tests are not the same and are not interchangeable.

111. At ¶35, for example, Mr. Hatch states that "I may use the term 'ordinary observer' interchangeably with the term 'ordinary designer'. This is because the 'observer' relevant to invalidity is one who is designing articles of the type involved; namely, protective cases for cell phones. As noted below, to the extent there is a difference between an 'ordinary

observer' and an 'ordinary designer' for purposes of the present patents, such a difference
does not change my opinions."

112. At ¶82 he states that "I understand that to be valid, a design patent must not be obvious
to an ordinary observer who designs articles of the type involved".  Then at ¶85 Mr. Hatch
states "I understand that the 'same overall visual appearance' determination involves
_either_ the application of the 'ordinary observer' test noted above for anticipation, _or_ an
assessment from the point of view of the person of ordinary skill in the art" (_emphasis
added_), and at ¶157 "I am informed and understand that it is possible that the Federal
Circuit _may_ hold that the comparison between the hypothetical design and the claimed
invention is appropriately considered from the perspective of an ordinary observer, not a
designer of ordinary skill in the art. I have considered whether comparing any of the four
hypothetical designs above to the claimed design from the perspective of an ordinary
observer would alter my conclusions, and I have determined that it would not. While an
ordinary observer in this case (who I discuss in detail herein) would likely not have
comparable design experience compared to a designer of ordinary skill in the art, the
ordinary observer would similarly conclude that each of the hypothetical designs I
discussed above and the claimed design would have the same overall visual appearance"
(_emphasis added_.)

113. My understanding of the correct analysis for invalidity is very different from Mr. Hatch's,
and I believe that his interchangeable use of, and application of, the "ordinary observer"
and "ordinary designer" standards fundamentally undermines the legitimacy of his
conclusions.

114. Per my discussion of the "ordinary observer" and "designer of ordinary skill in the art" in
Sections IV(C) to (F) above, the vantage point offered by each of these hypothetical
observers is significantly different, and the application of the appropriate vantage point –
who is doing the observing, and perceiving the factors to be analyzed – is absolutely
critical to the conclusions which can be drawn from that analysis. With that in mind, and as
described more fully in Section IV above, it is my understanding that the test for invalidity
by anticipation must, as with the test for patent infringement, be made through the eyes of
an ordinary observer, and not an ordinary designer skilled in the art.

115. Infringement and anticipation are, as I understand, tests of "substantial similarity" made
through the eye of the "ordinary observer." No special education or experience in the
design of products, let alone products of the nature alleged to be infringed or anticipated,
is required or desired, and to assume (as Mr. Hatch has) that the knowledge and
perspective which a designer of ordinary skill in the art brings to the test for anticipation
would not substantially alter his analysis and conclusions is a serious error.

116. A designer of ordinary skill in the art looks at, and analyzes, designs with the eye of an
individual fluent in the design of such products, with attention greater and more attuned
than that which "a purchaser usually gives". Mr. Hatch's use of such a skilled, trained eye
for the test of anticipation, rather than the correct use of the eye of an ordinary observer,
tips the balance heavily in favor of finding anticipation, and creates a very different test
than I understand has been set forth in cases such as _High Point Designs_, Gorham,
_International Seaway_, _and Peters,_ as described in more detail in Section IV above. As
such, any conclusions Mr. Hatch may offer with respect to anticipation, and invalidity of the
Patents at Issue as having been anticipated, will be fundamentally flawed by having been
reached through a standard that strongly favors a finding of anticipation, rather than the
more balanced test required to have been applied.

117. Similarly, Mr., Hatch's confusion with respect to the correct eye through which the test
for patent invalidity through obviousness has led to the opposite of the result described

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

above – namely, that his use of an ordinary observer as vantage point from which his obviousness analysis is made applies the eye of an individual wholly unskilled and untrained in the evaluation of the very factors at issue in this analysis, thus unfairly tipping the balance heavily in favor of a finding of obviousness.

118. To emphasize the importance of Mr. Hatch's use of the incorrect observer, and how it has undermined his conclusions with respect to obviousness of the Patents at Issue, I repeat part of my understanding of the legal principles involved from Section IV above: "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko*, 950 F.2d at 718. The examiner must ascertain what would have been obvious to one of ordinary skill in the art at the time the invention was made, and not to the inventor, a judge, a layman, those skilled in remote arts, or to geniuses in the art at hand. *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 697 (Fed. Cir. 1983), cert. denied, 464 U.S. 1043 (1984). Indeed, I have been informed that it has been held to be reversible error to apply an "ordinary observer" standard rather than an "ordinary designer" standard to an analysis of obviousness. *High Point Design*, 730 F.3d at 1313.

119. In the discussion which follows, I will address other aspects of Mr. Hatch's analysis with respect to the alleged anticipation and obviousness of the Patents at Issue, and I may focus on issues unrelated to the fundamental concern raised in this Section VI. Whether or not I specifically repeat my concerns regarding Mr. Hatch's conflation of the ordinary observer and ordinary designer standards in the discussion to follow, this concern, and the harmful results stemming from his misuse of these standards, should be understood to be integral to and reflected throughout.

## VII. Overarching Shortcomings in Mr. Hatch's Methodology

120. Mr. Hatch states at ¶79 that "In this section, I will discuss my opinion that the '607 patent is invalid under §102 as failing to meet the novelty requirements, and separately, under § 103 as obvious in light of the prior art." By use of the words "novelty requirements" and the context of his sentence, I assume that Mr. Hatch is referring to anticipation and, separately, obviousness.

121. Yet while Mr. Hatch follows the above with an overview of applicable legal standards, including a summary of the standards for anticipation, I am unable to determine exactly where his anticipation analysis lies within the Invalidity Report. Because Mr. Hatch's report is unclear at points as to where (or whether) he is making an analysis of invalidity through anticipation, I will address his primary claims as they are set forth in his report, and assume that he is arguing from the standpoint of obviousness unless otherwise noted. I reserve the right to address in detail any clearly articulated anticipation analysis if Mr. Hatch is permitted to provide it.

122. Throughout his analysis, it is my understanding that Mr. Hatch also fails to meet Defendants' burden of proof because of the way Mr. Hatch presents his comparisons of the Patents at Issue to the prior art he references, and to the hypothetical combinations he creates. I have been informed that invalidity analysis, just as infringement analysis, requires a comprehensive view-by-view comparison of the prior art, and the hypothetical "combinations" created using prior art, to the Patents at Issue. Without such a visual analysis illustrating the "substantial similarity" and "basically the same" claims which Mr. Hatch makes, or even some reasonable effort approximating such a visual analysis, I understand that there is no way for the finder of fact to assess the claims he makes with respect to anticipation and obviousness. Indeed, without this critical visual analysis, the Invalidity Report's conclusions are nothing more than unsubstantiated verbal explanations

at too high a level of generality to even be helpful to assessing anticipation and obviousness.

123. Per the above, in reading Mr. Hatch's report I personally struggled at many points to understand the claims he makes, as they are entirely lacking in any visual evidence to support them. In some instances, Mr. Hatch includes one or two images which focus on a particular feature he is discussing, zeroing in on an isolated design element without reference to the overall visual impression of either his referenced prior art or the Patents at Issue, and failing to make any visual comparison between them. Mr. Hatch's methodology fails to provide the detailed information required to reach valid and supportable conclusions, and this absence of visual support, as well as the "cherry picking" of a few images which he says serve to bolster Defendants' claims, results in extremely misleading analysis throughout his Invalidity Report.

124. With respect to the above concerns, I have been reminded that design patents are presumed to be valid, and that a party challenging a patent's validity must show by clear and convincing evidence that the patent is invalid. *L.A. Gear*, 988 F.2d at 1123. I believe that Mr. Hatch's analysis has fallen far short of being able to meet this burden, and I reserve the right to respond more comprehensively, including with appropriate visual analysis, at deposition and testimony at trial if Mr. Hatch attempts to supplement his analysis.

## VIII. <u>Assessment of Mr. Hatch's "State of the Art"</u>

125. While I would not disagree with Mr. Hatch's contention at ¶87 and 88 that "using a front silhouette of a generally rectangular shape with radiused edges, somewhat parallel to that of the phone it encases, was well known", or that "A person of ordinary skill in the art at the time of the alleged invention would have understood that basic shape for a phone case was a well-known design option", a designer of ordinary skill in the art would never consider the approximation of general form factor of a case, to the phone it is intended to hold, as the *only* form factor possible (e.g., there are many novelty-shaped cases, such as "Mickey Mouse-eared" design, or different variants of a generally rectangular shape that are not merely a rectangle, such as for example rectangle shapes with square corners, rounded corners, and other variants.)

126. A large number of smartphone case designs at the time the Patents at Issue were applied for, and since, are rectangular in shape, generally with some degree of radiused corners, but the fact that all of these cases were roughly the same rectangular shape did not prevent the U.S. Patent Office from finding many of these designs to be novel and non-obvious. As such, a designer of ordinary skill in the art would regard a "generally rectangular shape" as being irrelevant to the analysis of invalidity of the Patents at Issue. Moreover, a rectangular silhouette is, by definition, merely the representation of an overall shape or form factor, and not at all a design, or even an element of a design. The overall visual impression of the design representing that silhouette is the proper subject of a design patent, but Mr. Hatch's comparison of the front silhouette of the Patents at Issue to prior art serves no purpose, particularly when that silhouette is nothing more than a generic shape like a rectangle with round corners. This approach is analogous to comparing a case design to its shadow.

127. With respect to Mr. Hatch's claim at ¶90 that "keeping the outer contour of the case relatively close to the phone it encases would minimize bulk, an attractive visual attribute for the consumer choosing between cases", I incorporate here by reference my discussion of this very issue at Section V(B) above, and accompanying images. As I show above,

InformedInnovation

2176 W. 24ᵗʰ Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

there are many examples of designs which eschew, for the various reasons I describe, closely following the contours of the phone, and even the very prior art Mr. Hatch cites directly contradicts his assertion. The '181, '249 and '251 patents discussed by Mr. Hatch, for example, do not appear to feature any sort of chamfered surfaces that "mimic(s) the shape of the angular phone it encloses, keeping a constant wall thickness" while the '218 patent clearly adds significant "bulk" beyond the shape and form of the iPhone within, via a thick frame that appears to be at approximately 3x the width of other prior art Mr. Hatch references, and that of the Patents at Issue.

128. I have already addressed Mr. Hatch's claims, at ¶¶91-93 of his report, regarding the circular aperture on the rear of the phone. I incorporate my discussion at Section V(C) above, and the images accompanying, here by reference. Per that discussion above, Mr. Hatch's assumption that the inclusion of such an aperture would be obvious to a designer of ordinary skill in the art, that it's shape as a circle, its size, or that an aperture would even be a designer's only or obvious solution to reveal the iPhone's logo, is belied by the many alternate designs available. These include a large number of phone cases which do not feature any opening to reveal the Apple logo. Mr. Hatch's assumption that such an opening to reveal the Apple logo "would improve the visual appeal of the phone case to the consumer, particularly for Apple phone users' who this case was exclusively intended" is contradicted not only by the many cases shown above – including those manufactured by Apple – which do not feature an aperture or reveal, but through my own experience researching consumer preferences for mobile phone and tablet cases, which informs my understanding that many consumers prefer not to display any logo at all on their cases, for the reasons I have discussed above.

129. Lastly, in reviewing Section B "State of the Art" of Mr. Hatch's Invalidity Report, I am uncertain as to what Mr. Hatch is attempting to argue here, or the methodology he has applied. He makes no visual comparison of the Patents at Issue to prior art, instead offering only a single view from a selection of prior art patents which share no visual similarity whatsoever to the Patents at Issue. To the extent Mr. Hatch is attempting to set forth "the scope and content of the prior art" in a general sense, to begin an obviousness analysis more akin to the analysis used in a utility patent case under *Graham v. John Deere*, none of the examples Mr. Hatch discusses create the same overall visual appearance as the claimed design, which is the proper first step for beginning an obviousness analysis in a design patent case.

130. For example, none of the prior art Mr. Hatch references illustrates a smartphone case featuring an outer shell with lateral parting lines across its back and side surfaces, or includes chamfered surfaces which feature so prominently on the Patents at Issue. Indeed, the prior art referenced in his Section B appear (even from the misleading single view he offers of each) to include very different smartphone cases with sharply-edged or radiused surfaces rather than chamfers, rear surfaces uninterrupted by any parting lines or outer shell-like features, and Interface Features presenting entirely different ornamental designs from those of the Patents at Issue. After reviewing his Section B "State of the Art", I am left feeling that Mr. Hatch is in complete agreement with my conclusion, in the Infringement Report, that Spigen's designs were in fact novel and substantially dissimilar in overall visual impression from the prior art at the time they were filed, because none of the examples he use even remotely share the same overall visual appearance as the design claimed in the Patents at Issue.

131. To illustrate the foregoing I include additional views below, from the prior art cited by Mr. Hatch in this section of his report.



2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

US 9,143,181 Figure 8



InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

D662,092 Figure 5

Fig. 5



D676,845 Figure 1



FIG. 1

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

D677,249 Figure 5                                   D677,251 Figure 1



FIG. 5



FIG. 1

43

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

D729,218 Figure 1                    D703,654 Figure 2

FIG. 1




InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

## IX. Mr. Hatch's Application of the Test for Obviousness

132. While I am unsure whether Mr. Hatch attempted to provide any analysis in his report with respect to the contention that the Patents at Issue are invalid, as having been anticipated, I wholly disagree with his invalidity through obviousness analysis which begins at ¶94 of his report. As noted above, Mr. Hatch's failure to present his analysis as anything more than brief verbal summaries, accompanied by a handful of misleading views focused on isolated elements, falls far short of the "clear and convincing evidence" standard which I have been informed must be met to support an obviousness finding. Additionally, Mr. Hatch's use of unsuitable primary and secondary references, and prior art which, in some instances, is not actually prior to the Patents at Issue, makes for an analysis of obviousness which fails on all counts.

### A. The Spigen Slim Armor Alone or With Modifications Does Not Render the Patents at Issue Obvious

133. As an initial matter, it is notable that the U.S. Patent Office considered the Spigen Slim Armor case design during prosecution of the Patents at Issue. After consideration, the U.S. Patent Office did not reject the Patents at Issue over the Spigen Slim Armor case. This is strong evidence tending to show that the Patents at Issue cannot be obvious over the Spigen Slim Armor case alone.

134. Contrary to the determination of the U.S. Patent Office, Mr. Hatch contends at ¶95 of his report that "[t]he Spigen Slim Armor Renders the Asserted Design Patents Obvious." My comprehensive analysis of the Spigen Slim Armor, presented in Sections XIII and XIV of the Infringement Report, is incorporated here by reference, and I also present selected images from that analysis below to respond more directly to Mr. Hatch's analysis.

135. Per my discussion of the Slim Armor incorporated above, Mr. Hatch's conclusion that a designer of ordinary skill in the art would find the Slim Armor to be "basically the same" is incorrect, and he fails to provide the detailed analysis required to reach that conclusion, or to demonstrate that claim. By identifying only a few select elements in isolation - rather than providing a view-by-view analysis and comparison of the Slim Armor design to the Patents at Issue, and showing how its overall visual impression would be perceived as basically the same to a designer of ordinary skill in the art – Mr. Hatch fails to show how the Slim Armor design can serve either on its own as a prior art reference which renders the Patents at Issue obvious, or (as he later employs it) as a primary reference for obviousness analysis.

136. The problems caused by Mr. Hatch's failure to present a correct and comprehensive view-by-view comparison of the Spigen Slim Armor to the Patents at Issue are highlighted by his assertions at ¶¶96-98 of his report, that the Slim Armor's chamfers are similar to those featured on the Patents at Issue. In isolating these elements from the entirety of the designs he discusses, and by further isolating the visual presentation of these elements by providing entirely different views, taken from different perspectives and distances, to illustrate his analysis, Mr. Hatch offers an altogether misleading representation of the alleged similarity of these elements.

137. By presenting incongruous views, and selectively enlarging these incongruous views, Mr. Hatch attempts to illustrate that the chamfers he discusses would be perceived by a designer of ordinary skill as substantially similar in shape and size between the Slim Armor and the Patents at Issue. The images below (incorporated from my Infringement Report), presented from analogous views and equidistant perspectives, show otherwise. The chamfers of the Patents at Issue would clearly be seen by an ordinary designer to be

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

much broader, more steeply angled, and significantly more prominent to the overall visual impression of the Patents at Issue than the small chamfers featured on the Slim Armor. Indeed, the front chamfer of the Slim Armor is almost invisible in comparison to the wide, chamfered surface at the front of the Patents at Issue. This is a visual distinction that an ordinary designer would consider important, and that would lead an ordinary designer to conclude the two chamfers, especially in context of the overall design, create a distinctly different overall visual impression.  As a further example, Mr. Hatch completely ignores the different button styles and aperture styles on the Slim Armor case, and he does not even attempt to provide any analysis considering these elements in the context of the design as a whole.  The significant differences between the Slim Armor and '607 Patent, from the perspective of a designer of ordinary skill in the art, shows that these two smartphone cases create a distinctly different overall visual impression.

<div style="display:flex">
<div>

Slim Armor Photo 1
(Front Chamfer highlighted in yellow)



</div>
<div>

'607 Patent Figure 1
(Front Chamfer Highlighted in Yellow)



</div>
</div>

<div style="display:flex">
<div>

Slim Armor Photo 8
(Chamfers highlighted in yellow)



</div>
<div>

607 Patent Figure 8
(Chamfers highlighted in yellow)

</div>
</div>

46

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Slim Armor Photo 2                                        '607 Patent Figure 2




InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Slim Armor Photo 5                          '607 Patent Figure 5

                        

138. Per my discussion above, I disagree with Mr. Hatch's conclusion that the Spigen Slim
Armor is a correct or appropriate primary reference that is "basically the same" as the
Patents at Issue.  The Slim Armor case would need to be modified in major and significant
ways to make it look more like the Patents at Issue, which means that the Slim Armor
cannot qualify as the primary reference for an obviousness analysis. Mr. Hatch has offered
nothing more than three images (two of which are merely magnified details showing only
small portions of the Slim Armor case), without a view-by-view (or any) visual comparison
to the Patents at Issue to support this critical prerequisite. And aside from its generally
rectilinear shape, a designer of ordinary skill in the art would not perceive anything about
the Slim Armor's narrow, gently-angled rear chamfer, nearly invisible front chamfer,
prominent flat bezel surrounding the case's front aperture, individual, circular volume keys,
smooth, uninterrupted rear surface, and outer shell which wraps entirely around the broad
side surfaces to the front of the case, which suggests that the Slim Armor design is
"basically the same" as the Patents at Issue.

139. Because the starting point required in the first step of an analysis of whether a design
patent is obvious must begin with a primary reference that is "basically the same" as the
Patents at Issue, Mr. Hatch's analysis relying on the Spigen Slim Armor as a primary
reference cannot show that the Patents at Issue are invalid as obvious. Mr. Hatch uses the
Spigen Slim Armor as his primary reference in three out of the five invalidity analyses he
presents (specially, in his analyses at Section V(C)(1), V(C)(2), and V(C)(3) of his report),

48

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

and each of these analyses necessarily fail to support an obviousness finding because the Spigen Slim Armor is not a correct or appropriate primary reference.  While I believe an appropriate obviousness analysis cannot be made without a correct primary reference, I will for the sake of thoroughness address Mr. Hatch's attempt to do so.

140. The second part of the test for obviousness, as I understand it per Section IV(D) and (E) above, requires that this primary reference be modified by an appropriate secondary reference to create a design which has the same overall visual appearance as the Patents at Issue. This secondary reference, must, however, be "so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Further, and of particular relevance to Mr. Hatch's methodology, "[i]n considering patentability of a proposed design the appearance of the design must be viewed as a whole . . . and compared with something in existence – not with something that might be brought into existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature. *In re Rosen*, 673 F.2d at 391 (quoting *In re Jennings*, 182 F.2d at 208). If the prior art suggests "components of [the patented] design, but not its overall appearance, an obviousness rejection is inappropriate." *In re Harvey*, 12 F.3d at 1063.

141. With respect to modification of the primary prior art reference for purposes of obviousness analysis, I also understand that there must be some suggestion, incentive, or motivation, for a designer of ordinary skill in the art to hypothetically modify the primary reference with a secondary reference. "'[I]n order for secondary references to be considered, . . . there must be some suggestion in the prior art to modify the basic design with features from the secondary references.'" *MRC Innovations*, 747 F.3d at 1334 (quoting *In re Borden*, 90 F.3d at 1574). That is, "the teachings of prior art designs may be combined only when the designs are 'so related that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* (quoting *In re Borden*, 90 F.3d at 1574 (internal citation omitted)). "[T]he mere similarity in appearance [] itself [may] provide[] the suggestion that one should apply certain features to another design." *Id.* The modification, or motivation for the modification, however, must not be induced by a conclusion arrived at through knowledge which the ordinary designer would not have possessed: "As with utility patents, obviousness is not determined as if the designer had hindsight knowledge of the patented design." *L.A. Gear*, 988 F.2d at 1124.

142. As I read his analysis at ¶¶100-103 of his report, Mr. Hatch has used the '607 patent itself as an unnamed "secondary reference" to modify the Slim Armor design, via application of the '607 patent's circular aperture and button designs. Mr. Hatch states "[t]he *Spigen Slim Armor* readily suggests to a person of ordinary skill in the art only minor alterations are necessary to arrive at a hypothetical reference that is substantially the same as the claimed design" (emphasis added). Mr. Hatch continues "[t]he *Spigen Slim Armor* would have to be modified by adding the circular through-hole in the back surface and adding buttons for the phone's side functions. It is my opinion that this minor addition would have been obvious to a person of ordinary skill in the art and well within such a person's skill set" (emphasis added).  But this is impossible because the Spigen Slim Armor does not have a circular aperture, and it also does not have button designs that are even remotely similar to the button designs claimed in the Patents at Issue, and thus the Slim Armor cannot suggest these modifications.  As I understand it, Mr. Hatch is engaging in precisely the sort of impermissible "obviousness in hindsight" prohibited by the legal principles above, as a designer of ordinary skill in the art could not possibly be motivated to go back in time over 1 year prior to the '607 patent in order to modify the Slim Armor design, using the '607's aperture and button designs, as Mr. Hatch has done. Further, Mr. Hatch entirely ignores the differences between the chamfers in the two designs, and he does not even attempt to argue that a designer of ordinary skill would be motivated to

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

change the chamfers in the Slim Armor design to make them like the chamfers shown in the Patents at Issue.  Mr. Hatch also does not consider the distinctly different overall visual impression that the Slim Armor creates as compared to the design claimed in the Patents at Issue.

143. Even were the above issue to be overcome, I struggle to understand where and why a designer of ordinary skill in the art would find the suggestion, motivation, rationale or any other reason to make the modifications Mr. Hatch's analysis requires. As I have shown in my Infringement Report, the Slim Armor design presents a very different overall visual impression than the Patents at Issue. It is, as its name suggests, "slim" in appearance, and a designer of ordinary skill would perceive that it presents an uncluttered, streamlined aesthetic. The Patents at Issue are, in contrast, practiced by commercial embodiments named "Tough Armor." A designer of ordinary skill in the art would perceive these designs as presenting a rugged, bulky, and "engineered" aesthetic, including the bold, prominent button designs, and the inclusion of a deeply contoured aperture on the rear (which a designer of ordinary skill would note creates a substantially different impression than the smooth, uninterrupted rear surface of the Slim Armor.)

144. Indeed, Spigen's website encourages consumers to purchase its Slim Armor with the following: "If you're looking for a state-of-the-art protection with a *minimal design*, you've found Spigen's Slim Armor™ Case for the new iPhone SE!... It's *sleek design* and *smooth texture* offers a *modernistic impression*. (emphasis added) https://www.spigen.com/products/iphone-se-case-slim-armor?variant=16522703553 (attached as Exhibit E).   A designer of ordinary skill would understand that Spigen would wish to maintain these novel visual attributes in order to appeal to different consumer segments and divergent customer needs, while still providing visual indication to consumers that both lines of cases are manufactured by Spigen. I thus do not agree with Mr. Hatch's contention that a designer of ordinary skill would be at all motivated to make the modifications he claims are obvious without explaining why the modifications would be made, as they would entirely detract from the visual impression sought by the design of the Slim Armor. An ordinary designer reading these statements about the Slim Armor would be discouraged from using the Slim Armor as a basis to modify a smartphone case to create a rugged, bulky, "engineered" aesthetic appearance. The Slim Armor thus teaches away from the design shown in the Patents at Issue.

145. Finally, as he has throughout his Invalidity Report, Mr. Hatch approaches his obviousness analysis through a piece-by-piece, element-by-element methodology. Indeed, he has at ¶101 brought something into existence "by selecting individual features from prior art and combining them" (though in this case, selecting those features from art which he acknowledges is not prior), exactly as I have been informed the courts in *Rosen* and other cases has counseled against doing.

146. And in taking this improper approach to his analysis, Mr. Hatch does so in a most haphazard and incomplete manner, only mentioning a few discreet elements of alleged similarity between the Slim Armor design and the Patents at Issue. He makes no mention, comparison or analysis at all of the many significant differences noted in my Infringement Report between the Slim Armor design and the Patents at Issue, including the width of the side surfaces (highlighted in blue above), the degree to which the outer shell wraps around those surfaces (highlighted in orange above), and the flat bezel prominently featured around the front aperture of the Slim Armor design (highlighted in purple above), to name just a few of the elements which remain substantially different, even if we were to accept Mr. Hatch's arguments with respect to chamfers, parting lines, and the circular aperture and button designs. Thus, Mr. Hatch's analysis, even if accepted, fails to show all of the elements of the design claimed in the Patents at Issue are disclosed or suggested by the Slim Armor.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

147. As such, Mr. Hatch's analysis does not and cannot demonstrate the substantial similarity required between the modified Slim Armor and the Patents at Issue to prove the modified Slim Armor design creates the same overall visual appearance as the claimed design, and Mr. Hatch has thus failed to show that the Patents at Issue are rendered invalid through obviousness by Spigen's Slim Armor.

**B.   The Spigen Slim Armor Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious**

148. Mr. Hatch continues at ¶104 with a second obviousness analysis, this time using the Slim Armor again as his primary reference, and Spigen's D772,209 patent as his prior art secondary reference.

149. I have, however, been informed that the '209 patent is not prior art to the Patents at Issue, having been filed (as Mr. Hatch acknowledges) only 10 days before the '607 patent was filed and having one inventor in common with the Patents at Issue. I understand that one of the two inventors of the '209 patent, Dae-Young Kim, is also the inventor of the '607 patent, and that the '209 patent is thus not prior to the Patents at Issue per 35 U.S.C. § 102(b)(2)(c) of the America Invents Act. As such, I understand that Mr. Hatch's analysis that "[t]he Spigen Slim Armor with U.S. D772,209 Renders the Asserted Design Patents Obvious" is not valid, and that the conclusion he draws from this analysis is meaningless, as he has used a design (the '209 patent) which is not prior to the Patents at Issue to modify his primary reference. The same applies to Mr. Hatch's obviousness analyses presented in Sections V(C)(3) to V(C)(5) of his report because these sections also rely upon the '209 patent. Despite the foregoing, I will for the sake of thoroughness address the substance of Mr. Hatch's analysis.

150. As discussed in Section IX(A) above, I disagree that a designer of ordinary skill in the art would perceive the design of the Slim Armor case as "basically the same" as the Patents at Issue, which I understand to be the fundamental requirement for a prior art patent to qualify as primary reference in the first step of an obviousness analysis. Thus, Mr. Hatch's analysis relying on the Spigen Slim Armor as a primary reference cannot show that the Patents at Issue are invalid as obvious. While I believe an appropriate obviousness analysis cannot be made without a correct primary reference, I will for the sake of thoroughness address Mr. Hatch's attempt to do so.

151. In addition to my opinion, incorporated by reference to Section IX(A) above, that the Slim Armor is not a correct or appropriate primary reference to be used in the first step of an obviousness analysis because it is not "basically the same" as the Patents at Issue and that accordingly the obviousness analysis cannot proceed further,  I also disagree that a designer of ordinary skill in the art would find that the design claimed by the '209 patent makes an appropriate secondary reference for his obviousness analysis.

152. To serve as secondary reference in the second step of an obviousness analysis, I understand that a prior art reference must first be "so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Further, I understand that when creating a design by selecting a primary reference and then modifying the appearance by adding an element from a secondary reference, it is important that the design is considered as a whole, and not just the individual parts. *In re Rosen*, 673 F.2d at 391. Lastly, I have been informed that "there must be some suggestion in the prior art to modify the basic design with features from the secondary references. . . That is, the teachings of prior art designs may be combined only when the

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

designs are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other." *In re Borden*, 90 F.3d at 1574-75 (internal citation omitted).

153. I disagree that the design of the '209 patent is at all related, let alone "so related", as to suggest the application of its features to the Slim Armor design. To be sure, both the '209 patent and Slim Armor are smartphone cases, but the overall design of the two cases is entirely different.  Mr. Hatch appears to have overlooked this because he has has offered nothing more than a few images, without any view-by-view comparison to the Slim Armor design, to support the fundamental requirement that the '209patent be "so related" to the Slim Armor to suggest application of features from the '209 patent to the Slim Armor design. Aside from its generally rectilinear shape, I do not believe a designer of ordinary skill in the art would perceive anything about the '209 design's overall rounded visual impression, with its fully radiused side surfaces, which suggests the application of any of the features of the '209 patent to the Slim Armor design.

154. A designer of ordinary skill would, instead, find the '209 patent to be entirely distinct in its overall visual impression, with virtually no similarity or relationship to the Slim Armor other than its rectilinear form. As Mr. Hatch has not provided the required comparison of views to illustrate the foregoing, I have included below a comparison of analogous views, showing the complete lack of visual relationship between the Slim Armor and '209 designs; '209 is not in any way related to the primary reference, such that the appearance of ornamental features in one would suggest the application of those features to the other:

Slim Armor Photo 1                                      '209 Figure 1

    

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Slim Armor Photo 6                           '209 Figure 5



155. At step two of the obviousness analysis, I also find that Mr. Hatch again focuses on only individual elements of the '209 patent in isolation to create a modified design, rather than, as is required, focusing on the overall visual impression presented by the '209 patent design as a whole. Mr. Hatch merely "borrows" the circular aperture and trivial "outward protrusion" from the '209 patent, but he never explains why a designer of ordinary skill in the art would be motivated to apply  these design elements to the Slim Armor, and I understand that he has improperly brought his combined design "into existence by selecting individual features from prior art and combining them," *In re Rosen*, 673 F.2d at 391, using prior art which at most suggests "[isolated] components of [the patented] design, but not its overall appearance." *In re Harvey*, 12 F.3d at 1063. As discussed above in Section V(C), a designer of ordinary skill in the art would understand that there are many alternative ways to display the Apple logo on a smartphone case, should he or she wish to do so. Alternatives include apertures of entirely different shapes and sizes, the use of various translucent or tinted materials on the rear surface of the case, or the application of the logo through various means onto the surface of the case.  Mr. Hatch has posited no reason whatsoever for a designer of ordinary skill to pick a circular aperture that is in the exact same position and is exactly the same size as the aperture shown in the Patents at Issue. Mr. Hatch's assumption that an ordinary designer would pick such a circular aperture is entirely unsupported. Likewise, the trivial "outward protrusion" does not serve the functional purpose that Mr. Hatch assumes it does, and Mr. Hatch has not posited any reason why a designer of ordinary skill in the art would add the "outward protrusion" from a design perspective.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

156. Upon making this combination, Mr. Hatch again fails to provide any view-by-view visual analysis or comparison of his hypothetical design to the Patents at Issue. He does not demonstrate through any visual means that his modifications to the Slim Armor result in a design which in any way "has the same overall visual appearance as the claimed design." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Mr. Hatch merely provides a high-level verbal description discussing how his hypothetical design incorporates certain features of the Patents at Issue, and excuses the numerous and varied aspects in which it differs from the Patents at issue as "minor differences" that are "well within the skill of a person of ordinary skill." Mr. Hatch's analysis fails to show that the combined design creates a design that has the same overall visual appearance as the design claimed in the Patents at Issue.  For example, at ¶115 of his report, Mr. Hatch admits that the rectangular buttons shown in the Patents at Issue are of a different design than would be present in his design created by combining the Slim Armor and '209 patent.  To address this, Mr. Hatch opines "that a person of ordinary skill in the art would have been motivated to modify the shape of the buttons to match the needs of the phone button it actuates" and cites to a third and fourth prior art reference that he says contain rectangular buttons.  But, as discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

157. He also fails to explain or demonstrate how his combination has addressed the many other substantial differences between the combination of the Slim Armor and '209 Patent, and the Patents at Issue which he has not even mentioned, such as the way the outer shell wraps to the front of the case, and the flat bezel surrounding the aperture through which the phone would be visible. In my opinion his hypothetical design, for the reasons discussed above, falls far short of anything which a designer of ordinary skill in the art would perceive as having the same overall visual appearance as the Patents at Issue, and Mr. Hatch has not provided the required analysis or comparison images to support his claim of substantial similarity. Thus, Mr. Hatch's analysis, even if accepted, fails to show all of the elements of the design claimed in the Patents at Issue are disclosed or suggested by the combination of Slim Armor with the '209 patent.

158. I also struggle to understand why a designer of ordinary skill in the art would find motivation, rationale or any other reason to make the modifications Mr. Hatch suggests in his analysis. As I have shown in my Infringement Report, and discussed above, the Slim Armor design presents a very different overall visual impression than the Patents at Issue. It is, as the name suggests, "slim" in appearance, and a designer of ordinary skill would perceive that it presents an uncluttered, streamlined aesthetic. The Patents at Issue are, in contrast, practiced by commercial embodiments named "Tough Armor." A designer of ordinary skill in the art would perceive these designs as presenting a rugged, "engineered" aesthetic, including the bold, prominent button designs and inclusion of a deeply contoured aperture on the rear (which a designer of ordinary skill would note creates a substantially different ornamental impression than the smooth, uninterrupted rear surface of the Slim Armor.)

159. Indeed, Spigen's website encourages consumers to purchase its Slim Armor with the following: "If you're looking for a state-of-the-art protection with a *minimal design*, you've found Spigen's Slim Armor™ Case for the new iPhone SE!... It's *sleek design* and *smooth texture* offers a *modernistic impression*. (emphasis added) https://www.spigen.com/products/iphone-se-case-slim-armor?variant=16522703553 (attached as Exhibit E).  An ordinary designer reading these statements about the Slim Armor would be discouraged from using the Slim Armor as a basis to modify a smartphone case to create a rugged, bulky, "engineered" aesthetic appearance. The Slim Armor thus teaches away from the design shown in the Patents at Issue. Further, a

designer of ordinary skill would perceive the '209 patent, in contrast to the Slim Armor, as entirely different in the softly radiused, "rounded" aesthetic it embodies, and would consider the '209 patent to present an overall visual impression directly opposite to the edgy, angular appearance of the Slim Armor design. Mr. Hatch's secondary reference is in no way "so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other"; in fact, a designer of ordinary skill would understand the opposite to be true.

160. A designer of ordinary skill would appreciate that Spigen would wish to maintain these novel and distinct visual attributes, to appeal to different consumer segments and divergent customer needs, while still providing visual indication to consumers that both lines of cases are manufactured by Spigen. I thus do not agree with Mr. Hatch's contention that a designer of ordinary skill would be at all motivated to make the modifications which he claims are obvious, as such modifications would entirely detract from the visual impression sought by the design of the Slim Armor. In fact, a designer of ordinary skill would be discouraged from making such modifications, as they would entirely change the visual impression of the Slim Armor design in ways which would surely harm sales and reduce market interest in Spigen's novel design.

161. Mr. Hatch's analysis does not and cannot demonstrate the substantial similarity required between the combination of Slim Armor and the '209 patent and the Patents at Issue to prove his hypothetical design creates the same overall visual appearance as the claimed design, and Mr. Hatch has thus failed to show that the Patents at Issue are rendered invalid through obviousness by Spigen's Slim Armor combined with the '209 patent.

**C.  The Spigen Slim Armor Combined with the U.S. D714,274 Does Not Render the Patents at Issue Obvious**

162. Mr. Hatch's third "combination" of prior art, for purposes of demonstrating obviousness of the Patents at Issue, begins at ¶117 of his report. In this instance, he has again employed the Slim Armor as his primary reference, and uses D714,274 as his prior art secondary reference.

163. In addition to my opinion, incorporated by reference to Section IX(A) above, that the Slim Armor is not a correct or appropriate primary reference to be used in the first step of an obviousness analysis because it is not "basically the same" as the Patents at Issue and that accordingly the obviousness analysis cannot proceed further, I also disagree that a designer of ordinary skill in the art would find that the design claimed by the '274 patent makes an appropriate secondary reference for his obviousness analysis.

164. To serve as secondary reference in the second step of an obviousness analysis, I understand that a prior art reference must first be "so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Further, I understand that when creating a design by selecting a primary reference and then modifying the appearance by adding an element from a secondary reference, it is important that the design is considered as a whole, and not just the individual parts. *In re Rosen*, 673 F.2d at 391. Lastly, I have been informed that "there must be some suggestion in the prior art to modify the basic design with features from the secondary references. . . That is, the teachings of prior art designs may be combined only when the designs are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other." *In re Borden*, 90 F.3d at 1574-75 (internal citation omitted).

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

165. I disagree that the design of the '274 patent is at all related, let alone "so related", as to suggest the application of its features to the Slim Armor design. To be sure, both the '274 patent and Slim Armor are smartphone cases, but the overall design of the two cases is entirely different.  Mr. Hatch appears to have overlooked this because he has has offered nothing more than a few images, without any view-by-view comparison to the Slim Armor design, to support the fundamental requirement that the '274 patent be "so related" to the Slim Armor to suggest application of features from the '274 patent to the Slim Armor design. Aside from its generally rectilinear shape, I do not believe a designer of ordinary skill in the art would perceive anything about the "bowed" rear surface of the '274 design, its lack of any outer shell-like feature or parting lines, its apertures revealing the iPhone buttons within (it does not incorporate any button covers) or the flat surface with two "racetrack" apertures located at the base of the case's front aperture, which suggests the application of any of the features of the '274 patent to the Slim Armor design.

166. A designer of ordinary skill would, instead, find the '274 patent to be entirely distinct in its overall visual impression, with virtually no similarity or relationship to the Slim Armor other than its rectilinear form. As Mr. Hatch has not provided the required comparison of views to illustrate the foregoing, I have included below a comparison of analogous views, showing the complete lack of visual relationship between the Slim Armor and '274 designs; '274 is not in any way related to the primary reference, such that the appearance of ornamental features in one would suggest the application of those features to the other:

Slim Armor Photo 1                                    '274 Figure 1




InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Slim Armor Photo 5

'274 Figure 3





Slim Armor Photo 6

'274 Figure 4





InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

167. I also find that Mr. Hatch again focuses on the individual elements of the '274 patent in isolation, rather than the required overall visual impression presented by the '274 patent design as a whole. In ¶122 he borrows only the circular aperture from the '274 patent, and in ¶123 the trivial "outward protrusion" surrounding this aperture. In my opinion he has, as I discuss above with respect to similar features incorporated from the '209 patent, improperly brought his combined design "into existence by selecting individual features from prior art and combining them, *In re Rosen*, 673 F.2d at 391 using prior art which only suggests "components of [the patented] design, but not its overall appearance." *In re Harvey*, 12 F.3d at 1063. As discussed above in Section V(C), there are a designer of ordinary skill in the art would understand that there are many alternative ways to display the Apple logo on a smartphone case, should he or she wish to do so. Alternatives include apertures of entirely different shapes and sizes, the use of various translucent or tinted materials on the rear surface of the case, or the application of the logo through various means onto the surface of the case.  Mr. Hatch has posited no reason whatsoever for a designer of ordinary skill to pick a circular aperture that is in the exact same position and is exactly the same size as the aperture shown in the Patents at Issue. Mr. Hatch's assumption that an ordinary designer would pick such a circular aperture is entirely unsupported. Likewise, the trivial "outward protrusion" does not serve the functional purpose that Mr. Hatch assumes it does, and Mr. Hatch has not posited any reason why a designer of ordinary skill in the art would add the "outward protrusion" from a design perspective.

168. Upon making this combination, Mr. Hatch again fails to provide any view-by-view visual analysis or comparison of his hypothetical combination to the Patents at Issue, and does not demonstrate through any visual means that his modifications to the Slim Armor results in a design which in any way "has the same overall visual appearance as the claimed design." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Mr. Hatch merely provides a high-level verbal description at ¶¶125-127 discussing how his hypothetical design incorporates certain features of the Patents at Issue, and excuses the numerous and varied aspects in which it differs from the Patents at issue (including the Volume Buttons and Power Button) as "minor differences" that are "well within the skill of a person of ordinary skill in the art." Mr. Hatch's hypothetical design and his analysis, for the reasons discussed above, falls far short of anything which a designer of ordinary skill in the art would perceive as having the same overall visual appearance as the Patents at Issue, and Mr. Hatch has not provided the required analysis or comparison images to support such a claim. For example, at ¶127 of his report, Mr. Hatch admits that the rectangular buttons shown in the Patents at Issue are of a different design than would be present in his design created by combining the Slim Armor and '274 patent.  To address this, Mr. Hatch again opines without support "that a person of ordinary skill in the art would have been motivated to modify the shape of button to match the needs of the phone button it actuates" and cites to a third and fourth prior art reference that he says contain rectangular buttons.  But, as discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

169. He also fails to explain or demonstrate how his combination has addressed the many other substantial differences between the combination of the Slim Armor and '274 Patent, and the Patents at Issue which he has not even mentioned, such as the way the outer shell wraps to the front of the case, and the flat bezel surrounding the aperture through which the phone would be visible. In my opinion his hypothetical design, for the reasons discussed above, falls far short of anything which a designer of ordinary skill in the art would perceive as having the same overall visual appearance as the Patents at Issue, and

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Mr. Hatch has not provided the required analysis or comparison images to support his claim of substantial similarity. Thus, Mr. Hatch's analysis, even if accepted, fails to show all of the elements of the design claimed in the Patents at Issue are disclosed or suggested by the combination of Slim Armor with the '274 patent.

170. I also struggle to understand why a designer of ordinary skill in the art would find motivation, rationale or any other reason to make the modifications Mr. Hatch suggests in his analysis. As I have shown in my Infringement Report, the Slim Armor design presents a very different overall visual impression than the Patents at Issue. It is, as the name suggests, "slim" in appearance, and a designer of ordinary skill would perceive that it presents an uncluttered, streamlined aesthetic. The Patents at Issue are, in contrast, practiced by commercial embodiments named "Tough Armor." A designer of ordinary skill in the art would perceive these designs as presenting a rugged, "engineered" aesthetic, including the bold, prominent button designs and inclusion of a deeply contoured aperture on the rear (which a designer of ordinary skill would note creates a substantially different impression than the smooth, uninterrupted rear surface of the Slim Armor.)

171. Indeed, Spigen's website encourages consumers to purchase its Slim Armor with the following: "If you're looking for a state-of-the-art protection with a *minimal design*, you've found Spigen's Slim Armor™ Case for the new iPhone SE!... It's *sleek design* and *smooth texture* offers a *modernistic impression*. (emphasis added) https://www.spigen.com/products/iphone-se-case-slim-armor?variant=16522703553 (attached as Exhibit E).  An ordinary designer reading these statements about the Slim Armor would be discouraged from using the Slim Armor as a basis to modify a smartphone case to create a rugged, bulky, "engineered" aesthetic appearance. The Slim Armor thus teaches away from the design shown in the Patents at Issue. Further, a designer of ordinary skill would perceive the '274 patent, in contrast to the Slim Armor, as entirely different in that it features no outer shell wrapping around its back and side surfaces, and a prominently "bowed" rear surface, such that they would consider the '274 patent to present an overall visual impression wholly different from the edgy, angular appearance of the Slim Armor design. Mr. Hatch's secondary reference is in no way "so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other"; in fact, a designer of ordinary skill would understand the opposite to be true.

172. A designer of ordinary skill would understand that Spigen would wish to maintain these novel visual attributes, to appeal to different consumer segments and divergent customer needs, while still providing visual indication to consumers that both lines of cases are manufactured by Spigen. I thus do not agree with Mr. Hatch's contention that a designer of ordinary skill would be at all motivated to make the modifications which he claims are obvious, as they would entirely detract from the visual impression sought by the design of the Slim Armor.  In fact, a designer of ordinary skill would be discouraged from making such modifications, as they would entirely change the visual impression of the Slim Armor design in ways which would surely harm sales, and reduce market interest in its novel design.

173. Mr. Hatch's analysis does not and cannot demonstrated the substantial similarity required between the combination of Slim Armor and the '274 patent and the Patents at Issue to prove his hypothetical design creates the same overall visual appearance as the claimed design, and Mr. Hatch has thus failed to show that the Patents at Issue are rendered invalid through obviousness by Spigen's Slim Armor combined with the '274 patent.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

**D. The U.S. D729,218 Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious**

174. Mr. Hatch's fourth "combination" in his obviousness analysis begins at ¶129 of his report, and in this instance he employs patent D729,218 patent as primary reference, with the '209 patent as secondary reference.

175. Per my discussion above, I have been informed that the '209 patent is not prior art to the Patents at Issue, having been filed (as Mr. Hatch acknowledges) only 10 days before the '607 patent was filed and having one inventor in common with the Patents at Issue. I understand that one of the two inventors of the '209 patent, Dae-Young Kim, is also the inventor of the '607 patent, and that the '209 patent is thus not prior to the Patents at Issue per 35 U.S.C. § 102(b)(2)(c) of the America Invents Act. As such, Mr. Hatch's analysis that "[t]he U.S. D729,218 with the U.S. D772,209 Renders the Asserted Design Patents Obvious" is not valid, and the conclusion he draws from this analysis is meaningless, as he has again used a design (the '209 patent) which is not prior to the Patents at Issue to modify his primary reference. Despite the foregoing, I will for the sake of thoroughness address the substance of Mr. Hatch's analysis.

176. I disagree that a designer of ordinary skill in the art would perceive the design of the '218 patent as at all similar, let alone "basically the same", as the Patents at Issue, which I understand to be a fundamental requirement for a prior art patent to qualify as primary reference in the first step of the obviousness analysis. Mr. Hatch has offered nothing more than a few images, without any visual comparison to the Patents at Issue, to support this prerequisite. Aside from its generally rectilinear shape, I do not believe a designer of ordinary skill in the art would perceive anything about the unusually broad front and rear chamfers and side surfaces of the '218 design, substantially wider side surface, its lack of any outer shell-like feature or parting lines, or the small triangular elements illustrated on its chamfers, which suggests any visual similarity between the '218 patent and the Patents at Issue.

177. Mr. Hatch even cites disclaimed features on the '218 patent, such as the volume buttons, to find a similarity which simply does not exist. An ordinary designer would not consider the designs shown in the '218 patent and Patents at Issue to be "basically the same", or even "sort of the same", but would instead perceive them as entirely different in most every way.

178. As Mr. Hatch has not provided the required comparison of views to illustrate the foregoing, I have included below a comparison of analogous views, showing the complete lack of visual relationship between the '218 and the Patents at Issue From the perspective of an ordinary designer, the '218 is not in any way basically the same as the Patents at Issue because, among its many substantial differences from the Patents at Issue, the '218 features a substantially wider side surface, broad chamfers which appear to be over twice the width of those on the Patents at Issue, prominent triangular elements placed on the surface (or into the surface) of those broad chamfers, a flat rear surface devoid of any circular aperture, and Interface Features which appear nothing at all like those featured on in the Patents at Issue.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

'607 Figure 1



'218 Figure 1



FIG. 1

'607 Figure 5



'218 Figure 3



61

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

'607 Figure 7                    '218 Figure 4

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

'607 Figure 6                                    '218 Figure 5



179. Mr. Hatch also admits that the '218 and Patents at Issue feature some differences, which he characterizes in ¶133 of his report as "minor differences . . . [that] are dictated entirely by function."  Mr. Hatch opines the "buttons [shown in the '218 patent] appear to correspond to the location of buttons on the phone intended to be used with the disclosed case" and concludes that "[t]o move the buttons on a case to be consistent with the location of buttons on a different phone is an entirely functional concern."  But what Mr. Hatch fails to consider, however, is that the design of the buttons (e.g., their shape, size, etc.) is not entirely dictated by their placement or by function.  As I discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

180. A designer of ordinary skill in the art would find that Mr. Hatch has, in his attempt to make the '218 patent look similar to the Patents at Issue, made so many modifications as to disqualify it as a primary reference. If "major modifications would be required to make [the prior art design] look like the claimed designs, it cannot qualify as a [primary reference]." *In re Harvey*, 12 F.3d at 1063.  For example, as shown in the comparisons below between just two views of the '218 patent and the combined design suggested by Mr. Hatch after modifications are added from the '209 patent, the combined design does not even remotely resemble the design of the '218 patent due to all of the modifications that Mr. Hatch suggests making.  Mr. Hatch's combined design, for example, is different from the '218 patent because, among other significant differences, it now features an outer shell which wraps around its back and side surfaces, with lateral parting lines at its upper and lower edges, much more narrow side surfaces, a large circular aperture on its rear surface with a protruding "rim", and chamfers which are no longer adorned by ornamental triangular elements.  An ordinary designer would not make these major modifications to the design shown in the '218 prior art, and this disqualifies the '218 patent as a correct or appropriate primary prior art reference.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

Mr. Hatch's Hypothetical Design

'218 Figures 3 and 7






181. Per my analysis above, the '218 patent cannot serve as a proper primary reference for Mr. Hatch's obviousness analysis, making it impossible for the analysis Mr. Hatch employs in connection with the '218 patent to show that the Patents at Issue are invalid. While I believe an appropriate obviousness analysis cannot be made without a correct primary reference, I will for the sake of thoroughness address Mr. Hatch's attempt to do so.

182. In the second step of the obviousness analysis, I also find that Mr. Hatch again focuses on the individual elements of the '209 patent in isolation, rather than the required overall visual impression presented by the '209 patent design as a whole. In ¶¶135 to 137, for example, Mr. Hatch "borrows" the '209 patent's circular aperture, trivial "outward protrusion" on its outer shell, and parting lines, but he never explains why a designer of ordinary skill in the art would be motivated to apply these design elements to the '218 patent, and I understand that he has improperly brought his combined design "into existence by selecting individual features from prior art and combining them," *In re Rosen*, 673 F.2d at 391, using prior art which at most suggests "[isolated] components of [the patented] design, but not its overall appearance." *In re Harvey*, 12 F.3d at 1063.

183. As discussed above in Section V(C), there are a designer of ordinary skill in the art would understand that there are many alternative ways to display the Apple logo on a smartphone case, should he or she wish to do so. Alternatives include apertures of entirely different shapes and sizes, the use of various translucent or tinted materials on the rear surface of the case, or the application of the logo through various means onto the surface of the case. Mr. Hatch has posited no reason whatsoever for a designer of ordinary skill to pick a circular aperture that is in the exact same position and is exactly the same size as the aperture shown in the Patents at Issue. Mr. Hatch's assumption that an ordinary designer would pick such a circular aperture is entirely unsupported.

184. Likewise, the trivial "outward protrusion" does not serve the functional purpose that Mr. Hatch assumes it does, and Mr. Hatch has not posited any reason why a designer of ordinary skill in the art would add the "outward protrusion" from a design perspective.

64

185. Mr. Hatch also states no reason for adding the parting lines to the '218 design.  A designer of ordinary skill would not add these parting lines to the '2018 patent for many ornamental reasons, including the visual dissonance they would cause in combination and close proximity to the triangular shapes shown on the outside edges of the '218 patent design.

186. In ¶137 of his report, Mr. Hatch also opines "[a] person of ordinary sill [sic; skill] in the art would also be motivated to modify the back surface to include a back plate in the manner shown in the secondary reference for example, to provide additional structure, rigidity or as the Spigen marketing stated 'shock-absorption ….and scratch protection'. Furthermore, motivation would come from the ability to change materials and colors for the back plates, thus creating further interest and market demand." This part of Mr. Hatch's analysis is especially unclear because this section of his report is devoted to discussing the '218 and '209 patents, not any "Spigen marketing" materials. The '218 and '209 patents do not provide any support for Mr. Hatch's conclusions stated in the foregoing sentences. Mr. Hatch's analysis here makes clear that he is employing improper hindsight to stitch together individual elements found in different prior art designs to try to arrive at the novel designs claimed in the Patents at Issue.

187. Upon making this combination, Mr. Hatch again fails to provide any view-by-view visual analysis or comparison of his hypothetical design to the Patents at Issue, and does not demonstrate through any visual means that his modifications to the '218 patent result in a design which in any way "has the same overall visual appearance as the claimed design." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Mr. Hatch merely provides a high-level verbal description discussing how his hypothetical design incorporates certain features of the Patents at Issue, and excuses the numerous and varied aspects in which it differs from the Patents at issue as "minor differences" that are "well within the skill of a person of ordinary skill in the art." Mr. Hatch's analysis fails to show that the combined design creates a design that has the same overall visual appearance as the design claimed in the Patents at Issue. For example, at ¶140 of his report, Mr. Hatch admits that the rectangular buttons shown in the Patents at Issue are of a different design than would be present in his design created by combining the '218 and '209 patents. To address this, Mr. Hatch opines "relocating one of the buttons from the top surface of the case to a side surface of the case to correspond to the location of a button on the underlying phone would not only be obvious but an alteration that is entirely dictated by function." But, as discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

188. Mr. Hatch also fails to explain or demonstrate how his combination has addressed the many other substantial differences between the combination of the '218 and '209 patents, and the Patents at Issue which he has not even mentioned, such as the way the outer shell wraps to the front of the case, and the flat bezel surrounding the aperture through which the phone would be visible. In my opinion his hypothetical design, for the reasons discussed above, falls far short of anything which a designer of ordinary skill in the art would perceive as having the same overall visual appearance as the Patents at Issue; indeed a designer of ordinary skill would find the lack of any visual similarity particularly striking with respect to this hypothetical design combination, and Mr. Hatch has not provided any of the visual comparison images required to support his claim of substantial similarity. Thus, Mr. Hatch's analysis, even if accepted, fails to show all of the elements of the design claimed in the Patents at Issue are disclosed or suggested by the combination of the '218 and '209 patents.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

189. I also disagree that a designer of ordinary skill in the art would find suggestion, motivation, rationale or any other reason to make the modifications Mr. Hatch suggests in his analysis. As discussed above, the '218 patent presents a wholly different overall visual impression than the Patents at Issue. It is bulky, broad and oversized in its appearance, and a designer of ordinary skill would perceive that it presents a highly ruggedized aesthetic. A designer of ordinary skill in the art would, in contrast, perceive the Patents at Issue as presenting a refined, streamlined interpretation of a rugged case. Indeed, Spigen's website encourages consumers to purchase its Tough Armor with the following: "The Tough Armor® case for the iPhone 5/5S provides impact absorption while staying *less bulky than other protective cases*. (emphasis added) https://www.spigen.com/products/iphone-5s-5-case-tough-armor?variant=1165533129 (attached as Exhibit F). A designer of ordinary skill would understand that Spigen would wish to maintain these novel visual attributes, to appeal to particular consumer segments and customer needs. I thus do not agree with Mr. Hatch's contention that a designer of ordinary skill would be motivated to make the modifications he claims are obvious, as they would entirely detract from the visual impression sought by the design of both the '218 patent and the Patents at Issue, resulting in the odd "hybrid" design Mr. Hatch presents that is neither as "bulked up" and brutish as the '218 patent, nor as trim and refined as the Patents at Issue, but instead resides in some middle ground of visual impression which no designer of ordinary skill would deem substantially similar to the Patents at Issue.

190. Mr. Hatch's analysis has not and cannot demonstrate the substantial similarity required between the combination of the '218 and '209 patents and the Patents at Issue to prove his hypothetical design creates the same overall visual appearance as the claimed design, and Mr. Hatch has thus failed to show that the Patents at Issue are rendered invalid through obviousness by the combination of the '218 and '209 patents.

**E.   The Spigen Ultra Hybrid Combined with the U.S. D772,209 Does Not Render the Patents at Issue Obvious**

191. Mr. Hatch's final "combination" in his obviousness analysis begins at ¶143 of his report, and in this instance he employs Spigen's "Ultra Hybrid" case as primary reference, with the '209 patent again used as his secondary reference.

192. Per my discussion above, I have been informed that the '209 patent is not prior art to the Patents at Issue, having been filed (as Mr. Hatch acknowledges) only 10 days before the '607 patent was filed and having one inventor in common with the Patents at Issue. I understand that one of the two inventors of the '209 patent, Dae-Young Kim, is also the inventor of the '607 patent, and that the '209 patent is thus not prior to the Patents at Issue per 35 U.S.C.§ 102(b)(2)(C) of the America Invents Act. As such, I understand that Mr. Hatch's analysis that "[t]he Spigen Ultra Hybrid with the U.S. D772,209 Renders the Asserted Design Patents Obvious" is not valid, as he has again used a design (the '209 patent) which is not prior to the Patents at Issue to modify his primary reference. Despite the foregoing, I will for the sake of thoroughness address the substance of Mr. Hatch's analysis.

193. I disagree that a designer of ordinary skill in the art would perceive the design of Spigen's Ultra Hybrid case as at all similar, let alone "basically the same", as the Patents at Issue, which I understand to be a fundamental requirement for a prior art design to qualify as primary reference in the first step of the obviousness analysis. Mr. Hatch has offered nothing more than two images, without any view-by-view comparison to the Patents at Issue, to support this prerequisite, so he has not in any way met the burden of demonstrating that a designer of ordinary skill in the art would perceive the Ultra Hybrid design as "basically the same."

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

194. As Mr. Hatch has failed to provide the required comparison views of the Ultra Hybrid to the Patents at Issue, I have augmented Mr. Hatch's images with additional views from Spigen's website below, and compare them directly to the Patents at Issue, to clearly show that aside from its generally rectilinear shape, a designer of ordinary skill in the art would not find anything about the Ultra Hybrid to be basically the same as the Patents at Issue. The case's entirely transparent rear surface, its lack of any outer shell-like feature, or parting lines, its flat front bezel, and prominently raised radial "feet" at each corner of the rear surface, would not suggest any visual similarity whatsoever to an ordinary designer viewing the Ultra Hybrid case and the Patents at Issue.

Spigen Ultra Hybrid for iPhone 5/5s/SE                '607 Patent Figure 3

(Note that the "parting lines" and logo are actually the back surface of the iPhone, as seen through the transparent Ultra Hybrid case. They are NOT elements of the Ultra Hybrid case design.)





# InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

Spigen Ultra Hybrid for iPhone 5/5s/SE                    '607 Figure 1

 

Detail showing raised "Feet" at each corner



195. An ordinary designer would not consider the Ultra Hybrid to be "basically the same", or even "sort of the same", as the Patents at Issue, but would instead perceive them as entirely different in most every way. Further, a designer of ordinary skill in the art would find that Mr. Hatch has, in his attempt to make the Ultra Hybrid design look similar to the Patents at Issue, made so many modifications to its design as to disqualify it as a primary reference. (if "major modifications would be required to make [the prior art design] look like the claimed designs, it cannot qualify as a [primary reference]."  *In re Harvey*, 12 F.3d 1061, 1063 (Fed Cir. 1993) As such, the Ultra Hybrid patent cannot serve as a proper primary reference for obviousness analysis, making the analysis for which Mr. Hatch employs the Ultra Hybrid design, as I understand the legal principles discussed above, invalid.

196. Mr. Hatch also admits that the Ultra Hybrid and the Patents at Issue feature some differences, which he characterizes in ¶147 of his report as "minor differences . . . [that] are dictated entirely by function." Mr. Hatch opines the "buttons [shown in the Ultra Hybrid] appear to correspond to the location of buttons on the phone intended to be used with the disclosed case" and concludes that "[t]o move the buttons on a case to be consistent with the location of buttons on a different phone is an entirely functional concern." But what Mr. Hatch fails to consider, however, is that the design of the buttons (e.g., their shape, size,

**Informed**Innovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

etc.) is not entirely dictated by their placement or by function. As I discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

197. A designer of ordinary skill in the art would find that Mr. Hatch has, in his attempt to make the Ultra Hybrid look similar to the Patents at Issue, made so many modifications as to disqualify it as a primary reference. If "major modifications would be required to make [the prior art design] look like the claimed designs, it cannot qualify as a [primary reference]." *In re Harvey*, 12 F.3d at 1063. For example, as shown in the comparisons below between just two views of the Ultra Hybrid and the combined design suggested by Mr. Hatch after modifications are added from the '209 patent, the combined design does not even remotely resemble the design of the Ultra Hybrid due to all of the modifications that Mr. Hatch suggests making. Mr. Hatch's combined design, for example, is different from the 'Ultra Hybrid design because it no longer features a prominent, uninterrupted transparent rear surface, instead now including an outer shell which wraps around its rear and side surfaces, lateral horizontal parting lines at the top and bottom edges of that shell, and a large circular aperture, and is also missing the protruding radiused "feet" at each corner of its rear surface. An ordinary designer would not make these major modifications to the Ultra Hybrid design, and this disqualifies the Ultra Hybrid case as a correct or appropriate primary prior art reference.

Mr. Hatch's Hypothetical Design                    Ultra Hybrid

 

198. Per my analysis above, the Ultra Hybrid cannot serve as a proper primary reference for Mr. Hatch's obviousness analysis, making it impossible for the analysis Mr. Hatch employs in connection with the Ultra Hybrid to show that the Patents at Issue are invalid. While I believe an appropriate obviousness analysis cannot be made without a correct primary reference, I will for the sake of thoroughness address Mr. Hatch's attempt to do so.

199. In addition to my opinion above, that the Ultra Hybrid is not a correct or appropriate primary reference to be used in the first step of an obviousness analysis because it is not "basically the same" as the Patents at Issue, and that accordingly the obviousness analysis cannot proceed further, I also disagree that a designer of ordinary skill in the art would find that the design claimed by the '209 patent makes an appropriate secondary reference for his obviousness analysis.

200. To serve as secondary reference in the second step of an obviousness analysis, I understand that a prior art reference must first be "so related to the primary reference that appearance of certain ornamental features in one would suggest the application of those features to the other." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Further, I understand that when creating a design by selecting a primary reference and then modifying the appearance by adding an element from a secondary reference, it is important that the design is considered as a whole, and not just the individual parts. *In re Rosen*, 673 F.2d at 391. Lastly, I have been informed that "there must be some suggestion in the prior art to modify the basic design with features from the secondary references. . . That is, the teachings of prior art designs may be combined only when the designs are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other." *In re Borden*, 90 F.3d at 1574-75 (internal citation omitted).

201. I disagree that the design of the '209 patent is at all related, let alone "so related", as to suggest the application of its features to the Ultra Hybrid design. To be sure, both the '209 patent and Ultra Hybrid are smartphone cases, but the overall design of the two cases is entirely different.  Mr. Hatch appears to have overlooked this because he has has offered nothing more than a few images, without any view-by-view comparison to the Ultra Hybrid design, to support the fundamental requirement that the '209 patent be "so related" to the Ultra Hybrid to suggest application of features from the '209 patent to the Ultra Hybrid design. Aside from its generally rectilinear shape, I do not believe a designer of ordinary skill in the art would perceive anything about the '209 design's overall rounded visual impression, with its fully radiused side surfaces, which suggests the application of any of the features of the '209 patent to the Ultra Hybrid design.

202. A designer of ordinary skill would, instead, find the '209 patent to be entirely distinct in its overall visual impression, with virtually no similarity or relationship to the Ultra Hybrid other than its rectilinear form; '209 is not in any way related to the primary reference, such that the appearance of ornamental features in one would suggest the application of those features to the other:

203. In the second step of the obviousness analysis, I also find that Mr. Hatch again focuses on the individual elements of the '209 patent in isolation, rather than the required overall visual impression presented by its design as a whole. At ¶¶149 to 152 of his report, for example, he borrows the '209 patent's circular aperture, trivial "outward protrusion" on its outer shell, and parting lines, but he never explains why a designer of ordinary skill in the art would be motivated to apply these elements to the Ultra Hybrid design aside from his general claim that it would be "obvious" to do so, would provide "scratch protection" (a functional, not ornamental, benefit), or offer "color options" which would no doubt create market demand. In my opinion, Mr. Hatch has, as I discuss above, improperly brought his combined design "into existence by selecting individual features from prior art and combining them, *In re Rosen*, 673 F.2d at 391 using prior art which only suggests "components of [the patented] design, but not its overall appearance." *In re Harvey*, 12 F.3d at 1063.

204. The is no reason for a a designer of ordinary skill to add a circular aperture to the Ultra Hybrid because the Ultra Hybrid has a clear back and the Apple logo can already be seen. Further, as discussed above in Section V(C), there are a designer of ordinary skill in the art would understand that there are many alternative ways to display the Apple logo on a smartphone case having a solid back, should he or she wish to do so. Alternatives include apertures of entirely different shapes and sizes, the use of various translucent or tinted materials on the rear surface of the case, or the application of the logo through various means onto the surface of the case. Mr. Hatch has posited no reason whatsoever for a

designer of ordinary skill to pick a circular aperture that is in the exact same position and is exactly the same size as the aperture shown in the Patents at Issue.

205. Likewise, the trivial "outward protrusion" does not serve the functional purpose that Mr. Hatch assumes it does, and Mr. Hatch has not posited any reason why a designer of ordinary skill in the art would add the "outward protrusion" from a design perspective.  Mr. Hatch also states no reason for adding the outer shell and parting lines to the Ultra Hybrid.

206. In ¶151 of his report, Mr. Hatch also opines "[a] person of ordinary skill in the art would also be motivated to modify the back surface to include a back plate in the manner shown in the secondary reference for example, to provide additional structure, rigidity or as the Spigen marketing stated 'shock-absorption' ….and scratch protection'. Furthermore, motivation would come from the ability to change materials and colors for the back plates, thus creating further interest and market demand." This part of Mr. Hatch's analysis is especially unclear because this section of his report is devoted to discussing the Ultra Hybrid and '209 patents, not any unrelated "Spigen marketing" materials. The Ultra Hybrid and '209 patents do not provide any support for Mr. Hatch's conclusions stated in the foregoing sentences. Mr. Hatch's analysis here makes clear that he is employing improper hindsight to stitch together individual elements found in different prior art designs to try to arrive at the novel designs claimed in the Patents at Issue.

207. Upon making this combination, Mr. Hatch again fails to provide any view-by-view visual analysis or comparison of his hypothetical design to the Patents at Issue, and does not demonstrate through any visual means that his modifications to the Ultra Hybrid case result in a design which a designer of ordinary skill would in any way perceive to "has the same overall visual appearance as the claimed design." *Apple*, 678 F.3d at 1329-30 (internal citations omitted). Mr. Hatch merely provides a high-level verbal description discussing how his hypothetical design incorporates certain features of the Patents at Issue, and excuses the numerous and varied aspects in which it differs from the Patents at issue as "minor differences" that are "well within the skill of a person of ordinary skill in the art." Mr. Hatch's analysis fails to show that the combined design creates a design that has the same overall visual appearance as the design claimed in the Patents at Issue. For example, at ¶155 of his report, Mr. Hatch admits that the rectangular buttons shown in the Patents at Issue are of a different design than would be present in his design created by combining the Ultra Hybrid and '209 patents. To address this, Mr. Hatch opines "relocating one of the buttons from the top surface of the case to a side surface of the case to correspond to the location of a button on the underlying phone would not only be obvious but an alteration that is entirely dictated by function." But, as discussed above in Section V(E), many shapes and sizes of buttons that differ from those shown in the Patents at Issue could have been implemented, but Mr. Hatch has posited no reason (other than the use of impermissible hindsight) for selecting the exact shape and size buttons shown in the Patents at Issue.

208. Mr. Hatch also fails to explain or demonstrate how his combination has addressed the many other substantial differences between the combination of the Ultra Hybrid and '209 patent, and the Patents at Issue which he has not even mentioned, such as the existence of an outer shell which wraps around the back and sides to the front of the case, with lateral parting lines prominently visible at the upper and lower edges of this shell. In my opinion his hypothetical design, for the reasons discussed above, falls far short of anything which a designer of ordinary skill in the art would perceive as having the same overall visual appearance as the Patents at Issue, and Mr. Hatch has not provided the required visual comparison to support his claim of substantial similarity. Thus, Mr. Hatch's analysis, even if accepted, fails to show all of the elements of the design claimed in the Patents at Issue are disclosed or suggested by the combination of the Ultra Hybrid and '209 patent.

209. I also disagree that a designer of ordinary skill in the art would find suggestion, motivation, rationale or any other reason to make the modifications Mr. Hatch suggests in his analysis. As discussed above, the Ultra Hybrid case presents a wholly different overall visual impression than the Patents at Issue. It is slim, sleek and almost "invisible" in its translucency, and a designer of ordinary skill would perceive that its prominent transparent features, in particular, contribute a lightness to the design, presenting an overall modern and minimal aesthetic. A designer of ordinary skill in the art would perceive the Patents at Issue, in contrast, presenting a refined interpretation of a rugged case. The Patents at Issue do not appear light or minimal, but instead present a visual substantiality and solidity that a designer of ordinary skill would regard as entirely distinct from the visual impression of the Ultra Hybrid design.

210. Indeed, Spigen's website describes the Ultra Hybrid as "The perfect blend of a durably soft TPU bumper and a *clear PC back panel* for full enclosure of the device… maintain the *minimalistic look* of the iphone for the obvious choice in *clear and comfortable* protection." (emphasis added) https://www.spigen.com/products/iphone-5s-5-case-ultra-hybrid?variant=1166640421 (attached as Exhibit G). An ordinary designer reading these statements about the Ultra Hybrid would be discouraged from using the Ultra Hybrid as a basis to modify a smartphone case to create a rugged, bulky, "engineered" aesthetic appearance. The Ultra Hybrid thus teaches away from the design shown in the Patents at Issue. Further, a designer of ordinary skill would understand that Spigen would wish to maintain these novel visual attributes, to appeal to particular consumer segments and customer needs. Spigen sells an "Ultra Hybrid" design along with its "Tough Armor" design for a reason – they present very different visual impressions, to appeal to different purchasers who are looking for differently designed cases. I thus do not agree with Mr. Hatch's contention that a designer of ordinary skill would be motivated to make the modifications which he claims are obvious, as they would entirely detract from the visual impression sought by the design of the Ultra Hybrid case. In fact, a designer of ordinary skill would be discouraged from making such modifications, as they would entirely change the impression of the Ultra Hybrid case in ways which would surely harm sales and reduce market interest in its novel design.

211. Mr. Hatch's analysis has not and cannot demonstrate the substantial similarity required between the combination of Spigen's Ultra Hybrid and the '209 patent and the Patents at Issue to prove his hypothetical design creates the same overall visual appearance as the claimed design, and Mr. Hatch has thus failed to show that the Patents at Issue are rendered invalid through obviousness by Spigen's Ultra Hybrid combined with the '209 patent.

## X. Objective Evidence of Non-Obviousness

212. At ¶158 of his report, Mr. Hatch states that "Secondary Considerations Do Not Alter My Conclusions." Per the foregoing discussion, Mr. Hatch has not supported anything approaching a showing of obviousness through the analysis he presents. As such, I have been informed that secondary considerations, which might otherwise be offered to overcome such a showing, are thus not even relevant to his analysis. *KSR International v Teleflex, Inc.*, 550 US 398, 405 (2007); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010); *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310 (Fed. Cir. 2010). Despite the foregoing, I will briefly address the substance of Mr. Hatch's analysis and secondary considerations of nonobviousness.

213. At ¶159, for example, Mr. Hatch comments that he sees "no evidence ... [of] teaching away" by the prior art. I disagree with Mr. Hatch's conclusion because, as my analysis above shows, the prior art Mr. Hatch discusses in his Invalidity Report discloses designs

# EXHIBIT 2, p. 73

## TO THE DECLARATION OF

## BRIAN ARNOLD

## FILED UNDER SEAL

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018    773.517.1862    joel@informedinnovationinc.com

ornamental nature of the Patents at Issue, the ornamental contribution any such functional elements make to the visual impression of the Patents at Issue, or the eligibility of the designs claimed by the Patents at Issue for protection through design patents.

(b)  Mr. Hatch's analysis of the functionality of the Patents at Issue is seriously undermined by his focus on only discreet elements of the designs in isolation, and he fails to apply the proper analysis which must account for the design in its entirety, including the ornamental contributions made by functional elements to the overall visual impression of the claimed designs.

(c)  Mr. Hatch erroneously concludes that the Patents at Issue are invalid as either anticipated or obvious. Mr. Hatch's analysis is wholly unsupported by the prior art, by the comparisons he makes to the prior art, or by the hypothetical design combinations he presents, as explained in detail above.

(d)  Mr. Hatch's confusion with respect to the perspective from which critical assessments of similarity must be made, particularly in the context of his anticipation and obviousness analysis, raises serious concerns about the methodology he has used to reach his conclusions, and seriously undermines his conclusions.

(e)  Mr. Hatch's analysis is flawed by his reliance upon designs he asserts as prior art to the Patents at Issue which are not prior, primary references which a designer of ordinary skill would not find to be "basically the same" as the Patents at Issue, and inappropriate secondary references which a designer of ordinary skill would not be motivated to combine with his primary references. The hypothetical combinations he creates are thus fundamentally invalid, and would not be perceived as substantially similar to the Patents at Issue by a designer of ordinary skill, even if that were not the case.

(f)  In failing to provide comprehensive visual comparisons between the Patents at Issue and the prior art he presents, and between the Patents at issue and the hypothetical design combinations he creates, and instead offering only a few isolated images without any comparative context, Mr. Hatch has not provided the analysis or evidence required to support his claims of invalidity. Mr. Hatch offers no visual evidence whatsoever, instead drawing conclusions with respect to alleged visual similarity through verbal descriptions, and a limited selection of images which portray an inaccurate and incomplete representation of the designs he presents for analysis.

InformedInnovation

2176 W. 24th Street, Los Angeles, CA 90018   773.517.1862   joel@informedinnovationinc.com

219. In response to arguments which may be proposed by the Defendants, I reserve the right to provide supplemental reports to this report at a later date, and may use images, documents and other items referenced or cited in this report and my Infringement Report, as well as other demonstrative materials, during my testimony at trial.

Respectfully Submitted,

**Joel Delman**
October 16, 2018